United States District Court
Southern District of Texas
FILED

MAR 1 8 2005

Michael N. Milby
Clerk of Court

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## AT BROWNSVILLE

CRISTINA MUÑOZ,

      Plaintiff,

v.

                         Civil Action No. 1:04-CV-00066

THE LAREDO COCA-COLA BOTTLING
COMPANY, INC.,                 Judge Andrew Hanen

      Defendant.

---

## DEFENDANT LAREDO COCA-COLA BOTTLING COMPANY, INC.'S MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

WILLETTE & GUERRA, L.L.P.
EILEEN M. LEEDS
Texas State Bar No. 00791093
USDC No. 16799
1534 East 76th Street, Suite 200
Brownsville, TX 78520
Telephone: (956) 541-1846
Facsimile: (956) 541-1893

-and-

MILLER & MARTIN PLLC

By: _____
STACIE L. CARAWAY
Tennessee State Bar No. 17287
Attorney In Charge
Admitted to Appear *Pro Hac Vice*

Suite 1000, Volunteer Building
832 Georgia Avenue
Chattanooga, TN 37402-2289
Telephone: (423) 756-6600
Facsimile: (423) 785-8293

Attorneys for Defendant
The Laredo Coca-Cola Bottling Company, Inc.

Comes now Defendant, The Laredo Coca-Cola Bottling Company, Inc., by and through counsel, and, pursuant to Rule 56 of the *Federal Rules of Civil Procedure*, hereby moves this Honorable Court to grant summary judgment in its favor as to all of the claims made by Plaintiff Cristina Munoz in this case. In support of this Motion, Defendant relies upon the pleadings filed with this Court and the entire record in this matter, including, but not limited to, excerpts from the deposition transcript of Plaintiff Cristina Munoz, taken and transcribed on January 5, 2005, along with the affidavit of Denise Martinez dated March 15, 2005 and the exhibits thereto, the affidavit of Lee Guerra dated March 16, 2005, the affidavit of Carlos Ramos dated March 17, 2005, the affidavit of Cruz Rangel dated March 16, 2005, the affidavit of Felipe Sandoval dated March 15, 2005 and the Memorandum of Law filed herewith. Based on these supporting materials, Defendant submits that there is no genuine issue of material fact regarding any of the claims made against it by Plaintiff Cristina Munoz and Defendant is entitled to summary judgment as a matter of law in this case.

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing pleading upon opposing counsel as required by law by delivering a copy thereof via certified mail, with sufficient postage affixed thereto to ensure delivery to the following:

> Miguel Salinas, Esq.
> Law Office of Miguel Salinas
> 803 Old Port Isabel Road
> Brownsville, Texas 78521

This _18th_ day of March, 2005.

By: _Eileen M. Leeds_

2085970_1.DOC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
AT BROWNSVILLE

CRISTINA MUÑOZ,

      Plaintiff,

v.

                    Civil Action No. 1:04-CV-00066

THE LAREDO COCA-COLA BOTTLING
COMPANY, INC.,                Judge Andrew Hanen

      Defendant.

## DEFENDANT LAREDO COCA-COLA BOTTLING COMPANY, INC.'S
## MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

WILLETTE & GUERRA, L.L.P.
EILEEN M. LEEDS
Texas State Bar No. 00791093
USDC No. 16799
1534 East 76th Street, Suite 200
Brownsville, TX 78520
Telephone: (956) 541-1846
Facsimile: (956) 541-1893

-and-

MILLER & MARTIN PLLC

By: _____
      STACIE L. CARAWAY
      Tennessee State Bar No. 17287
      Attorney In Charge
      Admitted to Appear *Pro Hac Vice*

Suite 1000, Volunteer Building
832 Georgia Avenue
Chattanooga, TN 37402-2289
Telephone: (423) 756-6600
Facsimile: (423) 785-8293

Attorneys for Defendant
The Laredo Coca-Cola Bottling Company, Inc.

2075857_1.DOC

## **TABLE OF CONTENTS**

I.      Statement of the Nature and Stage of the Proceeding                    1

II.     Statement of Facts                                                      1

    A.      Background to the Circumstances
        Giving Rise to the Plaintiff's Termination                      1

    B.      Plaintiff Complains about Mr. Guerra                            3

    C.      Defendant Investigates Malfeasance by Plaintiff                 8

III.    Summary of Argument                                                     11

IV.     Legal Argument                                                          11

    A.      The Legal Standard for Granting Summary Judgment                11

    B.      Plaintiff's Sexual Harassment Claim Should Be Dismissed         12

        1.      The alleged harassment did not affect a term, condition or
            privilege of the Plaintiff's employment                 12

        2.      Defendant took appropriate remedial action upon learning
            of the Plaintiff's allegations of harassment            14

    C.      Plaintiff's Retaliation Claims Should Be Dismissed              15

        1.      The Plaintiff's co-workers' alleged ostracism toward
            her does not constitute an adverse employment action    15

        2.      Plaintiff's termination was unconnected with her
            protected activity                                      16

    D.      Plaintiff's Intentional Infliction of Emotional Distress Claim
        Should Be Dismissed                                             19

V.      Conclusion                                                              20

i

## TABLE OF CITATIONS

**Cases:**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252,
106 S. Ct. 2505, 91 L. Ed.2d 202 (1986)                                    11

Brazoria County v. EEOC, 391 F.3d 685, 692 (5th Cir. 2004)                 15, 16

Celotex Corp. v. Catrett, 477 U.S. 317, 322,
106 S. Ct. 2548, 91 L. Ed.2d 265 (1986)                                    11

Deines v. Dept. of Prot. & Reg. Serv., 164 F.3d 277, 281 (5th Cir. 1999)    19

Dutton v. University Healthcare System, L.L.C., 2004 WL 1078908,
*9 (E.D. La. May 12, 2004)                                                 17

Green v. Administrators of Tulane Educ. Fund, 284 F.3d 642, 656
(5th Cir. 2002)                                                            12, 16

Hall v. Pitney Bowes, Inc., 2004 WL 389093,
*11 (N.D. Tex. Feb. 27, 2004)                                              16, 18-19

Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22, 114 S. Ct. 367,
126 L.Ed.2d 295 (1993)                                                     12

Hockman v. Westward Communications, LLC, ___ F.3d ___,
2004 WL 2980351, *5 (5th Cir. Dec. 22, 2004)                               12, 13

Hoffman-La Roche Inc. v. Zeltwanger, 144 S.W.3d 438, 447 (Tex. 2004)       19

Little v. BP Exploration, 265 F.3d 357, 363-64 (6th Cir. 2001)             18-19

Long v. Eastfield College, 88 F.3d 300, 307 (5th Cir. 1996)                16, 19

