IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CRISTINA MUNOZ            ) (
      Plaintiff        ) (
                       ) (
VS.                       ) (    CIVIL ACTION NO. B-04-066
                       ) (
LAREDO COCA-COLA BOTTLING ) (
COMPANY                   ) (
      Defendant        ) (

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF
CHRISTINA MUNOZ
JANUARY 5, 2005

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

      ORAL AND VIDEOTAPED DEPOSITION OF CHRISTINA

MUNOZ, produced as a witness at the instance of the

DEFENDANT, taken in the above styled and numbered cause

on JANUARY 5, 2005, from 9:45 a.m. to 11:47 a.m. and

12:46 p.m. to 6:05 p.m. before CINDY S. ROMERO, CSR in

and for the State of Texas, at the Law Offices of

Miguel Salinas, 803 Old Port Isabel Road, Brownsville,

Texas, pursuant to the Federal Rules of Civil Procedure

and the provisions stated on the record or attached

therein.

Apx.-1

HILL & ROMERO
CERTIFIED COURT REPORTERS



09:55  1          MR. SALINAS:  So just irreconcilable

09:55  2   differences is grounds for divorce in Texas.

09:55  3          MS. CARAWAY:  Right.

09:55  4      Q.  But he is not stating -- but you -- I asked you

09:55  5   earlier what the grounds were.

09:55  6      A.  It was both ways.  It was both ways.

09:55  7      Q.  Okay.

09:55  8      A.  Yeah, he accused me.  I accused him.

09:55  9      Q.  Okay.  And who was he accusing you of having

09:55  10  adultery -- or being in an adulterous relationship

09:55  11  with?

09:55  12     A.  With who?

09:55  13     Q.  Yeah.

09:55  14     A.  My previous boss.

09:55  15     Q.  Okay.  And who was that?

09:55  16     A.  Ruben.

09:55  17     Q.  Valdez?

09:55  18     A.  Exactly.

09:55  19     Q.  Were you involved in an adulterous relationship

09:55  20  with Ruben Valdez?

09:55  21     A.  Yes.

09:55  22     Q.  During what period?

09:55  23     A.  2002?  I'm trying to think.

09:55  24     Q.  How long, I guess, like in terms of your

09:55  25  terminating --

09:56  1      A.  It was about a year and a half.

09:56  2      Q.  Before your termination?

09:56  3      A.  Yes.

09:56  4      Q.  Okay.  It's my understanding that he had been

09:56  5  transferred to Houston prior to your termination.

09:56  6      A.  Yes.

09:56  7      Q.  Did the -- did your affair continue when he was

09:56  8  in Houston and you were still in McAllen?

09:56  9      A.  We never saw each other.

09:56  10      Q.  After that -- after he moved to Houston?

09:56  11      A.  Yeah, we never saw each other.

09:56  12      Q.  I'll call it Houston, just so --

09:56  13      A.  Right.

09:56  14      Q.  Okay.  Do you have a copy of your driver's

09:56  15  license with you?

09:56  16      A.  I have it.

09:56  17      Q.  Okay.  At a break we'll just get a -- I usually

09:56  18  use that as a form of ID.  Since you and I have never

09:56  19  met, it just, you know, makes the record clean that I

09:56  20  am deposing who I think I am.

09:56  21      A.  Okay.

09:56  22      Q.  So we'll just make a copy -- if you'll just

09:56  23  make a note that that will be Exhibit 1.  At the break

09:57  24  we'll make a copy of that.  And let me get your date of

09:57  25  birth and your Social Security number.

09:58 1      A.  We were about to start mediation but we

09:58 2   postponed it.

09:58 3      Q.  So that's going to be the next step in your

09:58 4   divorce?

09:58 5      A.  Maybe.

09:58 6      Q.  Okay.  So you both -- are you both represented

09:58 7   by counsel in the divorce?

09:58 8      A.  Yes.

09:58 9      Q.  Okay.  Anything else taking place?  Have

09:58 10  you-all exchanged any type of written -- you know, in

09:58 11  this case you got written interrogatories to fill out.

09:58 12  Have you gotten anything like that in your divorce

09:58 13  case?

09:58 14     A.  No.

09:58 15     Q.  So far everything that has happened is he

09:58 16  filed, did you -- and you filed a counter answer --

09:58 17     A.  Yes.

09:58 18     Q.  -- accusing him of adultery?  Were there any

09:58 19  other grounds that you accused him of in the divorce?

09:58 20  I know it's a no fault state.  But apparently you-all

09:58 21  did use grounds.

09:58 22     A.  Well, for me it was adultery and abusive

09:58 23  language.

