```
16:58  1   harassed?
16:58  2        A.  I did not know that because I walked in there
16:58  3   as -- and told him, I want to talk to you as my
16:58  4   brother-in-law.
16:58  5        Q.  Okay.  So you believe he should have just taken
16:58  6   off one hat and put on the other.  So as an area VP if
16:59  7   he had not told anybody, you would not have thought
16:59  8   that that was wrong, that he -- if he had not told
16:59  9   anybody about your conversation with him?
16:59 10        A.  I didn't want him going to HR or to him
16:59 11   individually.
16:59 12        Q.  To who individually?
16:59 13        A.  Lee.
16:59 14        Q.  Why did you not want him going to HR?
16:59 15        A.  Because I knew that if he took care of it the
16:59 16   same way he did before, it would be okay.
16:59 17        Q.  So you thought if he just had a group meeting
16:59 18   -- if Carlos just had a group meeting telling everybody
16:59 19   about sexual harassment that that would end it?
16:59 20        A.  Yes.
16:59 21        Q.  Did you tell him that you wanted him to do
16:59 22   that?
16:59 23        A.  No.
16:59 24        Q.  So all you told him was, I'm talking to you as
16:59 25   your sister-in-law.  I don't want you to tell HR, I
```

| | | |
|---|---|---|
| 16:59 | 1 | don't want you to tell Lee? |
| 16:59 | 2 | A.  I said, don't -- don't do anything.  I'll take |
| 16:59 | 3 | care of it. |
| 16:59 | 4 | Q.  Okay.  Did you tell him that you really didn't |
| 16:59 | 5 | think this was sexual harassment, it was just things |
| 16:59 | 6 | that were making you uncomfortable that you wanted him |
| 16:59 | 7 | to be aware of? |
| 16:59 | 8 | A.  I told him that I wanted him to be aware of it. |
| 16:59 | 9 | Q.  Okay.  Did you use the words -- you said that |
| 16:59 | 10 | in the e-mail you may or may not have used the words |
| 16:59 | 11 | sexual harassment? |
| 16:59 | 12 | A.  I'm sure I did. |
| 16:59 | 13 | Q.  You're sure you -- in the e-mail that you used |
| 17:00 | 14 | the words sexual harassment? |
| 17:00 | 15 | A.  No.  I'm sure I told him sexual harassment. |
| 17:00 | 16 | Q.  Okay.  So you're telling -- you're saying that |
| 17:00 | 17 | in the meeting with Carlos Ramos you said, I feel like |
| 17:00 | 18 | I'm being sexually harassed by Lee Guerra? |
| 17:00 | 19 | A.  Uh-huh. |
| 17:00 | 20 | Q.  You're sure you used that term? |
| 17:00 | 21 | A.  I guess I did. |
| 17:00 | 22 | Q.  Okay.  And yet you told him, don't report this. |
| 17:00 | 23 | I'm saying that I was sexually harassed but don't |
| 17:00 | 24 | report it? |
| 17:00 | 25 | A.  I told him not to say anything. |

| | | |
|---|---|---|
| 17:06 | 1 | Q. Okay. So the retaliation was that Lee said not |
| 17:07 | 2 | to be a burden on you by telling your problems -- |
| 17:07 | 3 | telling you their problems? |
| 17:07 | 4 | A. Yes. |
| 17:07 | 5 | Q. Okay. Anything else besides your termination |
| 17:07 | 6 | that you consider retaliation? |
| 17:07 | 7 | A. His attitude toward me, Lee's. |
| 17:07 | 8 | Q. Okay. And what was that? |
| 17:07 | 9 | A. He grew distant. And that's how I found out |
| 17:07 | 10 | that Carlos had talked to him because of his attitude. |
| 17:07 | 11 | He had changed. He walked in to my office one day and |
| 17:07 | 12 | stood on the other side of my desk and he said, I have |
| 17:07 | 13 | to stand back here from now on. He says, just turn |
| 17:07 | 14 | your screen to me. And I said, what's going on. He |
| 17:07 | 15 | goes, you know what's going on. And he stayed cold. |
| 17:07 | 16 | After that, he just -- his attitude just completely |
| 17:07 | 17 | changed. |
| 17:07 | 18 | Q. How else did it change? |
| 17:07 | 19 | A. The way he would talk to me, real short and |
| 17:07 | 20 | abrupt. I would ask him for things to -- paperwork to |
| 17:07 | 21 | get signed. And he'll say, just leave it there. I'll |
| 17:07 | 22 | sign it later. Things like that. |
| 17:07 | 23 | Q. Did he -- did you have anymore problems with |
| 17:08 | 24 | him looking down your blouse or -- |
| 17:08 | 25 | A. No. |