Manatt v. Bank of America, 339 F.3d 792, 803 (9th Cir. 2003)               16

Mato v. Baldauf, 267 F.3d 444, 450 (5th Cir. 2001)                         17

Medina v. Ramsey Steel Co., Inc., 238 F.3d 674, 685 (5th Cir. 2001)        18

Rios v. Rossotti, 252 F.3d 375, 380 (5th Cir. 2001)                        17

Roark v. Kidder, Peabody & Co., 959 F. Supp. 379, 384 (N.D. Tex. 1997)     13

Septimus v. University of Houston, ___ F.3d ___,
2005 WL 237351, *7 (5th Cir. Feb. 2, 2005)                                 12, 15, 17

Shepherd v. Comptroller of Pub. Accts., 168 F.3d 871, 874 (5th Cir. 1999)   12, 13

Smith v. Allen Health Systems, Inc., 302 F.3d 827, 834 (8th Cir. 2002)     17, 19

<u>Wright v. Western Elec. Co., Inc.</u>, 664 F.2d 959, 964 (5th Cir. 1981)          19

**<u>Statutes</u>:**

42 U.S.C. §§2000, *et seq.*          1

Comes now, Defendant, Laredo Coca-Cola Bottling Company, Inc., and, in support of its Motion for Summary Judgment, submits the following Memorandum of Law.

## I.   Statement of the Nature and Stage of the Proceeding

Plaintiff, Christina Munoz ("Plaintiff"), filed suit against Defendant, Laredo Coca-Cola Bottling Company, Inc. ("Defendant"), on April 30, 2004. The Plaintiff's Complaint alleges that she was sexually harassed in violation of Title VII of the Civil Rights Act of 1964, 42 *U.S.C.* §§ 2000, *et seq.* ("Title VII"), that Defendant unlawfully retaliated against her for engaging in activity protected by Title VII, and that Defendant intentionally inflicted emotional distress upon her. Defendant has filed an Answer denying all of the Plaintiff's claims. No other depositions aside from the Plaintiff's have been taken in this case.

Now before the Court is Defendant's Motion for Summary Judgment. For the reasons set forth below, there are no genuine issues as to any material fact and Plaintiff is unable to establish the requisite elements for proving any of her claims as a matter of law.

## II.   Statement of Facts

### A.   Background to the Circumstances Giving Rise to the Plaintiff's Termination.

Defendant is a bottler and distributor of soft drinks and other products. (Guerra Aff., ¶ 3).[1] Plaintiff was employed by Defendant from September 12, 1994, until October 3, 2002. (Martinez Aff., ¶¶ 4 and 62).[2] At all pertinent times, Plaintiff served as a Branch Secretary at Defendant's McAllen, Texas facility. (Id. at ¶ 5). As a Branch Secretary, Plaintiff's duties included providing administrative assistance to the Branch Manager, performing general office duties, reviewing the McAllen facility's bills before forwarding them to the Branch Manager for approval, creating payment requests for the same, processing orders placed by facility employees from the Company store and payroll deductions relating to purchases made through other Company programs and assisting with coordinating special events and

---

[1]   All references to "Guerra Aff." are to the affidavit of Lee Guerra dated March 16, 2005 along with the paragraph number(s) referenced therein. This affidavit is attached as **Exhibit C** hereto.

[2]   All references to "Martinez Aff." are to the affidavit of Denise Martinez dated March 15, 2005 along with the paragraph number(s) referenced therein. This affidavit is attached as **Exhibit B** hereto.

special orders for customers as requested by the facility sales personnel. (Id.).

Until August of 2002, Plaintiff reported to Branch Manager Ruben Valdez. (Id. at ¶¶ 36 and 40). During 2001 and 2002, Plaintiff was engaged in an extra-marital affair with Mr. Valdez. (Pl. Depo., p. 16, l. 9 - p. 17, l. 11).[3] In August of 2002, Mr. Valdez applied for and received a transfer to Defendant's Houston facility and, as a result, he was replaced by Lee Guerra. (Martinez Aff., ¶ 40).

Before this management change at Defendant's McAllen facility, Defendant's Human Resources department had noticed some serious irregularities concerning the Plaintiff's handling of office expenses versus her personal expenses. (Id. at ¶¶ 32 - 39). Specifically, Denise Martinez, the Employee Relations Manager for the McAllen facility, noticed that, even though Plaintiff had a Company cell phone, there were never any payroll deduction forms completed for any cell phone use overages relating to her use of this phone. (Id.). When Ms. Martinez questioned Plaintiff about this, Plaintiff explained that she had been paying for her overages directly to Nextel, the Company's cell phone service provider. (Id.). Ms. Martinez contacted Nextel to confirm this information, but was told no other payments aside from the Company one had been paid toward the Company Nextel account. (Id.). Ms. Martinez also had noted that the Plaintiff's name had been whited out on another recent Nextel bill. (Id.). When Ms. Martinez questioned Plaintiff about this, Plaintiff had no explanation as to how or why her name had been whited off the bill. (Id.). Ms. Martinez reported the results of her investigations into these situations as well as others involving the facility credit card to the McAllen facility Branch Manager at that time, Mr. Valdez. (Id.). However, because of the inappropriate relationship which was going on in 2002 between Plaintiff and Mr. Valdez, no action was taken against Plaintiff concerning these irregularities. (Id.; Pl. Depo., p. 16, l. 9 - p. 17, l. 11).

When Mr. Guerra replaced Mr. Valdez in August of 2002, Ms. Martinez advised Mr. Guerra that he should "keep an eye out" for the Plaintiff's dealings with facility bills based on these prior

---

[3]    All references to the Plaintiff's deposition transcript dated January 5, 2005 will be to "Pl. Depo." along with the page and line numbers of the transcript or the exhibit number upon which such references appear therein. The excerpts of this transcript and the exhibits thereto containing all such references are attached as **Exhibit A** hereto.

investigations. (Martinez Aff., ¶ 40; Guerra Aff., ¶ 6). Accordingly, when Plaintiff brought Mr. Guerra a large stack of facility bills in September, he reviewed them rather than just summarily approving them for payment. (Id. at ¶¶ 41 - 42; Guerra Aff., ¶ 8). As part of this process, Mr. Guerra requested the supporting documentation which described the purchases reflected on the facility's Nextel bills from Plaintiff. (Guerra Aff., ¶ 8). In scanning through these supporting materials, some of the pages were noted to be missing. (Martinez Aff., ¶ Id. at ¶ 9). Mr. Guerra asked Ms. Martinez to help him review the supporting materials since she already was familiar with this issue and they were about ten inches thick. (Id. at ¶ 10).

By calling Nextel to get copies of the missing supporting documents, Ms. Martinez learned that the missing pages contained a description of three "I-95" cell phones. (Martinez Aff., ¶ 47). These "I-95" phones were not part of the Company's regular purchase plan but were a much higher grade than the Company-issued phones which approved employees received as part of this plan. (Id. at ¶ 48). Accordingly, there should have been payroll deduction forms which corresponded to the purchase of these more expensive phones or other notations that the employees who had ordered these phones had paid for them. (Id. at ¶ 49).