09:58 24     Q.  Okay.  And over what period has that abusive

09:58 25  language gone on?

10:01 1    Q.  Okay.  Was it just to end your relationship, I

10:01 2    mean, to start over with his wife or what?  You said it

10:01 3    was for business reasons.  What reasons did he give you

10:01 4    for wanting to transfer?

10:01 5    A.  He found there was more opportunity, bigger

10:01 6    facility.

10:01 7    Q.  Okay.  In Houston?

10:01 8    A.  Yes.

10:01 9    Q.  Was there at any time a plan that you would

10:02 10    join him in Houston, that you-all would -- you would

10:02 11    have like a mutual divorce and you-all would be

10:02 12    together in a different city?

10:02 13    A.  No.

10:02 14    Q.  So he had always planned to move there with his

10:02 15    wife?

10:02 16    A.  Yes.

10:02 17    Q.  Were you ever asked by anyone at Coca-Cola

10:02 18    about your relationship with Mr. Valdez?  Did anybody

10:02 19    ever come to you asking, you know, are you having an

10:02 20    affair with Ruben Valdez during your employment at

10:02 21    Coca-Cola?

10:02 22    A.  My brother-in-law.

10:02 23    Q.  Okay.  Carlos?

10:02 24    A.  Uh-huh.

10:02 25    Q.  And what was your response to him?



11:36  1    Q.  Okay.  But then why would he not have just

11:36  2    given -- paid Tony for it?

11:36  3    A.  He didn't have all the money that Tony was

11:36  4    asking for it.

11:36  5    Q.  Okay.  So Kyle -- so Kyle wanted to buy Tony's

11:36  6    phone but he couldn't pay him all the money at that

11:36  7    point so he gave Tony some of the money?

11:36  8    A.  He gave him what he had in his pocket.

11:36  9    Q.  Okay.

11:36  10   A.  Plus he added in --

11:36  11   Q.  Those amusement park tickets?

11:36  12   A.  Uh-huh.

11:36  13   Q.  And then you said he was supposed to pay -- how

11:36  14   was Kyle supposed to pay for the rest of the phone?

11:36  15   A.  That was it.

11:36  16   Q.  That was it?  So the amusement park tickets

11:36  17   plus the cash was all that Kyle was planning to pay for

11:36  18   that phone?

11:36  19   A.  Exactly.

11:36  20   Q.  Do you know what the total value of that little

11:36  21   package was?

11:36  22   A.  I don't.

11:36  23   Q.  Okay.  Do you remember as you sit here today

11:36  24   how much cash Tony Castillo gave you for his phone?

11:36  25   A.  It was either $60 or $80.  I really don't

11:36  1    recall.

11:36  2        Q.  Okay.  When Ms. Martinez asked you about Tony's

11:36  3    phone what did you tell her initially?

11:36  4        A.  Honestly I don't -- I don't remember.

11:37  5        Q.  Did Ms. Martinez talk to you about both Ms.

11:37  6    Perez's phone and Mr. Castillo's in that same meeting?

11:37  7        A.  Yes.

11:37  8        Q.  Was anybody else present during that meeting?

11:37  9        A.  Yes.

11:37 10        Q.  Who?

11:37 11        A.  It was either Rick Rangel or Janie Olmos.

11:37 12        Q.  So in that first meeting you told -- what did

11:37 13    you tell Denise about Tony's phone about how he got his

11:37 14    phone?

11:37 15        A.  He asked to buy it.  He asked Ruben.

11:37 16        Q.  Okay.

11:37 17        A.  And that it was going to be payroll-deducted,

11:37 18    but he didn't want it coming out in one big chunk

11:37 19    because of his wife.

11:37 20        Q.  So he asked Ruben to buy this -- was it a nicer

11:37 21    phone than what he had?

11:37 22        A.  Yes.

11:37 23        Q.  Okay.  And Ruben said it was okay?

11:37 24        A.  Yes.

11:37 25        Q.  So he was supposed to do -- so tell me again.

11:39   1    Q. Okay. What did you tell her about that?

11:39   2    A. That there was -- that he gave me either 60 or

11:39   3   $80, somewhere along there, and the remaining balance

11:40   4   was to be payroll-deducted and I had started the

11:40   5   payroll deduction.

11:40   6    Q. Do you remember if Ms. Martinez asked you

11:40   7   whether there was cash involved or whether you

11:40   8   volunteered that information that, oh, yeah, by the way

11:40   9   he's giving -- he's adding cash, too?

11:40   10    A. No, I don't remember.

11:40   11    Q. Okay. Did you tell Ms. Martinez that there was

11:40   12   more than one payroll deduction form filled out for Mr.