| | | |
|---|---|---|
| 17:08 | 1 | Q. -- giving you gifts after you made that |
| 17:08 | 2 | complaint to Carlos? |
| 17:08 | 3 | A. No. |
| 17:08 | 4 | MS. CARAWAY: This will be Exhibit 14. |
| 17:08 | 5 | Q. Feel free to read through that document and |
| 17:08 | 6 | then you can tell me if you're familiar with it. |
| 17:08 | 7 | A. I've seen this. |
| 17:08 | 8 | Q. Okay. In what context did you see that? |
| 17:09 | 9 | A. I believe Denise -- |
| 17:09 | 10 | Q. Gave you this document? |
| 17:09 | 11 | A. I think she showed it to me, yes. |
| 17:09 | 12 | Q. There are two pages to it. The handwritten |
| 17:09 | 13 | notes that are on there on the first and second pages |
| 17:09 | 14 | of Exhibit 14, who made those? Who made the |
| 17:09 | 15 | handwritten notes? |
| 17:09 | 16 | A. These? |
| 17:09 | 17 | Q. Uh-huh. |
| 17:09 | 18 | A. I don't know. |
| 17:09 | 19 | Q. It's not your handwriting? |
| 17:10 | 20 | A. No, it's not. |
| 17:10 | 21 | Q. When you were presented with this document did |
| 17:10 | 22 | you tell Ms. Martinez that you wanted to make changes |
| 17:10 | 23 | to it? |
| 17:10 | 24 | A. Yes. |
| 17:10 | 25 | Q. Do the handwritten notes reflect changes that |

| | | |
|---|---|---|
| 17:20 | 1 | A. That's the change I made. |
| 17:20 | 2 | Q. Okay. Were there other changes that you wanted |
| 17:20 | 3 | made to this document? |
| 17:20 | 4 | A. No. The reason why I put that is because I |
| 17:20 | 5 | knew that Lee would get ahold of it. |
| 17:20 | 6 | Q. So that's not true? |
| 17:20 | 7 | A. Looking down my blouse? |
| 17:20 | 8 | Q. The changes you made there, is that -- |
| 17:21 | 9 | A. No, I know -- I know he looked down my blouse, |
| 17:21 | 10 | but I knew that Lee was going to have to sign this, so |
| 17:21 | 11 | I didn't want to put it there. |
| 17:21 | 12 | Q. So that's an untrue statement when you crossed |
| 17:21 | 13 | that out, that she has never seen Lee do this, you |
| 17:21 | 14 | crossed that out even though it was true, that you have |
| 17:21 | 15 | seen him do this? |
| 17:21 | 16 | A. Yes, because I knew that Lee would -- Lee had |
| 17:21 | 17 | to sign this. |
| 17:21 | 18 | Q. Is there anything else in the statement that |
| 17:21 | 19 | you -- that was put in there even though you believe it |
| 17:21 | 20 | was untrue? |
| 17:21 | 21 | A. No. I think this is it. |
| 17:21 | 22 | Q. Down at the bottom it says, my signature is |
| 17:21 | 23 | only to acknowledge receipt of this document. Why did |
| 17:21 | 24 | you sign that way rather than just the signing the |
| 17:21 | 25 | document straight out? |

| | | |
|---|---|---|
| 17:21 | 1 | A. For one, because of this and, secondly -- |
| 17:21 | 2 | Q. "Because of this" meaning that one change? |
| 17:21 | 3 | A. This -- yes, that change. And, also, I didn't |
| 17:21 | 4 | get to read it all. I was nervous so I just signed it. |
| 17:21 | 5 | Q. Well, it says the meeting took 90 minutes and |
| 17:21 | 6 | you just reviewed the whole thing in less than a minute |
| 17:21 | 7 | right here. |
| 17:21 | 8 | A. Well, I didn't read it. I didn't read it all. |
| 17:21 | 9 | I do recall because I read it later. |
| 17:21 | 10 | Q. Well, I want you to read it all and tell me if |
| 17:22 | 11 | there's anything in there that's inaccurate or that you |
| 17:22 | 12 | wanted to change? |
| 17:22 | 13 | A. Well, I read it at a later date. |
| 17:22 | 14 | Q. Okay. |
| 17:22 | 15 | A. I mean, I have this copy. |
| 17:22 | 16 | Q. So you're familiar with that -- |
| 17:22 | 17 | A. Yes. |
| 17:22 | 18 | Q. -- document enough to where you can tell me |
| 17:22 | 19 | today that there's nothing else that you want to change |
| 17:22 | 20 | in there? |
| 17:22 | 21 | A. Right, right. |
| 17:22 | 22 | Q. Okay. So you agree with everything that's in |
| 17:22 | 23 | that document? |
| 17:22 | 24 | A. Yes. |
| 17:22 | 25 | Q. Okay. When you filed your charge of -- |

```
                IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
                        BROWNSVILLE DIVISION

CRISTINA MUNOZ              )(
        Plaintiff           )(
                            )(
VS.                         )(   CIVIL ACTION NO. B-04-066
                            )(
LAREDO COCA-COLA BOTTLING   )(
COMPANY                     )(
        Defendant           )(
```