Ms. Martinez then met with Plaintiff to discuss the circumstances surrounding the purchase of these three "I-95" phones. (Id. at ¶ 50). The conclusion of this meeting, which eventually led to the Plaintiff's termination, will be discussed at the end of this section.

**B.**    **Plaintiff Complains about Mr. Guerra.**

Once Mr. Guerra became Branch Manager of the McAllen facility and thereby the Plaintiff's supervisor in August of 2002, Plaintiff did not have the "free reign" over the McAllen facility she had enjoyed when her supervisor/lover Mr. Valdez held the Branch Manager position. (Martinez Aff., ¶¶ 36 - 40; Guerra Aff., ¶ 6; Rangel Aff., ¶¶ 9, 17 - 18).[4] On Thursday, September 12, 2002, approximately three (3) weeks after Mr. Guerra had become her new supervisor, Plaintiff sent the Defendant's Area Vice-

---

[4]    All references to "Rangel Aff." are to the affidavit of Cruz Rangel dated March 16, 2005 along with the paragraph number(s) referenced therein. This affidavit is attached as **Exhibit E** hereto.

President, Carlos Ramos, an e-mail advising him of various issues concerning Mr. Guerra. (Pl. Depo., p. 348, ln. 5 – p. 349, ln. 12; Ramos Aff., ¶ 4).[5]  Mr. Ramos also is the Plaintiff's brother-in-law by marriage. (Pl. Depo., p. 23, ll. 17 - 24; Ramos Aff., ¶ 3). Later that day, Mr. Ramos met with Plaintiff to discuss her concerns. (Pl. Depo., p. 349, ll. 13 - 14; Ramos Aff., ¶ 5). In particular, Plaintiff advised Mr. Ramos that Mr. Guerra had given her gifts, hugged her several months before (both prior to the time that he was her supervisor) and had been looking down her blouse while they worked together (since he became her supervisor). (Pl. Depo., p. 359, l. 18 – p. 363, l. 11). Moreover, she stated that the District Sales Managers of the McAllen facility had confided in her that they did not enjoy working for Mr. Guerra. (Ramos Aff., ¶ 12).

During this meeting with Mr. Ramos, Plaintiff stressed that she did not want Mr. Ramos to advise Human Resources or Mr. Guerra about her comments but, instead, that she would "deal with it" herself. (Pl. Depo., p. 349, ll. 19-21, p. 371, l. 2 – p. 373, ll. 3 - 8; Ramos Aff., ¶¶ 6 - 7). Plaintiff laughed when Mr. Ramos expressed concern over the nature of her comments and told him that she was "not making a harassment claim" and "did not want any investigation because there was nothing to investigate." (Pl. Depo., p. 392, l. 2 – p. 393, l. 24, Exhs. 14 and 15; Ramos Aff., ¶¶ 6 - 7). During her deposition, Plaintiff explained that she was just "venting" to Mr. Ramos about her new boss and was sharing these things with him "as a family member". (Pl. Depo., p. 371, l. 5 – p. 372, l. 11, Exhs. 14 - 15).

Notwithstanding Plaintiff's repeated requests to "keep this between us", Mr. Ramos, as the Company's Area Vice-President, forwarded the Plaintiff's issues to the Human Resources department. (Ramos Aff., ¶¶ 8 - 9). Specifically, Mr. Ramos met with the McAllen facility's Employee Relations Manager, Denise Martinez, and, thereafter, they met with Mr. Guerra on Monday, September 16, 2002 to discuss the issues raised by Plaintiff. (Ramos Aff., ¶¶ 9 - 10). Mr. Guerra was visibly shaken by the allegations of inappropriate conduct toward Plaintiff and denied the same. (Ramos Aff., ¶ 11; Martinez Aff., ¶ 11). The three then discussed how to proceed with resolving the issues Plaintiff had raised with

---

[5]    All references to "Ramos Aff." are to the affidavit of Carlos Ramos dated March 17, 2005 along with the paragraph number(s) referenced therein. This affidavit is attached as **Exhibit D** hereto.

Mr. Ramos. (Ramos Aff., ¶ 13; Martinez Aff., ¶¶ 12 - 13). They decided Mr. Guerra should explain to Plaintiff that he did not recall hugging her at the Company golf tournament and had not looked down her blouse or done anything else which was intended to make her uncomfortable working with him. (Id.). They also decided that Mr. Guerra should discuss the issues Plaintiff had raised in the e-mail to Mr. Ramos concerning the McAllen District Sales Managers with them. (Id.).

Accordingly, on Wednesday, September 18, 2002, Mr. Guerra met with the McAllen facility District Sales Managers ("DSM's"). (Guerra Aff., ¶ 15). In these meetings, Mr. Guerra addressed the concerns relating to these employees he had learned during his meeting with Mr. Ramos and Ms. Martinez. (Id.). Mr. Guerra also advised the DSM's that, in the future, they should voice their concerns directly to him rather than circumventing the chain of command by relaying their problems to Plaintiff. (Id.). The purpose of this meeting was not to "retaliate" against Plaintiff for voicing concerns relating to Mr. Guerra to her brother-in-law, Mr. Ramos, but instead was to remind the DSM's of proper protocol concerning work issues they may have from time to time. (Guerra Aff., ¶ 16; Martinez Aff., ¶¶ 12-14; Ramos Aff., ¶ 13; Rangel Aff. – all, Sandoval Aff. -- all).[6] Those participating in these meetings were not told to treat Plaintiff badly, to ignore her or otherwise to "retaliate" against her. (Rangel Aff., ¶¶ 3, 10 - 11, 17; Sandoval Aff., ¶ 7). On the contrary, Mr. Guerra instructed the DSM's to continue treating Plaintiff as they always had, with the exception of not staying in her office discussing their work issues. (Rangel Aff., ¶¶ 10 - 11, 13 - 18).

As the Branch Secretary, Plaintiff had no authority to resolve these issues. (Martinez Aff., ¶ 5). However, under the previous Branch Manager, Plaintiff's former lover, Mr. Valdez, employees of the McAllen facility had gotten into the habit of discussing their work issues with Plaintiff because she was believed to have the Branch Manager's ear due to their rumored affair (which, per the Plaintiff's deposition testimony, was a reality not merely a rumor). (Rangel Aff., ¶¶ 9, 18; Sandoval Aff., ¶ 5; Pl. Depo., p. 16, l. 9 - p. 17, l. 11). As the new Branch Manager, Mr. Guerra was attempting to correct this

---

[6]    All references to "Sandoval Aff." are to the affidavit of Felipe Sandoval dated March 15, 2005 along with the paragraph number(s) referenced therein. This affidavit is attached as **Exhibit F** hereto.

inappropriate pattern. (Guerra Aff., ¶¶ 5, 15 - 18; Rangel Aff., ¶¶ 10 - 11, 13 - 18; Martinez Aff., ¶ 14).