11:40   13   Castillo's phone?

11:40   14    A. I don't remember. I do remember that there was

11:40   15   -- there was a -- when I had Tony sign the payroll

11:40   16   deduction form, at the bottom I recall putting a

11:40   17   balance because he questioned the balance.

11:40   18    Q. Okay. Do you remember telling Ms. Martinez

11:41   19   that you remembered having him fill out one payroll

11:41   20   deduction form?

11:41   21    A. Yes.

11:41   22    Q. Okay. So you remember telling her about Tony

11:41   23   Castillo's phone, that Ruben had authorized it, the

11:41   24   purchase of it --

11:41   25    A. Yes.



12:48  1      A.  I believe -- I wish I could have seen it.  You

12:49  2  know, it probably was just in my drawer in cash.

12:49  3      Q.  The cash that he gave you?

12:49  4      A.  Right, for that phone.

12:49  5      Q.  If he gave it?  I mean, do you know that he

12:49  6  gave you any cash?

12:49  7      A.  Oh, no, I know he did.

12:49  8      Q.  Okay.  Do you know how much as you sit here

12:49  9  today?

12:49 10      A.  It was either 60 or $80.  It was somewhere

12:49 11  around that.

12:49 12      Q.  Okay.  And so when you were in that meeting

12:49 13  with Ms. Martinez, you were telling us earlier that you

12:49 14  don't remember how that issue of cash got brought up

12:49 15  but you do remember discussing --

12:49 16      A.  Right.

12:49 17      Q.  -- that cash and transfer?

12:49 18      A.  Correct.

12:49 19      Q.  Do you remember -- what do you remember telling

12:49 20  Ms. Martinez about the cash that had been transferred

12:49 21  between --

12:49 22      A.  That he had given that -- it was a certain

12:49 23  dollar amount, and she had said, no, he says that he

12:49 24  gave you this amount.  And it was back and forth, no,

12:49 25  you know.

13:33  1      Q.  At will employment.  So why do you believe -- I

13:33  2  mean, do you believe that you were terminated for some

13:33  3  other reason besides not having a log and not being

13:33  4  honest about how the phones were paid for and how all

13:33  5  this cash in the office --

13:33  6      A.  I believe that it attached to my initial sexual

13:33  7  harassment.

13:33  8      Q.  And why do you believe that?

13:33  9      A.  Because it happened too quick.

13:33  10      Q.  What do you mean?

13:33  11      A.  The termination happened real fast.

13:33  12      Q.  Okay.  So that's the reason that you believe it

13:33  13  was related to your complaints about Mr. Guerra --

13:33  14      A.  Yes.

13:33  15      Q.  -- was because of the timing?

13:33  16      A.  Yes.

13:33  17      Q.  Okay.  Any other reason?

13:33  18      A.  No.

13:33  19      Q.  Okay.  Any reason that Ms. Martinez would have

13:33  20  to be part of this, you know, terminating you because

13:33  21  of a complaint you made against Mr. Guerra?  I mean,

13:33  22  why would she be involved in -- it's my understanding

13:34  23  that she terminated you, correct?

13:34  24      A.  Yes.

13:34  25      Q.  Why would she have gotten involved if having to



13:52   1      A.   Somebody, yeah.

13:52   2      Q.   Do you remember who that was?

13:52   3      A.   And it was a while back.

13:52   4      Q.   Okay.   Do you know of any reason why Rick

Rangel would have to lie about what was said?

13:52   6      A.   That was the only reason.

13:52   7      Q.   What, that he just didn't like you?

13:52   8      A.   Because I was related.

13:52   9      Q.   He would lie about you because you were related

to Carlos?

13:52  11      A.   Yeah.

13:52  12      Q.   Okay.   When you were having an affair with

Ruben Valdez, did other people at Coke know about that

affair?

13:52  15      A.   We never said anything.

13:52  16      Q.   Okay.   Do you think people found out -- I mean,

rumors, did you ever hear rumors that that was

happening?

13:52  19      A.   It did.

13:52  20      Q.   Did you ever hear rumors that you were

receiving favorable treatment from Ruben?

13:53  22      A.   No.

13:53  23      Q.   Never heard those?

13:53  24      A.   No.

13:53  25      Q.   Also were you -- earlier in the year 2002,

13:53 1    before your termination, was there another

13:53 2    investigation concerning Nextel bills?  I believe

13:53 3    something about you whiting out something off a Nextel

13:53 4    bill?

13:53 5        A.  What did I white out?  Something, but I don't

13:53 6    think it was an investigation.  I think Ruben just

13:53 7    asked me.  I don't -- I don't even recall.  I remember

13:53 8    that I made a copy of the top sheet.  I don't recall.