                    REPORTER'S CERTIFICATION
                 DEPOSITION OF CHRISTINA MUNOZ
                        JANUARY 5, 2005

   I, CINDY S. ROMERO, Certified Court Reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of the oral deposition of CHRISTINA MUNOZ;

   I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

434

1    Certified to by me this 25TH day of
2    JANUARY_____, 2005.
3
4
5                    *Cindy S. Romero* (signature)
     _____
6    CINDY S. ROMERO, Texas CSR 186
     Expiration Date: 12-31-06
7    Hill & Romero
     Certified Court Reporters
8    10125 North 10th Street, Suite B
     McAllen, Texas   78504
9    (956) 287-8898
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# Memo

**From:** Denise Martinez

**Date:** 9/25/02

**Re:** 9/23/02 meeting with Chris Munoz

Today, September 25, 2002, we had a meeting the purpose of which was to follow-up on the three issues we had discussed in another meeting on Monday of this week at which Chris Munoz, Janie Olmos and I were present. The three issues were the following:

1. A report Chris Munoz made to Carlos Ramos on September 13, 2002 stating that Lee Guerra had hugged her once three months ago during a golf tournament and had been looking down her blouse while they worked together.

2. Lee Guerra's meeting with the McAllen DSM's on September 18, 2002 in which he asked about any job problems they were having and reminded them that they needed to maintain communication with their supervisors or Human Resources or with him directly if they did have such problems. Lee also told the DSM's that they should not be venting or dumping their problems on Chris. This process was discussed in this meeting in part because of reports Chris Munoz had made to Carlos Ramos in the same conversation referenced in item 1 above that the DSM's were not happy with Lee's management style and had told her that Lee was "talking down to them."

3. Lee Guerra's conversations with Chris Munoz about her reports to Carlos Ramos.

These three issues have been discussed and resolved as follows:

1. In response to Chris' report to Carlos Ramos on September 13, 2002, Carlos asked her if she had felt Lee was harassing her by hugging her. Chris said "no." She explained to Carlos in response to his questions that she was "not making a harassment claim" and "did not want any investigation because there was nothing to investigate." She said she was only telling him because she wanted to vent. Carlos later asked Lee in a meeting where I was present on September 16, 2002 if he recalled any time he had hugged Chris and he did not. Carlos also asked Lee about looking down Chris' blouse and he said he did not do this. Carlos then asked Lee to talk with Chris and to let her know that he did not remember any hug and had not looked down her blouse but that he also did not want to create any rumors that made her uncomfortable. Lee had this conversation with Chris on September 18, 2002. During this meeting, Chris also told Lee that the hug had not offended her but that she was just concerned with what other people would think. Chris then told Lee that she never said he was looking down her blouse but had only told Carlos that she thought other people were (as per Lee)

  During our meeting on September 23, I explained to Chris that if any employee makes her feel uncomfortable by looking down her blouse or hugging her or something else like this, she should let her supervisor or myself or someone else in Human Resources know. Chris understands this and is satisfied with this process.

2. Lee told Chris on September 18 that he had spoken to the DSM's regarding the complaints she had reported from them to Carlos and that they had denied these complaints. He also explained to her that he had asked the DSM's not to be venting or dumping their complaints on her so that she would not have to deal with any problems they had in the future.