After conferring with the DSM's, Mr. Guerra met with Plaintiff pursuant to his earlier meeting with Ms. Martinez and Mr. Ramos. (Guerra Aff., ¶ 19; Martinez Aff., ¶¶ 12 - 13; Ramos Aff., ¶ 13). During this meeting, Mr. Guerra told Plaintiff that he did not intend for her to feel uncomfortable working with him. (Guerra Aff., ¶ 19). Plaintiff responded to Mr. Guerra that his hug had not made her feel uncomfortable and that she had only reported it to Mr. Ramos because she was concerned about what her co-workers might think. (Pl. Depo., p. 392, l. 2 – p. 393, l. 24, Exhs. 14 and 15; Guerra Aff., ¶ 23). Mr. Guerra then addressed appropriate work issue protocol with Plaintiff just as he had with the DSM's. (Guerra Aff., ¶ 19; Pl. Depo., p. 392, l. 2 – p. 393, l. 24, Exhs. 14 and 15). At this point in the meeting, Plaintiff became angry and walked out of Mr. Guerra's office. (Martinez Aff., ¶ 15; Pl. Depo., p. 392, l. 2 – p. 393, l. 24, Exhs. 14 and 15). She then hung up the phone on Mr. Guerra when he called to continue the meeting later in the day and walked out of another meeting with Mr. Guerra over the course of the next few days. (Id.). Accordingly, Mr. Guerra asked Human Resources to intervene again by meeting with Plaintiff. (Martinez Aff., ¶¶ 15 - 16).

Ms. Martinez met with Plaintiff on Monday, September 23, 2002, to try to find out what was going on regarding Mr. Guerra. (Id.). During this meeting, Plaintiff told Ms. Martinez that she felt "retaliated against" because Mr. Guerra had met with the McAllen DSM's and had told them not to "burden" her with their problems anymore. (Pl. Depo., p. 392, l. 2 – p. 393, l. 24, Exhs. 14 and 15; Martinez Aff., ¶ 18). Ms. Martinez explained to Plaintiff that it was not appropriate for the DSM's to be discussing their work issues with the Branch Secretary rather than with a member of management who could address them. (Pl. Depo., p. 392, l. 2 – p. 393, l. 24, Exhs. 14 and 15). Plaintiff agreed with this approach and agreed to help facilitate it. (Id.). Plaintiff also told Ms. Martinez that Mr. Guerra's meeting with the DSM's was the only thing she believed had been done by any employee of Defendant to "retaliate" against her. (Martinez Aff., ¶ 19). She went on to say that her working relationship with Mr. Guerra was good and expressly said she did not want to be transferred to work for someone else. (Id. at ¶ 20).

As she had told Mr. Guerra, Plaintiff told Ms. Martinez that the only reason she had told her brother-in-law, Mr. Ramos, about Mr. Guerra hugging her or looking down her blouse was that she was concerned that other employees were going to start spreading rumors about her and Mr. Guerra the way they had about her and the previous Branch Manager, Mr. Valdez. (Id. at ¶ 16). Nonetheless, Ms. Martinez instructed Plaintiff to advise the Human Resources department if anything else occurred that made her feel uncomfortable working with Mr. Guerra. (Pl. Depo., Exhs. 14 and 15). According to Plaintiff, she never had any further problems with Mr. Guerra acting "inappropriately" toward her after she sent her e-mail to Mr. Ramos on September 12, 2002. (Pl. Depo., p. 382, l. 23 – p. 383, l. 3)

Following her meeting with Plaintiff, Ms. Martinez investigated the Plaintiff's complaint to her that Mr. Guerra's meetings with the McAllen DSM's had been "retaliatory" against her. (Martinez Aff., ¶ 21). None of the employees who had participated in these meetings shared with Ms. Martinez that Mr. Guerra had said anything negative concerning Plaintiff or that they had been told to ignore her or to otherwise treat her badly. (Id.; Rangel Aff. -- all; Sandoval Aff. -- all).

Following this investigation, Ms. Martinez drafted a memorandum commemorating her previous discussion with Plaintiff. (Martinez Aff., ¶¶ 22 – 23, Exh. 1; Pl. Depo., Exh. 14). Plaintiff and Ms. Martinez reviewed the memorandum paragraph by paragraph, and Plaintiff pointed out certain changes she wanted made to the memorandum so that it would accurately reflect her recollection of the meeting. (Martinez Aff., ¶ 23; Pl. Depo., p. 392, l. 2 – p. 393, l. 24). Ms. Martinez made the Plaintiff's requested changes and then called her to meet again to review and sign the revised memorandum the following day. (Martinez Aff., ¶¶ 23 - 24). Plaintiff said she was busy that day, so they agreed to meet the following day, which was Friday, September 27, 2002. (Id.)

When Ms. Martinez met with Plaintiff this time and presented the revised memorandum to her, Plaintiff asked to make still more changes. (Id. at ¶ 25). Ms. Martinez asked her to simply hand-write in these new changes. (Id.; Pl. Depo., p. 392, l. 2 – p. 393, l. 24; Exhs. 14 and 15). At the conclusion of this process, Plaintiff then refused to sign the memorandum. (Martinez Aff., ¶ 26, Exh. 2; Pl. Depo., Exh. 15). Instead, she indicated that she would only "acknowledge receipt of it", which is exactly all she did. (Id.).

During her deposition, however, Plaintiff acknowledged the accuracy of the substance of the memorandum. (Pl. Depo., p. 392, l. 2 – p. 393, l. 24, Exh. 15).

### C.     Defendant Investigates Malfeasance by Plaintiff.

During this same period during which Ms. Martinez, Mr. Ramos and Mr. Guerra were in the process of resolving the issues Plaintiff had raised with Mr. Ramos in her e-mail on September 12, 2002, Plaintiff had presented Mr. Guerra with the Nextel bills and the supporting documentation (minus the missing pages) which are described in the "Background" portion of this section above. See p. 3, *infra*. The conclusion of this investigation led to the Plaintiff's termination on October 3, 2002.