13:53 9    Something.

13:53 10       Q.  So all you remember is that Ruben Valdez came

13:53 11   and asked you about whiting something out off a Nextel

13:53 12   bill?

13:53 13       A.  Or I told him.  Really I can't remember.

13:53 14       Q.  Do you remember either Denise Martinez or Ken

13:53 15   Williams, anybody from human resources getting involved

13:53 16   in trying to find out why there was white out on a

13:54 17   Nextel bill?

13:54 18       A.  I don't remember that.

13:54 19       Q.  You don't remember anybody investigating that

13:54 20   situation?

13:54 21       A.  No.

13:54 22       Q.  Do you remember whiting something out on a

13:54 23   Nextel bill?

13:54 24       A.  I do.

13:54 25       Q.  Do you remember what it was?

13:54  1      A.  I don't remember what it was.

13:54  2      Q.  So you don't remember that it was your

13:54  3  information, the fact that you had a phone and that

13:54  4  deductions were being made for your phone?

13:54  5      A.  Oh, I did make payments on my phone.  I don't

13:54  6  recall if it was my information, but I do recall

13:54  7  payments that I had made on my phone.

13:54  8      Q.  Payments to who?

13:54  9      A.  Nextel.

13:54 10      Q.  On your company phone or on a personal phone?

13:54 11      A.  On a company phone but it was my personal

13:54 12  payment.

13:54 13      Q.  Okay.  So why -- what did that have to do with

13:54 14  whiting something out off a Nextel bill?

13:54 15      A.  See, I don't recall -- I don't recall whiting

13:54 16  out my information.

13:54 17      Q.  You just recall whiting something out?

13:54 18      A.  Yes, and I remember talking --

13:54 19      Q.  And that Ruben -- and you remember talking to

13:54 20  Ruben Valdez about it, about the whiting out something?

13:54 21      A.  Yes.

13:54 22      Q.  Okay.  And you don't remember anything else

13:54 23  about that?

13:54 24      A.  I remember -- I remember him -- giving him

13:55 25  copies of the checks that were written to Nextel.  I

13:55  1    can't remember.

13:55  2        Q.  So to you somebody asking about something and

13:55  3    you giving them records and that sort of thing is not

13:55  4    an investigation?

13:55  5        A.  Honestly, I didn't remember that.

13:55  6        Q.  Okay.

13:55  7        A.  Honestly, I didn't remember that.

13:55  8        Q.  Well -- but you understand that earlier you

13:55  9    said that the reason you -- one of the reasons you

13:55 10    believed that your termination was because of making a

13:55 11    complaint against Lee Guerra was that you had never

13:55 12    been investigated before.  So we're now seeing that

13:55 13    there -- that there had been other instances where you

13:55 14    were investigated.

13:55 15        A.  Well, I know -- yes, but this is a different

13:55 16    investigation.  It was completely -- I mean, admin

13:55 17    leave and it kind of followed, you know, too fast.  It

13:55 18    was just too fast.

13:55 19        Q.  Okay.  But this was actually the second

13:55 20    incident, though, involving a Nextel bill that you had

13:55 21    been involved in.

13:55 22        A.  Okay.

13:55 23        Q.  If we remember the one about the white out; is

13:55 24    that correct?

13:55 25        A.  Uh-huh.

13:55  1      Q.  And it happened within the same year.

13:55  2      A.  Okay.

13:55  3      Q.  Is that correct?

13:55  4      A.  I guess so.  I don't remember when it was, the

13:55  5  first one.

13:55  6      Q.  Okay.  But you remember being investigated two

13:55  7  times for a Nextel bill?

13:56  8      A.  I remember Ruben asking me for copies of the

13:56  9  checks that were made because Denise didn't believe

13:56 10  that I had made the payment.  And so I went ahead and I

13:56 11  gave them to him.

13:56 12      Q.  Was that when Ruben was still your supervisor?

13:56 13      A.  I believe so.

13:56 14      Q.  So this was before the complaints about Lee

13:56 15  Guerra?

13:56 16      A.  Yes.

13:56 17      Q.  Okay.  So back then when Ms. Martinez was

13:56 18  asking about Nextel bills --

13:56 19      A.  He didn't make it seem as if it was a big deal.

13:56 20  He just says, Denise doesn't believe you.  Can you just

13:56 21  get copies of them?  And I said, okay, yes.

13:56 22      Q.  So back at that point why do you believe that

13:56 23  Denise Martinez was asking about your Nextel bills back

13:56 24  when Ruben was your supervisor?