Apx.-39

MUNOZ
EXHIBIT NO. 14
Hill & Romero

Chris' response to this information was to feel that the DSM's would not ~~like her~~ talk or trust ~~me~~ help me. anymore. She expressed this to me on Monday, September 23, 2002. I explained to her that this was not the purpose of Lee's instruction to the DSM's or to her regarding their venting to her. The bottom line is that it is not part of her job to have to listen to employees vent their job complaints. Employees are supposed to discuss problems they have on the job with their supervisors, HR or someone else who can help them. Lee was trying to facilitate this process by reminding the DSM's of this process, ~~and letting Chris know what he had told them, so she could also help facilitate the process by also reminding DSM's or any employees who came in her office just to vent their job problems that they should take these problems to someone who can help resolve them. Lee was also trying~~ to avoid having Chris be put ~~in the awkward position~~ of having information that someone else really needs to know in order to help resolve a problem ~~that~~ that employees had confided in her.

Chris now understands this and has agreed to help facilitate this process by not encouraging employees to have "closed door" meetings with her, and instead telling them that they need to report their concerns or complaints to their supervisor, Lee or someone in HR who can help them.

3. Finally, we discussed the process that needs to be used in light of these circumstances when Lee and Chris need to communicate in the future. Lee had reported to me that Chris had walked out on a couple of meetings that he had tried to have with her about issues 1 and 2 last Wednesday and Thursday. During our meeting on September 23, I explained to Chris that she cannot simply walk out during a meeting with a supervisor and that doing so constitutes insubordination. Chris said she understood this, but explained that she did not perceive that she had walked out before these meetings with Lee were over. Chris explained that she had told Lee that she did not want to talk about these issues at that time and believed that the meetings had ended before she left. I told Chris that if there were issues she did not feel comfortable talking directly with Lee about that she could tell him that she would like to speak with me or someone else in HR about them and that he would work with her to coordinate this. I explained that this approach, rather than just telling Lee she did not want to talk about something and leaving the room, was a more clear way of dealing with any such issue.

Chris agreed that walking out would be insubordination and that she would use this approach for any issues she was uncomfortable about and said that she does not have problems communicating with Lee generally.

This meeting took place in the Human Resources office and lasted approximately ___ minutes. We were in attendance in this meeting and agree that this memo accurately reflects the issues discussed and the resolutions of these issues.

_____

_____

_____

I was not in attendance at this meeting, but have reviewed this memo and agree that it accurately reflects the way these issues have been dealt with and resolved.

_____

Apx.-40

*[handwritten at bottom: Nowhere does it say that she felt intimidated. / Because Ron - wed]*

Memo

From: Denise Martinez

Date: 9/25/02

Re: 9/23/02 meeting with Chris Munoz

Today, September 25, 2002, we had a meeting the purpose of which was to follow-up on the three issues we had discussed in another meeting on Monday of this week at which Chris Munoz, Janie Olmos and I were present. The three issues were the following:

1. A report Chris Munoz made to Carlos Ramos on September 13, 2002 stating that Lee Guerra had hugged her once three months ago during a golf tournament and had been looking down her blouse while they worked together.

2. Lee Guerra's meeting with the McAllen DSM's on September 18, 2002 in which he asked about any job problems they were having and reminded them that they needed to maintain communication with their supervisors or Human Resources or with him directly if they did have such problems. Lee also told the DSM's that they should not be venting or dumping their problems on Chris. This process was discussed in this meeting in part because of reports Chris Munoz had made to Carlos Ramos in the same conversation referenced in item 1 above that the DSM's were not happy with Lee's management style and had told her that Lee was "talking down to them."

3. Lee Guerra's conversations with Chris Munoz about her reports to Carlos Ramos.

These three issues have been discussed and resolved as follows:

1. In response to Chris' report to Carlos Ramos on September 13, 2002, Carlos asked her if she had felt Lee was harassing her by hugging her. Chris said "no." She explained to Carlos in response to his questions that she was "not making a harassment claim" and "did not want any investigation because there was nothing to investigate." She said she was only telling him because she wanted to vent. Carlos later asked Lee in a meeting where I was present on September 16, 2002 if he recalled any time he had hugged Chris and he did not. Carlos also asked Lee about looking down Chris' blouse and he said he did not do this. Carlos then asked Lee to talk with Chris and to let her know that he did not remember any hug and had not looked down her blouse but that he also did not want to create any rumors that made her uncomfortable. Lee had this conversation with Chris on September 18, 2002. During this meeting, Chris also told Lee that the hug had not offended her but that she was just concerned with what other people would think. Chris then told Lee that she never said he was looking down her blouse but had only told Carlos that she thought other people were (as per Lee). Chris' recollection of this conversation is that she told Lee that she had told Carlos that other people had told her that he was looking down her blouse, but she has never seen Lee do this. CM

During our meeting on September 23, I explained to Chris that if any employee makes her feel uncomfortable by looking down her blouse or hugging her or something else like this, she should let her supervisor or myself or someone else in Human Resources know. Chris understands this and is satisfied with this process.