As it turned out, in Ms. Martinez's meeting with Plaintiff concerning the circumstances surrounding the purchase of the three expensive "I-95" Nextel phones which were described on the missing Company billing statement pages Ms. Martinez obtained from Nextel, Plaintiff told her that the phones had been purchased by herself and two of her co-workers as follows: (1) Tony Castillo was planning to pay for his phone through a payroll deduction but wanted to spread the deduction out over two months and so had completed two forms; (2) The second phone had been ordered by Ms. Munoz for the former Branch Manger, Ruben Valdez. However, when she presented this phone to him, Mr. Valdez said he did not want it. An employee named Joanne Perez saw the phone and asked if she could have it. Ms. Munoz told Ms. Perez to ask Mr. Valdez, which she did, and he said she could have it; (3) the third phone had been ordered by Ms. Munoz for her own use. She was planning to pay for her phone through payroll deductions, but had not completed the deduction form yet because she was waiting to see how much credit she would get toward her new phone from trading in her old Nextel phone. (Martinez Aff., ¶ 51).

In connection with this description, Ms. Martinez reviewed the McAllen facility's payroll deduction form file with Plaintiff during this meeting which was held on or about October 3, 2002. (Id. at ¶ 50). Only one payroll deduction form relating to these three phones was found – it had been completed by Tony Castillo on June 6, 2002 for $150.00. (Id.). The cost of an "I-95" phone was $459.99 less some discounts. (Id. at ¶ 48).

Ms. Martinez then contacted Mr. Castillo, Ms. Perez and Mr. Valdez to verify the Plaintiff's accounts of how these three phones had been purchased. (Id. at ¶ 52). Through these discussions, Ms. Martinez learned the following concerning these three phones: (1) Tony Castillo gave Ms. Munoz $150.00 in cash to pay for part of his new phone and intended to have the balance taken out of his check through payroll deductions; (2) Mr. Valdez did recall saying that Joanne Perez could have the phone Ms. Munoz had ordered for him, but had assumed she would pay for it; (3) Mr. Valdez did recall approving the purchase of Ms. Munoz's phone. (Id.). Ms. Martinez then met with Plaintiff again to discuss what she had learned from these interviews. (Id. at ¶ 53).

During this meeting, held on October 4, 2002, Ms. Martinez explained that the investigations concerning the Plaintiff's own "I-95" phone and Ms. Perez's were closed due to Mr. Valdez's description of the circumstances surrounding the purchase of these two phones. (Id.). She then moved on to discuss Mr. Castillo's description of the circumstances surrounding the purchase of his phone – specifically that he had given Plaintiff $150.00 in cash toward the purchase of his phone. (Id. at ¶ 54). At first, Plaintiff denied receiving any cash from Mr. Castillo. (Id.). She then said she "knew" she did not accept $150.00 from Mr. Castillo but "might have accepted $60.00." (Id.) Ms. Martinez then asked Plaintiff if she had heard that Mr. Castillo had obtained $100.00 in cash by selling his old Nextel phone to a co-worker. (Id. at ¶ 56). Plaintiff said she had heard about this and then said "it could have been $100.00 he [Mr. Castillo] gave me." (Id. at ¶ 57).

Ms. Martinez also asked Plaintiff what had happened to whatever amount of cash Mr. Castillo had given her. (Id. at ¶ 55). Plaintiff explained the she had "put it in her desk" along with some other cash that she kept as a "slush fund" "for when things come up and we need cash." (Id.). Ms. Martinez pointed out that the cash received from Mr. Castillo should have been deposited with the facility cashier, so there would be a record of it, and put toward the Company Nextel bill. (Id. at ¶ 58). The Plaintiff's response to this statement was that she was not aware of being able to deposit cash with the facility cashier. (Id.). This was despite the fact that part of the Plaintiff's duties included depositing cash and checks given to her by other employees for Company store purchases. See p. 1, *infra*; Martinez Aff., ¶¶

5 and 58.

In short, Plaintiff's second account of how Mr. Castillo's "I-95" phone was purchased conflicted not only with his account, but with her own earlier account. The "second" payroll deduction form she had described in her earlier account also was never found. (Martinez Aff., ¶¶ 50-51). Mr. Castillo gave a signed written statement attesting to his account of how he purchased his "I-95" phone. (Martinez Aff., ¶ 61, Exh. 3).

As explained in the "Background" portion of this section above, this was the not the first time Plaintiff had had "trouble" keeping an honest and accurate account of the Company's finances. See p. 2, *infra*. As Branch Secretary, Plaintiff was responsible for processing many financial transactions such that the position requires a high level of trust. (Martinez Aff., ¶ 5). Accordingly, following the investigation of these "I-95" phones, and in particular Mr. Castillo's, Ms. Martinez determined that the Plaintiff's conduct was inconsistent with Company policy in that she had been dishonest during the course of the investigation. (Id. at ¶¶ 62 - 65, Exh. 4). Ms. Martinez then advised Plaintiff on October 7, 2002, that she was being terminated effective October 3, 2002. (Id. at ¶ 62). (Plaintiff had been placed on administrative leave during the intervening period while the Company investigation was completed.) (Id. at ¶ 50).

The decision to terminate Plaintiff was approved by Ms. Martinez's supervisors in the Defendant's Human Resources department in agreement with Mr. Ramos and Mr. Guerra. (Id. at ¶¶ 64 - 65; Ramos Aff., ¶¶ 14 - 16, Guerra Aff., ¶¶ 11 - 14). It was not made in order to "retaliate" against Plaintiff for her earlier reports to Mr. Ramos – Mr. Ramos was her brother-in-law for heavens' sake and, again, agreed with the decision to terminate her employment. (Id.). It was made because Plaintiff was dishonest in the course of the Defendant's investigation concerning the I-95 phones, specifically for her giving contradictory explanations concerning the circumstances under which Mr. Castillo's phone was purchased. (Martinez Aff., ¶ 62).

When given a final opportunity to discuss this issue with Ms. Martinez during her termination meeting on October 7, 2002, Plaintiff was specifically asked why she had not been honest during the

Nextel phone investigation. (Id. at ¶ 63). Plaintiff's response was "it was in the back of my mind." (Id.)

### III.   Summary of Argument

All of the Plaintiff's claims should be dismissed as a matter of law. Plaintiff's sexual harassment claim must be dismissed because the purported incidents of harassment were not sufficiently abusive from either an objective or subjective standpoint so as to constitute unlawful harassment as a matter of law. Additionally, Plaintiff cannot show that Defendant failed to take appropriate corrective measures upon being made aware of the purported incidents of harassment. The Plaintiff's claim of retaliation also must be dismissed because she cannot establish that the explanation for her termination offered by Defendant was a pretext for unlawful retaliation. Plaintiff also cannot state a claim for intentional infliction of emotional distress because this claim is incidental to another tort cause of action she is pursuing in this lawsuit.

### IV.   Legal Argument

#### A.   The Legal Standard for Granting Summary Judgment.

The United States Supreme Court has held that "the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." Celotex Corp v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed.2d 265 (1986). In the Rule 56 context, the plaintiff must come forward with sufficient evidence so that reasonable jurors could find that the plaintiff has proven her claim by a preponderance of the evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247-48 (emphasis in original).