13:56 25      A.  Ruben said that she was just picking on me.

13:56  1      Q.  For what reason?

13:56  2      A.  He just made that comment.  He goes, can you

13:56  3  just get them for her.

13:56  4      Q.  Okay.  Was there any other times when Ruben had

13:56  5  said that Denise Martinez was picking on you?

13:56  6      A.  I don't remember.

13:56  7      Q.  Okay.  We were going through and we were

13:56  8  talking about, again, former or current employees of

13:56  9  Coca-Cola that you've had communications with since

13:57 10  your termination.  And the next name on the list was

13:57 11  Espie Ruiz.

13:57 12      A.  Ruiz.

13:57 13      Q.  What is it?

13:57 14      A.  Ruiz.

13:57 15      Q.  Ruiz.  I need to spell it out phonetically.

13:57 16  Sorry about that.  Espie Ruiz.  How often would you

13:57 17  talk to -- is that a lady or a man?

13:57 18      A.  A lady.

13:57 19      Q.  How often would you talk to her after your

13:57 20  termination?

13:57 21      A.  After, I don't recall.  But it would be for

13:57 22  tickets.

13:57 23      Q.  Okay.  She would be -- would she be calling you

13:57 24  for -- when you worked at Dodge Arena?

13:57 25      A.  Right.

16:38  1      Q.  Let's go through what -- you said earlier that

16:38  2   you --

16:38  3              MS. CARAWAY:  And I'll make this Exhibit

16:38  4   13.

16:38  5      Q.  -- that the way you initially made your

16:38  6   complaint against Lee Guerra was through your

16:38  7   brother-in-law Carlos.  Let's go through how that took

16:38  8   place.  Was that by phone or in person?

16:38  9      A.  I think maybe I e-mailed him something.

16:38  10     Q.  Okay.

16:38  11     A.  And then he asked me to go upstairs.

16:38  12     Q.  To his office?

16:38  13     A.  Uh-huh.

16:38  14     Q.  Did you -- do you remember sending the e-mail

16:38  15  in like a locked form where you couldn't print it out,

16:38  16  couldn't forward it, put any special lock on it where

16:38  17  you couldn't -- where Carlos was unable to forward it

16:39  18  or print out the e-mail?

16:39  19     A.  I don't remember.

16:39  20     Q.  Okay.  So you went to Carlos -- do you remember

16:39  21  what the e-mail said?

16:39  22     A.  It might have said something about it, but I

16:39  23  know it wasn't in detail because he wanted to talk to

16:39  24  me.

16:39  25     Q.  So the e-mail wasn't in -- you don't remember

16:39  1   what the e-mail said?

16:39  2       A.  No.  I don't think it was in detail.

16:39  3       Q.  So do you remember what it said about Lee?

16:39  4       A.  Probably something -- having problems with Lee

16:39  5   or something.  I know I sent him an e-mail, though.

16:39  6       Q.  Did it talk about sexual harassment problems or

16:39  7   just saying, I'm having problems with Lee?

16:39  8       A.  It might have said sexual harassment, probably

16:39  9   to have gotten his attention.

16:39  10      Q.  As you sit here today you don't remember what

16:39  11  that e-mail said?

16:39  12      A.  I just know I sent him one.

16:39  13      Q.  Okay.  And then he called you up to his office?

16:39  14      A.  Yes.

16:39  15      Q.  And then do you -- what do you remember about

16:39  16  that conversation?

16:39  17      A.  I told him exactly what had happened.

16:39  18      Q.  Okay.

16:39  19      A.  And I told him -- he says -- he said, do you

16:39  20  want me to take care of it, and I said, no, I'll deal

16:40  21  with it.  But I wanted him to know.

16:40  22      Q.  When you say you told him exactly what

16:40  23  happened, what exactly did you -- I don't know what

16:40  24  that is.

16:40  25      A.  Well, I had --

16:40  1      Q.  You're going to have to go through details of

16:40  2   what you told him.

16:40  3      A.  I had told him about -- that I had caught him

16:40  4   looking down my blouse and that he stands next to me

16:40  5   when I type letters and I didn't know why.  I even

16:40  6   asked him, do you do that?  He said no, he always

16:40  7   stands on the other side of the desk.  I told him about

16:40  8   a golf outing that the employees had and that how he

16:40  9   had taken me aside and gave me a hug.  I told him about

16:40  10  how he would hug me and give me a kiss on the cheek.  I

16:40  11  told him about the gifts that he has given me.  And the

16:40  12  reason I did tell him is because it's happened in the

16:41  13  past.

16:41  14     Q.  Do what?

16:41  15     A.  It's happened in the past.