2. Lee told Chris on September 18 that he had spoken to the DSM's regarding the complaints she had reported from them to Carlos and that they had denied these complaints. He also explained to her that he had asked the DSM's not to be venting or dumping their complaints on her so that she would not have to deal with any problems they had in the future.

Chris' response to this information was to feel that she had been retaliated against because she believed that the DSM's would not talk to her or trust her anymore. She expressed this to me

on Monday, September 23, 2002. I explained to her that this was not the purpose of Lee's instruction to the DSM's or to her regarding their venting to her. The bottom line is that it is not part of her job to have to listen to employees vent their job complaints. Employees are supposed to discuss problems they have on the job with their supervisors, HR or someone else who can help them. Lee was trying to facilitate this process by reminding the DSM's of this process. Lee was also trying to avoid having Chris be "burdened" by having information that someone else really needs to know in order to help resolve a problem that employees had confided in her. In light of Chris' comment that she felt "retaliated against" as a result of Lee's comments to the DSM's, I spoke with Jimmy Silva, the Sales Manager, who was present when Lee met with the DSM's, and also met with three of our four DSM's. From these conversations, I learned that Lee had not instructed the DSM's not to talk to Chris or to otherwise treat her badly or retaliate in any way against her. All he had said was that it was not her job to have to listen to their complaints.

Chris now understands this process and has agreed that she will not discuss job complaints with other employees. Instead, she will explain to them that they need to report their concerns or complaints to their supervisors, Lee or someone in HR who can help them. Chris also understands that engaging in such discussions in the future will result in discipline, up through and including termination, as engaging in such conversations is not part of her job duties and is a hindrance to employee concerns and complaints being constructively and efficiently resolved.

3. Finally, we discussed the process that needs to be used in light of these circumstances when Lee and Chris need to communicate in the future. Lee had reported to me that Chris had walked out on a couple of meetings that he had tried to have with her about issues 1 and 2 last Wednesday and Thursday. During our meeting on September 23, I explained to Chris that she cannot simply walk out during a meeting with a supervisor and that doing so constitutes insubordination. Chris said she understood this, but explained that she did not perceive that she had walked out before these meetings with Lee were over. Chris explained that she had told Lee that she did not want to talk about these issues at that time and believed that the meeting was to continue at a later time. I told Chris that if there were issues she did not feel comfortable talking directly with Lee about that she could tell him that she would like to speak with me or someone else in HR about them and that he would work with her to coordinate this. I explained that this approach, rather than just telling Lee she did not want to talk about something and leaving the room, was a more clear way of dealing with any such issue.

Chris agreed that walking out would be insubordination and that she would use this approach for any issues she was uncomfortable about and said that she does not have problems communicating with Lee generally.

This meeting took place in the Human Resources office and lasted approximately _90_ minutes. We were in attendance in this meeting and agree that this memo accurately reflects the issues discussed and the resolutions of these issues.

_____
_____
_____

I was not in attendance at this meeting, but have reviewed this memo and agree that it accurately reflects the way these issues have been dealt with and resolved.

_____

Apx.-42

— My signature is only to acknowledge receipt of this document. csy.

# Coca-Cola Enterprises

---

### Acknowledgement of Receipt of the EEO and Sexual Harassment/Anti-Harassment Policies

---

I acknowledge that I have been provided a copy of the Company's EEO and Sexual Harassment/Anti-Harassment Policies. I understand that as part of my job I am expected to know and follow these policies. I further understand I have an affirmative obligation to report promptly any misconduct in violation of this policy including making reports to the Corporate Office should misconduct not be fully corrected by local/Division management.

In addition, I understand that the Company policy prohibits any retaliation against those making good faith complaints under this policy. I also understand that if I engage in conduct prohibited by these policies, I will be subject to disciplinary action, up to and including discharge.

Christina J Munoz
**Print Name**

Christina J Munoz
**Signature**

2·6·02
**Date**

EXHIBIT NO. 19
MUNOZ
HILL & Romero

---

### NOTE:
The Sexual harassment/Anti-harassment policies of the Company will be applied to all employees including those who may not have signed the above acknowledgement of receipt.

Apx.-43