In her Complaint, Plaintiff alleges that she was subjected to unwelcome sexual harassment and, therefore, that Defendant discriminated against her on the basis of her sex in violation of Title VII. Additionally, Plaintiff alleges that Defendant unlawfully retaliated against her for engaging in activity

protected by Title VII and that Defendant intentionally inflicted emotional distress upon her. Summary judgment should be awarded in favor of Defendant as to these claims as asserted by Plaintiff because there is no genuine issue as to any material fact and Defendant is entitled to a judgment as a matter of law concerning each of them.

**B.    Plaintiff's Sexual Harassment Claim Should Be Dismissed.**

Plaintiff alleges that Defendant sexually discriminated against her by creating a sexually hostile work environment. To state a claim for "hostile work environment sexual harassment", a plaintiff must establish "1) she belongs to a protected class; 2) she was subjected to unwelcome sexual harassment; 3) the harassment was based on sex; 4) the harassment affected a term, condition or privilege of employment; and 5) the employer knew or should have known of the harassment and failed to take remedial action." Septimus v. University of Houston, __ F.3d ___, 2005 WL 237351, *7 (5th Cir. Feb. 2, 2005). Here, Plaintiff cannot satisfy the fourth and fifth elements of this claim as a matter of law.

*1.    The alleged harassment did not affect a term, condition or privilege of the Plaintiff's employment.*

In order for harassment to impact a term, condition or privilege of employment, it must be both objectively and subjectively abusive based upon the totality of the circumstances. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); Green v. Administrators of Tulane Educ. Fund, 284 F.3d 642, 656 (5th Cir. 2002). To be "abusive", the harassment must be "so severe and pervasive that it destroys a protected classmember's opportunity to succeed in the workplace." Shepherd v. Comptroller of Pub. Accts., 168 F.3d 871, 874 (5th Cir. 1999). Recently, the Fifth Circuit identified the following factors to be weighed when considering whether an employment atmosphere is objectively abusive:

> (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating as opposed to a mere offensive utterance; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether the complained-of conduct undermines the plaintiff's workplace competence.

Hockman v. Westward Communications, LLC, ___ F.3d ____, 2004 WL 2980351, *5 (5th Cir. Dec. 22, 2004).

The only employee who Plaintiff claims sexually harassed her is Lee Guerra. In particular, Plaintiff cites the following conduct of Mr. Guerra that she now believes constituted "sexual harassment": (1) he hugged her at a Company outing; (2) he periodically gave her gifts; (3) he attempted to look down her blouse; and (4) he kissed her on the cheek. (Pl. Depo., p. 350, ll. 1 - 13).

Regarding these alleged incidents, during the Plaintiff's deposition she explained that the hug occurred at a Company golf outing prior to the time Mr. Guerra became her supervisor. (Id. at p. 359, l. 20 – p. 361, l. 23). According to Plaintiff, Mr. Guerra said, "[t]hank you for all the help," and gave her a hug. (Id. at p. 361). Plaintiff further stated that, on a few occasions, Mr. Guerra gave her gifts, such as a CD, a book of poems, candles, soap and lotion. (Id. at p. 366, l. 8 – p. 369, l. 4). With respect to Mr. Guerra allegedly attempting to look down her blouse, Plaintiff stated that "[i]t happened a few times, but I only mentioned it [happening] once." (Pl. Depo., p. 362, ll. 2 - 4). Plaintiff also alleged that Mr. Guerra kissed her on the cheek "maybe once." (Id. at p. 365, l. 24 – p. 366, l. 5).

Assuming, for purposes of this Motion only, that all of the Plaintiff's allegations concerning Mr. Guerra's conduct toward her are true, these incidents do not rise to the level of being unlawful harassment. The alleged instances were not frequent, severe, or physically threatening; they did not interfere with the Plaintiff's workplace performance and did not undermine her workplace competence. Accordingly, as a matter of law, these incidents did not create a hostile work environment from an objective standpoint. See, e.g., Hockman v. Westward Communications, LLC, ___ F.3d ____, 2004 WL 2980351 (5th Cir. Dec. 22, 2004) (perpetrator's attempts to kiss plaintiff, crude remarks, brushing up against plaintiff's private parts, and slapping her rear with a newspaper were not sufficiently severe and pervasive); Shepherd v. Comptroller of Pub. Accts., 168 F.3d 871 (5th Cir. 1999) (perpetrator's attempts to look beneath plaintiff's clothing and crude remarks did not rise to level of creating a hostile work environment); Roark v. Kidder, Peabody & Co., 959 F. Supp. 379, 384 (N.D. Tex. 1997) (small number of hugs and offensive jokes were not sufficiently severe to create a hostile work environment).

The incidents Plaintiff described during her deposition also were not abusive from her own subjective viewpoint. Even when Plaintiff allegedly informed Mr. Ramos (her brother-in-law) of them,

she expressly stated several times that she was "just venting", was "not making a harassment claim" and "did not want any investigation because there was nothing to investigate." (Pl. Depo. p. 392, l. 2 – p. 393, l. 24, Exhs. 14 and 15; Ramos Aff., ¶¶ 6 - 7). Moreover, Plaintiff advised both Mr. Guerra and Human Resources that Mr. Guerra's hug had not made her feel uncomfortable but that she was only concerned with what her co-workers might think in light of the (albeit true) rumors which had permeated the McAllen facility concerning her having an affair with the previous Branch Manager, Ruben Valdez. (Pl. Depo. p. 392, l. 2 – p. 393, l. 24, Exhs. 14 and 15; Martinez Aff., ¶ 16; Guerra Aff. ¶ 23).

### 2.  *Defendant took appropriate remedial action upon learning of the Plaintiff's allegations of harassment.*

Even if Plaintiff could show that the purported sexual harassment was pervasive enough to affect a term, condition or privilege of her employment, her hostile work environment/discrimination claim must fail because she cannot show that Defendant failed to take appropriate remedial action in response to her bringing the alleged incidents to its attention. During her employment, Plaintiff signed an acknowledgment that she was aware of the Defendant's sexual harassment/anti-harassment policy and that she has "an affirmative obligation to report promptly any misconduct in violation of this policy." (Pl. Depo., Exh. 19).

When Plaintiff approached Mr. Ramos regarding her concerns about Mr. Guerra, she indicated that she "was going to him as a family member" and that she "didn't want him to go and tell HR." (Pl. Depo., p. 371, ll. 2 - 8). Mr. Ramos, however, appropriately advised Human Resources of the Plaintiff's issues with Mr. Guerra. (Martinez Aff., ¶ 4; Ramos Aff., ¶¶ 8 - 9). Thereafter, Mr. Ramos and Human Resources conducted an investigation concerning these and the Plaintiff's later allegations of retaliation. (Martinez Aff., ¶¶ 6 - 13, 16 - 27; Ramos Aff., ¶¶ 9 - 11). Plaintiff was advised to notify Human Resources if she ever felt uncomfortable in the future, and Plaintiff never had any further complaints that she was being sexually harassed. (Pl. Depo., p. 382, l. 23 – p. 383, l. 3, p. 392, l. 2 – p. 393, l. 24, Exhs. 14 and 15). Since Plaintiff can cite no incident of sexual harassment after reporting Mr. Guerra's alleged inappropriate conduct, she cannot contend that Defendant did not take appropriate remedial action in this

case.