16:41  16     Q.  The reason why you didn't or --

16:41  17     A.  I did tell him.

16:41  18     Q.  The reason -- I don't understand.

16:41  19     A.  I had told him -- you know, it had happened a

16:41  20  while back also.  And the way he fixed it was having a

16:41  21  meeting with all the -- all his staff.

16:41  22     Q.  So you had -- before you sent the e-mail to

16:41  23  Carlos you had complained --

16:41  24     A.  I didn't complain.  I had spoken to him about

16:41  25  that.

16:47  1      Q.  Who would have?

16:47  2      A.  Lee.

16:47  3      Q.  And so since he didn't tell you, you're

16:47  4  assuming nothing else happened?

16:47  5      A.  Right.

16:47  6      Q.  So then this -- so did you make any other

16:47  7  complaints or have any other problems with him after

16:48  8  Carlos had that meeting with all the --

16:48  9      A.  No.

16:48 10      Q.  -- his staff?

16:48 11      A.  He was -- he was then promoted to San Benito.

16:48 12      Q.  So the day after the meeting with Carlos, he

16:48 13  was promoted to San Benito?

16:48 14      A.  No, no, but it never happened again.

16:48 15      Q.  Okay.  So you never had any more problems after

16:48 16  that meeting?

16:48 17      A.  No.

16:48 18      Q.  Okay.  Then when did the problems start again?

16:48 19      A.  When he became my supervisor.

16:48 20      Q.  Okay.  So the golf outing, that was when he was

16:48 21  your supervisor, when he pulled you aside and gave you

16:48 22  a hug?

16:48 23      A.  No, I don't think so.  I believe he was -- he

16:48 24  was not my supervisor at the time.  He was -- I think

16:48 25  he was just hired on as my supervisor, but he wasn't

16:48  1    directly -- I think Ruben was still my supervisor.

16:48  2    Q.  Okay.  So that happened one time.  You were at

16:48  3    a golf outing -- a company golf outing, he pulled you

16:48  4    aside.  Was it a frontal hug or was it just like from

16:48  5    the side?

16:48  6    A.  Frontal.

16:48  7    Q.  So he came up and hugged you --

16:48  8    A.  Yes.

16:48  9    Q.  -- from the front?

16:48  10    A.  Yes.

16:48  11    Q.  Was anybody else around?

16:48  12    A.  He pulled me aside.

16:48  13    Q.  Like behind a tree?  No one else was even in

16:48  14    the area?

16:48  15    A.  Probably the employees from the -- from the

16:48  16    actual little store.

16:49  17    Q.  What store?

16:49  18    A.  There at the golf course.

16:49  19    Q.  The gift shop or whatever?

16:49  20    A.  Right.

16:49  21    Q.  So he pulled you over in to the gift shop?

16:49  22    A.  Uh-huh.

16:49  23    Q.  And gave you a hug?

16:49  24    A.  Right.

16:49  25    Q.  Did he say anything?

16:49 1    A.  Thank you for all the help.

16:49 2    Q.  Okay.  Did you take that as being some kind of

16:49 3 a sexual advance?

16:49 4    A.  The type of hug it was.  I just -- I mean, it

16:49 5 was a squeeze.

16:49 6    Q.  Okay.  How long did the hug last?

16:49 7    A.  It was just a pat.

16:49 8    Q.  Do what?

16:49 9    A.  Than just a pat on the back.  It was different.

16:49 10   Q.  Had he given you pats on the back before?

16:49 11   A.  No.

16:49 12   Q.  Okay.  So this was the first hug -- first

16:49 13 physical touch he had ever given you was this one hug?

16:49 14   A.  Right.

16:49 15   Q.  And he just said thank you for your help?

16:49 16   A.  Uh-huh.

16:49 17   Q.  But you took it because of the type of hug it

16:49 18 was to be a sexual thing?

16:49 19   A.  Yeah.

16:49 20   Q.  How long did the hug last?

16:49 21   A.  I don't -- I can't say how many --

16:49 22   Q.  I mean, was it a lingering thing?

16:49 23   A.  No.

16:49 24   Q.  Okay.  Then you said you talked to Carlos about

16:49 25 that you had caught Lee looking down your blouse?

A.   Yes.

Q.   And how many times did that happen?

A.   It happened a few times, but I only mentioned once because that's where -- when I looked up at him, he was standing next to me, I could see his eyes were not focused on me.  I knew that they were down my blouse.