**C.**     **Plaintiff's Retaliation Claims Should Be Dismissed.**

To state a claim for unlawful retaliation, a plaintiff must first establish a *prima facie* case of retaliation. A *prima facie* case is demonstrated upon a showing that: "(1) the employee engaged in protected activity; (2) the employer took adverse employment action against the employee; and (3) a causal connection exists between the protected activity and the adverse employment action." Brazoria County v. EEOC, 391 F.3d 685, 692 (5th Cir. 2004). If the plaintiff meets this burden, the burden of production shifts to the employer to articulate a legitimate non-retaliatory explanation for the employment action. Thereafter, the plaintiff bears the burden of establishing that the employer's explanation is a pretext for retaliation. Septimus v. University of Houston, , __ F.3d ___, 2005 WL 237351, *3 (5th Cir. Feb. 2, 2005).

During her deposition, Plaintiff testified that Defendant retaliated against her in two respects after she complained about Mr. Guerra's alleged inappropriate conduct: (1) the McAllen facility DSM's were told not to talk to her; and (2) she was terminated. She cannot establish that these acts constitute "retaliation" as a matter of law.

> **1.**     **The Plaintiff's co-workers' alleged ostracism toward her does not constitute an adverse employment action.**

Concerning the first "incident of retaliation", Plaintiff was not present during the McAllen DSM meetings wherein she believes these employees were told by Mr. Guerra to retaliate against her. This "incident of retaliation" thus is based purely on the Plaintiff's speculation as to what occurred during these meetings. Such speculation cannot be used to create a genuine issue of material fact at the summary judgment stage. Accordingly, the fact that the Plaintiff's speculation as to what she *thinks* occurred during these DSM meetings contradicts the sworn affidavit testimony of those who actually participated in these meetings does not create such an issue in this case. (See Rangel Aff. – all; Sandoval Aff. – all).

Even if the Plaintiff's belief that after she complained of Mr. Guerra's alleged harassment he instructed the McAllen DSM's not to talk to her about their work issues is true, this action does not

satisfy the second aspect of a *prima facie* case of retaliation because it does not qualify as an adverse employment action. "Adverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." Green v. Administrators of Tulane Educ. Fund, 284 F.3d 642, 656 (5th Cir. 2002). Instructing employees to limit their conversations with a co-worker does not rise to the level of an ultimate employment decision. See Brazoria County v. EEOC, 391 F.3d 685, 693 (5th Cir. 2004) ("Mere ostracism in the workplace is not grounds for a retaliation claim.") *quoting* Manatt v. Bank of America, 339 F.3d 792, 803 (9th Cir. 2003).

Plaintiff also cannot establish the third element of a *prima facie* case of retaliation. Plainly, Mr. Guerra's instructions to the DSM's resulted from the inappropriate pattern Plaintiff and the previous Branch Manager had created of employees using Plaintiff as a go-between to the Branch Manager rather than going directly to the Branch Manager, Human Resources or another member of management with their work issues. (Rangel Aff., ¶¶ 9 - 11, 13 - 18; Sandoval Aff., ¶ 5; Pl. Depo., p. 16, l. 9 - p. 17, l. 11; Guerra Aff., ¶¶ 5, 15 - 18; Martinez Aff., ¶ 14). Plaintiff cannot show that the correction of this inappropriate practice had any connection to her complaint against Mr. Guerra.

### 2.    *Plaintiff's termination was unconnected with her protected activity.*

#### a.    *Plaintiff cannot establish a* prima facie *case.*

For purposes of this Motion only, Defendant concedes that Plaintiff can establish the first two elements of a *prima facie* case of retaliation as it relates to the termination facet of her claim. However, Plaintiff is anticipated to attempt to use the temporal proximity between her protected activity and her termination to satisfy the third "causal link" element of her *prima facie* case. During her deposition, Plaintiff testified that the timing of her termination was the only reason she believed her termination was retaliatory. (Pl. Depo., p. 173, ll. 1 - 18). Although in certain circumstances temporal proximity, alone, may be deemed to establish this element,[7] Plaintiff cannot rely on this aspect in this case.

Here, Denise Martinez made the termination decision and conducted the investigation leading up to the termination decision -- not the alleged harasser, Mr. Guerra. (Martinez Aff., ¶ 64; Guerra Aff., ¶

---

[7]    See Hall v. Pitney Bowes, Inc., 2004 WL 389093, *11 (N.D. Tex. Feb. 27, 2004) (copy attached).

13; Ramos Aff., ¶ 14). Under Fifth Circuit law, "the causal link between the protected conduct and termination is broken where the official with final authority to fire employees conducts an 'independent investigation' in the course of reaching his or her decision." Mato v. Baldauf, 267 F.3d 444, 450 (5th Cir. 2001) citing Long v. Eastfield College, 88 F.3d 300, 307 (5th Cir. 1996). There is no dispute in the record that Ms. Martinez made the decision to terminate Plaintiff without the influence of Mr. Guerra. (Martinez Aff., ¶ 64). This decision also was implemented with the agreement of the Plaintiff's own brother-in-law, the Defendant's Area Vice-President, Carlos Ramos. (Ramos Aff., ¶ 14).

It also is significant to note that the Defendant's Human Resources department had been examining the Plaintiff's financial dealings *before* Mr. Guerra became her supervisor and *before* she made a complaint of harassment against him. (Martinez Aff., ¶¶ 30 - 40; Pl. Depo., p. 185, l. 25 – p. 190, l. 3). Consequently, no inference of a causal link arises merely from the temporal proximity of the Plaintiff's complaint against Mr. Guerra and her termination. See Smith v. Allen Health Systems, Inc., 302 F.3d 827, 834 (8th Cir. 2002) ("Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity."); Dutton v. University Healthcare System, L.L.C., 2004 WL 1078908, *9 (E.D. La. May 12, 2004) (quoting same). Plaintiff thus cannot meet her burden of establishing a casual link between her termination and her complaint against Mr. Guerra.

> b. *Plaintiff cannot show that the Defendant's explanation for her termination was a pretext for retaliation.*

Even if Plaintiff could establish a *prima facie* case of retaliation concerning her termination, her claim still must fail. Defendant can easily meet its burden of offering a legitimate, non-retaliatory explanation for Plaintiff's discharge -- Plaintiff was dishonest in the course of the Defendant's investigation concerning Mr. Castillo's purchase of a Nextel phone. (Martinez Aff., ¶ 62).