Q.   Okay.  Did you say anything to Lee?

A.   No.  I just turned my body.

Q.   Why not -- why didn't you say something to Lee?

A.   It was an uncomfortable situation.  That's why I just turned my body.

Q.   Okay.  And how long between the time when he looked down your blouse to when you talked to Carlos?

A.   Probably within a day or two.

Q.   Okay.  And the golf outing, how long had that been before you talked to Carlos?

A.   Maybe a week.

Q.   Okay.  I thought you said that he had become your supervisor but he wasn't your -- but Ruben was still there?

A.   Right.

Q.   And then earlier you said you didn't e-mail Carlos until eight weeks or so after he was your supervisor.

16:50  1       A.  He was my supervisor for eight weeks, yeah.

16:50  2   Okay, so it was a longer period of time.  I know that

16:50  3   the golf outing was -- Ruben was still there and it

16:50  4   happened to have been the last golf outing we had when

16:50  5   he was there.

16:50  6       Q.  Okay.

16:50  7       A.  And that's when that happened.

16:50  8       Q.  Okay.  Did you tell Lee that that hug as you

16:51  9   pulled back from him or tell him that, you know, you

16:51  10  didn't appreciate that hug?

16:51  11      A.  No.  I turned around and just walked away.

16:51  12      Q.  Okay.  So your complaint to Carlos was the

16:51  13  first time you told anybody that you didn't appreciate

16:51  14  that hug?

16:51  15      A.  Right.  I had mentioned it to Ruben.

16:51  16      Q.  Okay.  But he was in -- was he already in

16:51  17  Houston?

16:51  18      A.  He was in Houston.

16:51  19      Q.  Okay.  Had you mentioned the catching -- any of

16:51  20  these other -- catching Lee looking down your blouse to

16:51  21  Ruben?

16:51  22      A.  I think so.  I'm not sure.

16:51  23      Q.  Okay.  Was this all when Ruben was in Houston?

16:51  24      A.  Uh-huh.

16:51  25      Q.  Did you ever make a complaint to Ruben about



16:52  1      Q.   Years ago?

16:52  2      A.   Uh-huh.

16:52  3      Q.   Okay.  Standing next to me looking down --

16:52  4   standing next to me when I type a letter.  How long had

16:52  5   that happened before you told Carlos about it?

16:52  6      A.   He would always stand next to me, it was just

16:52  7   an uncomfortable feeling, whenever he would ask me to

16:53  8   do something.

16:53  9      Q.   Did you ever tell him that that made you feel

16:53 10   uncomfortable?

16:53 11      A.   No, I did not.

16:53 12      Q.   Tell Lee?

16:53 13      A.   No, I did not.

16:53 14      Q.   Okay.  And then hug and kiss on the cheek.

16:53 15   When did that take place in relation to when you told

16:53 16   Carlos about it?

16:53 17      A.   It had happened prior.

16:53 18      Q.   Back years before --

16:53 19      A.   No.

16:53 20      Q.   -- or while he was your supervisor?

16:53 21      A.   He was my supervisor.

16:53 22      Q.   How long prior?  You said you had been working

16:53 23   for him about eight weeks when you told Carlos.

16:53 24      A.   It was before me catching him looking down my

16:53 25   blouse.  He would give me a hug and then kiss me on the

16:53   1    cheek.

16:53   2    Q. Like daily or did that happen --

16:53   3    A. No.

16:53   4    Q. -- one time?

16:53   5    A. Maybe once.

16:53   6    Q. Did you tell Lee at that point --

16:53   7    A. No, I did not.

16:53   8    Q. -- that you didn't like that? Gifts. What

16:53   9    gifts had he given you while he was your supervisor?

16:53   10   A. He gave me a Kenny G CD, he gave me an Eric

16:53   11   Clapton, the book of poems.

16:53   12   Q. Was this while he was your supervisor or years

16:53   13   before?

16:53   14   A. He was my supervisor.

16:54   15   Q. This current time, right, in 2002?

16:54   16   A. Right.

16:54   17   Q. That was the Kenny G CD and the Eric Clapton

16:54   18   CD?

16:54   19   A. Uh-huh.

16:54   20   Q. And then a book of poems?

16:54   21   A. Uh-huh.

16:54   22   Q. And you told Carlos about all of that during

16:54   23   your meeting with him?

16:54   24   A. I did tell him.

16:54   25   Q. So in your meeting with Carlos you told him

16:54   1   about catching Lee looking down your blouse, him

16:54   2   standing next to you when you typed letters, a golf

16:54   3   outing, a hug and a kiss on the cheek and gifts.  Did

16:54   4   you describe what the gifts were or did you just tell

16:54   5   him, he's giving me gifts?

16:54   6        A.  He's giving me gifts.

16:54   7        Q.  Okay.  Any other gifts you can think of besides

16:54   8   those three?