Plaintiff cannot show that this explanation is a pretext for discrimination. Under this "final burden," Plaintiff is required to "demonstrate that the adverse employment action would not have occurred 'but for' the protected activity." Rios v. Rossotti, 252 F.3d 375, 380 (5th Cir. 2001); see also

Septimus, at *4. "While this portion of the analysis may seem identical to the 'causal link' step in the prima facie case, the burden here is *more stringent*." Medina v. Ramsey Steel Co., Inc., 238 F.3d 674, 685 (5th Cir. 2001) (emphasis added). Thus, for instance, "[a] close temporal proximity may satisfy Plaintiff's initial *prima facie* case, where the causal burden is 'minimal,' but it **does not satisfy** the stringent requirement of showing 'but for' causation." Hall v. Pitney Bowes, Inc., 2004 WL 389093, *11 (N.D. Tex. Feb. 27, 2004) (emphasis added). See also Little v. BP Exploration, 265 F.3d 357, 363-64 (6th Cir. 2001) ("Temporal proximity alone is generally insufficient to establish a causal connection for a retaliation claim.").

Here, Plaintiff cannot show that she would not have been terminated "but for" her complaint of sexual harassment. It is undisputed that: (1) Plaintiff initially told Human Resources that Tony Castillo had completed a second payroll deduction form for the purchase of his cell phone but that only one form was located (Martinez Aff., ¶¶ 50 - 51);[8] (2) Plaintiff's version of how much (if any) cash Mr. Castillo provided to her for the cell phone was conflicting during her interviews with Ms. Martinez and also conflicted with what Mr. Castillo told Human Resources (Martinez Aff., ¶¶ 51 - 52, 54 – 61, Exh. 3); and (3) Plaintiff kept the cash provided by Mr. Castillo in her desk drawer, rather than depositing it with the McAllen facility cashier in accordance with Company protocol so that the amount of cash he gave her could be confirmed. (Pl. Depo., p. 125, ll. 1-4; Martinez Aff., ¶¶ 55, 58).

Since the Branch Secretary is responsible for processing many financial transactions, it is critically important that Defendant be able to trust the person who holds this position. (Martinez Aff., ¶ 5). Given the inconsistency between the Plaintiff's multiple accounts and the consistent one of Mr. Castillo, it was appropriate for Ms. Martinez to conclude that Plaintiff was not trustworthy and, therefore,

---

[8]    During her deposition, Plaintiff testified that she cannot remember how much cash Mr. Castillo gave her to pay for his phone let alone what she told Human Resources concerning the purchase of this phone back in 2002. (Pl. Depo. p. 111, l. 23 - p. 112, l. 1, p. 112, ll. 2-4, p. 115, ll. 11-14). Plaintiff's lack of memory cannot be used to create a genuine issue of material fact concerning this issue. See e.g., Tinder v. Pinkerton Security, 305 F.3d. 728, 736 (7th Cir. 2002).

should be discharged.[9]  Plaintiff has no evidence suggesting that Human Resources' motive for her termination was due to her complaint of harassment against Mr. Guerra.  As discussed above, Human Resources had been examining the Plaintiff's conduct concerning Company finances before she even engaged in protected activity. (Martinez Aff., ¶¶ 30 - 40; Pl. Depo., p. 185, l. 25 – p. 190, l. 3).

Plaintiff may not satisfy her burden of establishing pretext merely by citing the proximity in time between her complaint and her termination. Little, 265 F.3d at 363-64; Hall, 2004 WL 389093, at *11; Smith v. Allen Health Systems, Inc., 302 F.3d 827, 833 (8th Cir. 2002).  For all of these reasons, the Plaintiff's claim that she was discharged in retaliation for complaining about sexual harassment must be dismissed as a matter of law.

### D. Plaintiff's Intentional Infliction of Emotional Distress Claim Should Be Dismissed.

Under Texas law, an intentional infliction of emotional distress claim is a "'gap-filler tort, judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." Hoffman-La Roche Inc. v. Zeltwanger, 144 S.W.3d 438, 447 (Tex. 2004).  In other words, "[a] claim for intentional infliction of emotional distress cannot be maintained when the risk that emotional distress will result is merely incidental to the commission of some other tort." Standard Fruit & Vegetable Co. v. Johnson, 985 S.W.2d 62, 68 (Tex. 1998)).

Here, the Plaintiff's claim of intentional infliction of emotional distress is based on her sexual harassment and retaliation claims.  Therefore, this claim must be dismissed as a matter of law. Hoffman-La Roche, 144 S.W.3d at 448-450.  In any event, this claim also must fail because Plaintiff cannot establish the requisite elements of an intentional infliction of emotional distress cause of action.

---

[9]     There is no merit to any suggestion that Defendant was obligated to believe Plaintiff rather than Mr. Castillo in this investigation.  The Plaintiff's own multiple stories even contradicted each other.  In any event, an employer "is not liable under Title VII for an employment decision based on the false complaint of an ordinary employee, where the employer reasonably believed the allegation and acted on it in good faith." Long v. Eastfield College, 88 F.3d 300, 306 (5th Cir. 1996).  See also Deines v. Dept. of Prot. & Reg. Serv., 164 F.3d 277, 281 (5th Cir. 1999) (determining that "[w]hether the employer's decision was the correct one, or fair one, or the best one is not within the jury's province to decide."); Wright v. Western Elec. Co, Inc., 664 F.2d 959, 964 (5th Cir. 1981) (the only relevant inquiry is the employer's good faith perception of the employee's work performance).

To recover damages for intentional infliction of emotional distress, a plaintiff must establish that: (1) the defendant acted intentionally or recklessly, (2) the defendant's conduct was extreme and outrageous, (3) the defendant's actions caused the plaintiff emotional distress, and (4) the resulting emotional distress was severe. Id. at 445. "Extreme and outrageous conduct" supporting a claim for intentional infliction of emotional distress is conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Id. Nothing even alleged by Plaintiff in this lawsuit has crossed this line in this case. See Id. "Liability for intentional infliction of emotional distress does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Id. Accordingly, the Plaintiff's intentional infliction of emotional distress claim also must be dismissed as a matter of fact and law.

## V.    Conclusion

For the foregoing reasons, Defendant respectfully requests that the Court award summary judgment in its favor and dismiss all of the Plaintiff's claims against it.

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing pleading upon opposing counsel as required by law by delivering a copy thereof via certified mail, with sufficient postage affixed thereto to ensure delivery to the following:

Miguel Salinas, Esq.
Law Office of Miguel Salinas
803 Old Port Isabel Road
Brownsville, Texas 78521

This __18th__ day of March, 2005.

By: _Eileen M. Leeds_