16:54   9        A.  He gave me body soap, body lotion.

16:54  10        Q.  This is in 2002 or is this the previous time?

16:54  11        A.  It could be 2002.  Most of the stuff I still

16:54  12   have.

16:54  13        Q.  Okay.  You remember -- we were talking earlier

16:55  14   about a previous time --

16:55  15        A.  Right.

16:55  16        Q.  -- years ago that you told Carlos about and you

16:55  17   told me the gifts then.  And I thought we went through

16:55  18   all of them so now are we just talking about the 2002

16:55  19   gifts?

16:55  20        A.  Yes.  But he would also give me gifts when he

16:55  21   was in San Benito.

16:55  22        Q.  Okay.  So he -- Lee had continually even when

16:55  23   he wasn't your supervisor and he was in San Benito had

16:55  24   been sending you stuff?

16:55  25        A.  He would come over to the plant.

16:55  1      Q.  Okay.  And how often did that happen?

16:55  2      A.  It was every once in a while.

16:55  3      Q.  Like once a year?

16:55  4      A.  No.

16:55  5      Q.  Twice a year?

16:55  6      A.  Maybe three, four times.

16:55  7      Q.  Three or four times a year?

16:55  8      A.  Yes.

16:55  9      Q.  And what type of gifts did he give you during

16:55 10   that period?

16:55 11      A.  All of those.

16:55 12      Q.  So the Eric Clapton CD, the Kenny G CD, the

16:55 13   book of poems, the body soap and lotion, that was

16:55 14   during both the San Benito time and 2002 when he became

16:55 15   your supervisor?

16:55 16      A.  Yes.  I know that he gave me a frame but I know

16:55 17   that was for a holiday.  Actually he gave me two

16:55 18   frames.  I can't think of all the gifts he's given me.

16:56 19      Q.  So there are more than what you've described?

16:56 20      A.  I'm sure there are.

16:56 21      Q.  Okay.  And was that when he was in San Benito

16:56 22   or in 2002?

16:56 23      A.  Within San Benito and 2002 becoming my

16:56 24   supervisor.

16:56 25      Q.  So during all that time?

16:56  1    A.  Uh-huh.

16:56  2    Q.  Would you get gifts weekly or monthly?

16:56  3    A.  Whenever he would come over.  Every now and

16:56  4  then.

16:56  5    Q.  Did you ever tell him that you didn't like

16:56  6  those gifts --

16:56  7    A.  I never told him anything.

16:56  8    Q.  -- not to bring you anything?

16:56  9    A.  I never told him anything.

16:56  10   Q.  Okay.  Have you ever before today described to

16:56  11 anybody what the gifts -- I'm not talking about your

16:56  12 attorney, described to anybody at Coca-Cola what the

16:56  13 gifts were that Lee gave you?

16:56  14   A.  At Coke?

16:56  15   Q.  Uh-huh.

16:56  16   A.  I didn't -- I didn't go and tell anybody.

16:56  17 People would see them, you know.  Who give you that?

16:56  18 Lee.  You know, people like that.

16:56  19   Q.  Co-workers or like supervisors and HR walk by

16:57  20 and see those?

16:57  21   A.  Co-workers or supervisors.

16:57  22   Q.  What supervisors walked by?

16:57  23   A.  I always had DSMs in my office.  If they saw

16:57  24 something in there, they would ask me, where did you

16:57  25 get that from.

16:58  1    anything about it?

16:58  2         A.  I didn't want him to go and tell HR.

16:58  3         Q.  Okay.  You told him that?

16:58  4         A.  Yes.

16:58  5         Q.  Did you understand that Coca-Cola had a policy

16:58  6    against sexual harassment at that time?

16:58  7         A.  Not really.  I was going to him as a family

16:58  8    member.

16:58  9         Q.  Okay.  Did you tell him that you -- did he

16:58  10   bring up -- you said that you mentioned the words

16:58  11   sexual harassment in your first e-mail or you think you

16:58  12   may have.

16:58  13        A.  Yes.

16:58  14        Q.  So when you mentioned that word and -- what

16:58  15   position did Carlos Ramos have with that company at

16:58  16   that time?

16:58  17        A.  Area VP.

16:58  18        Q.  Okay.  So you're going to the area VP and

16:58  19   mentioning the words sexual harassment and you're

16:58  20   telling him not to tell HR?

16:58  21        A.  Yes.

16:58  22        Q.  Did you think -- I mean, did you understand

16:58  23   that that would be a violation of company policy for

16:58  24   him to do if he didn't tell somebody as area VP if he

16:58  25   didn't let somebody know that you were being sexually