UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
AT BROWNSVILLE

| | |
|---|---|
| CRISTINA MUÑOZ,<br><br>　　　Plaintiff,<br><br>v.<br><br>THE LAREDO COCA-COLA BOTTLING COMPANY, INC.,<br><br>　　　Defendant. | Civil Action No. 1:04-CV-00066 |

### AFFIDAVIT OF DENISE MARTINEZ

STATE OF TEXAS　　　)
COUNTY OF HIDALGO　)

　　This day, personally appeared before me, the Affiant, Denise Martinez, who, after first being duly sworn by me, deposes and says the following:

1.　　My name is Denise Martinez. I am over twenty-one (21) years of age and am otherwise fully competent to make this affidavit.

2.　　At all times relevant hereto, I have held the position of Employee Relations Manager for The Laredo Coca-Cola Bottling Company, Inc. and Coca-Cola Enterprises Inc. Part of my duties have included handling personnel issues for the McAllen, Texas facility.

3.　　On or about September 12, 2002, I received a call from the Area Vice-President for the Southwest Texas Division of Coca-Cola Enterprises, Carlos Ramos, stating that he had received an e-mail from an employee of the McAllen facility by the name of Cris Munoz. Ms. Munoz is Mr. Ramos' sister-in-law. (Mr. Ramos is married to Ms. Munoz's sister.)

4.　　Ms. Munoz's date of hire was September 12, 1994.

5.  At all pertinent times described herein, Ms. Munoz was the Branch Secretary for the McAllen facility. Her job duties as a Branch Secretary included providing administrative assistance to the Branch Manager, performing general office duties, reviewing the McAllen facility's bills before forwarding them to the Branch Manager for approval, creating payment requests for the same, processing orders placed by facility employees from the Company store and payroll deductions relating to purchases made through other Company programs and assisting with coordinating special events and special orders for customers as requested by the facility sales personnel.

6.  Four (4) issues were addressed in this e-mail:

(1) Ms. Munoz did not receive a Key Account Manager position after applying for the same with her current supervisor, Lee Guerra; (2) Mr. Guerra had hugged Ms. Munoz on one occasion at a golf tournament prior to becoming her supervisor; (3) Mr. Guerra had looked down Ms. Munoz's blouse while they were working together in her office; and (4) the McAllen facility District Sales Managers were not comfortable working with Mr. Guerra and had related several concerns to Ms. Munoz about him.

7.  Mr. Ramos explained to me that he had spoken with Ms. Munoz concerning these issues after receiving her e-mail. Mr. Ramos and I then met to discuss them.

8.  We had this meeting despite the fact that Mr. Ramos conveyed to me that Ms. Munoz had told him repeatedly that she did not want to file any type of harassment complaint regarding Mr. Guerra and did not want the issues addressed in her e-mail forwarded to Human Resources.

9.  At the conclusion of my meeting with Mr. Ramos, we agreed to have a meeting with Mr. Guerra to make him aware of the issues which had been raised by Ms. Munoz and obtain his responses to the same.

10. September 12, 2002 was a Thursday. Mr. Ramos was leaving town that afternoon and was not going to return until Monday, September 16, 2002. Accordingly, we agreed to meet with Mr. Guerra on Monday morning.

11. On Monday, September 16, 2002, Mr. Ramos and I met with Mr. Guerra. He was visibly shaken by Ms. Munoz's accusations. During this meeting, Mr. Guerra said that he did not recall giving Ms. Munoz a hug at a Company golf tournament several months earlier. He also denied looking down Ms. Munoz's blouse.

12. We discussed Mr. Guerra talking to Ms. Munoz to let her know that he had never intended to do anything which would make her feel uncomfortable, even though he did not remember hugging her at the golf tournament and did not look down her blouse. We also discussed Mr. Guerra meeting with the District Sales Managers of the McAllen facility to address the issues Ms. Munoz had described in her e-mail to Mr. Ramos concerning these employees.

13. Mr. Ramos and I approved of these actions in moving forward to resolve these matters.

14. Mr. Guerra had only been the Branch Manager of the McAllen facility for a couple of months at the time of this meeting.

15. Over the course of the next few days, I became aware that Ms. Munoz had walked out on meetings and hung up during telephone conversations with Mr. Guerra and was accusing him of "retaliating" against her by talking to the District Sales Managers about the concerns that she had expressed to Mr. Ramos concerning their working with Mr. Guerra.

16. Accordingly, on Monday, September 23, 2002, I met with Ms. Munoz. During this meeting she confirmed that Mr. Guerra had hugged her but also said that the reason she had told Mr. Ramos about being hugged was not because she was offended by it or believed it was

"sexual harassment" but because she was concerned about other people spreading rumors about "something going on" between she and Mr. Guerra the same way employees had spread rumors about an affair between she and her former supervisor, Ruben Valdez.

17. Ms. Munoz also said during this meeting that instead of seeing Mr. Guerra look down her blouse herself she had heard from other people that they had seen Mr. Guerra doing this.

18. Ms. Munoz also expressed her belief that Mr. Guerra's meeting with the McAllen District Sales Managers was "in retaliation" for her telling Mr. Ramos about him hugging her and looking down her blouse.

19. I asked Ms. Munoz during this meeting if Mr. Guerra's meeting with the District Sales Managers was the only thing that she believed Mr. Guerra or anyone else in the Company had done to "retaliate" against her, and she said "yes."

20. I also asked Ms. Munoz during this meeting how her working relationship with Mr. Guerra was. She said it was fine and specifically said that she did not want to be transferred to work for someone else.

21. I then interviewed the employees who had been part of the District Sales Managers' meeting Mr. Guerra had held. None of them said Mr. Guerra had said anything negative about Ms. Munoz in the meeting.

22. On Wednesday, September 25, 2002, I asked Ms. Munoz to meet with me again. During this meeting I explained that we needed to close the investigation concerning her complaint of retaliation and to make sure that it had been resolved to her satisfaction. In order to accomplish this, she and I reviewed a written statement that I had prepared which summarized our previous meeting and the understandings we had reached during that meeting.

23.     Ms. Munoz and I reviewed this statement paragraph by paragraph.  A copy of this statement is attached as **Exhibit 1** hereto.  During our meeting, Ms. Munoz requested several changes to this statement.  At the end of this meeting, I told Ms. Munoz that I would make the changes we had discussed and would meet with her again once I had made them.

24.     I called Ms. Munoz the following afternoon.  When I first tried to call her, Ms. Munoz had her phone directed to automatic voice-mail.  When I called her later, she said she was busy, so we agreed to meet the next day.

25.     Ms. Munoz and I met along with the Senior Human Resources Clerk for the McAllen facility, Jamie Olmos on Monday, September 30, 2002.  We once again went through the written statement, now with Ms. Munoz's suggested changes.  Ms. Munoz said she had additional changes she wanted to make to the statement.  Ms. Munoz had not requested these changes in our previous meeting.  I asked her to hand-write her additional changes in.

26.     Ms. Munoz did so, however, when she finished making her changes, she refused to sign the statement, saying instead that she preferred merely to say that she was "acknowledging receipt of the document".  This is in fact what she did.  A copy of this second statement is attached as **Exhibit 2** hereto.

27.     Ms. Munoz also added during this meeting that she actually had seen Mr. Guerra looking down her blouse while they were working together.  She said she could recall occasions when their eyes had met when she "caught" him doing so.  I asked Ms. Munoz why she had not mentioned this in our previous two meetings.  She said she had "just thought of it."

28.     During this three-week or so period from when I had first learned of Ms. Munoz raising issues with Mr. Ramos concerning Mr. Guerra and the first part of October, 2002, I also was in the process of reviewing the McAllen facility's Nextel phone bills for August.  Sometime in mid-

September, Ms. Munoz had presented the July, August and September Nextel bills to Mr. Guerra for him to sign so that they could be paid through the facility's Company account.

29. The August Nextel statement reflected charges for equipment that totaled over a thousand dollars, yet there was no description of what this equipment was. I noticed that in the July and September statements, there was a description of the equipment purchased. I contacted Nextel to find out why there was no description for the equipment purchased during the month of August. Nextel explained that this description had been included and, based on the copy of the statement Nextel had, the copy Ms. Munoz had given to Mr. Guerra was missing eleven (11) pages. These pages reflected the description of the equipment.

30. This was not the first time that I had had questions concerning the McAllen facility Nextel bill.

31. It was part of Ms. Munoz's job as Branch Secretary to review these bills and their supporting statements before forwarding them to the Branch Manager for his approval for payment. It was also part of her job to complete payroll deduction forms for any employees who had used over the monthly allotment on their Company cell phones or had purchased upgraded equipment which was not paid for by the Company.

32. Prior to Mr. Guerra becoming Branch Manager, I had noticed that although she had a Company cell phone, I never saw any payroll deduction forms for Ms. Munoz herself.

33. I had questioned Ms. Munoz about this, and she explained that she had been sending her overage payments directly to Nextel rather than having them taken out of her check through payroll deductions.

34. I contacted Nextel to confirm this information and was told that they had not received any "separate payments" on the McAllen facility's account – only the one Company payment.

35.  I also had noticed that Ms. Munoz's name was whited out on another Nextel bill. I had asked her about this, and she had no explanation as to how or why her name had been whited out.

36.  I forwarded all of this information on to Ms. Munoz's supervisor at the time, who was the previous Branch Manager, Ruben Valdez.

37.  As far as I know, no action was ever taken by Mr. Valdez to address these issues.

38.  It was rumored that Mr. Valdez was romantically involved with Ms. Munoz, so I assumed this was the reason I never heard anything more about these matters.

39.  Ms. Munoz also had been involved in some other matters involving questionable charges on the Company credit card while Mr. Valdez was Branch Manager.

40.  When Mr. Guerra became Branch Manager in August of 2002, I told him that I believed he should carefully review all invoices and bills Ms. Munoz asked him to sign, particularly the Nextel ones, based on my prior experience with these issues.

41.  The first time Ms. Munoz submitted Nextel bills to Mr. Guerra was in mid-September, 2002. For some reason she had held the bills for July, August and September and submitted them all together to him.

42.  Per my prior recommendation, Mr. Guerra reviewed the Nextel bills rather than just signing off on them to approve them for payment.

43.  As part of this process, he asked Ms. Munoz for the supporting monthly statements which showed what the amounts shown on the bills were for.

44.  Three months' worth of these statements amounted to a stack of documents about ten inches thick.

45. Mr. Guerra and I noticed that some of the pages of the supporting information were missing, and he asked for my assistance in reviewing these statements.

46. As noted above, there was over a thousand dollars in equipment charges shown on the August Nextel bill.

47. By reviewing the missing pages (of which Nextel provided another copy at my request), I learned that this total was for three "I-95" phones.

48. "I-95" phones are not part of our regular Company purchase plan – they are a much higher grade than the phones which approved employees are permitted to purchase for Company use. The price of each of these phones is $459.99 less some discounts.

49. Accordingly, there should have been payroll deduction forms reflecting deductions for the purchase of these expensive phones by the employees who had ordered them or other notations that the employees had given cash or checks to purchase the same.

50. On or about October 3, 2002, I met with Ms. Munoz to ask her about these three phones. I also reviewed the McAllen facility's payroll deduction form file in her presence during this meeting. We only found one form relating to any of these phones – it had been completed by Tony Castillo for $150.00 on June 6, 2002. I placed Ms. Munoz on administrative leave pending the outcome of this investigation.

51. Ms. Munoz also had explained to me the following during this meeting:

(1) Tony Castillo was planning to pay for his phone through a payroll deduction but wanted to spread the deduction out over two months and so had completed two forms. (This explanation was offered before we found the one payroll deduction form dated June 6, 2002 in the payroll deduction form file. Once we found this form, Ms. Munoz said she did not know what had happened to the second form but still maintained that there was one.)

(2) The second phone had been ordered by Ms. Munoz for the former Branch Manger, Ruben Valdez. However, when she presented this phone to him, Mr. Valdez said he did not want it. An employee named Joanne Perez saw the phone and asked if she could have it. Ms. Munoz told Ms. Perez to ask Mr. Valdez, which she did, and he said she could have it.

(3) The third phone had been ordered by Ms. Munoz for her own use. She was planning to pay for her phone through payroll deductions but had not completed the deduction form yet because she was waiting to see how much credit she would get toward her new phone from trading in her old Nextel phone.

52. Through my further investigation of these explanations by talking to Mr. Castillo, Ms. Perez and Mr. Valdez, I was able to learn the following:

(1) Tony Castillo gave Ms. Munoz cash to pay for part of his phone and intended to have the balance taken out of his check through payroll deductions.

(2) Mr. Valdez did recall saying that Joanne Perez could have the phone Ms. Munoz had ordered for him, but had assumed she would pay for it.

(3) Mr. Valdez did recall approving the purchase of Ms. Munoz's phone.

53. After having these conversations, I held another meeting with Ms. Munoz along with Rick Rangel (who participated as a witness in Ms. Olmos' absence) on October 4, 2002. I told her that the investigations concerning her phone and Ms. Perez's were closed because of Mr. Valdez's comments to me.

54. I then asked Ms. Munoz if she remembered Mr. Castillo giving her some cash toward the purchase of his phone. She at first said she did not recall this. I then told her that Mr. Castillo had told me that he gave her $150.00 toward the purchase of his phone. Ms. Munoz again said

she "didn't think" she had taken any cash from Mr. Castillo. She then said she knew she did not accept $150.00 from Mr. Castillo. She then said "he might have given me $60.00."

55. I then asked Ms. Munoz what had happened to the cash Mr. Castillo gave her. She explained that she had put it into a "slush fund" she kept in her desk "for when things come up and we need cash."

56. I then asked if Ms. Munoz had heard that Mr. Castillo had sold his old Nextel phone to another employee and that this employee had given him $100.00 in cash for it.

57. Ms. Munoz explained that she had heard this and then said "it could have been $100.00 not $60.00 that he gave me."

58. I then asked Ms. Munoz why she had put cash that was supposed to go toward the Company Nextel bill in her desk rather than depositing it with the facility cashier so we would have a record of it. She said she was not aware of being able to deposit money with the facility cashier. (This was despite the fact that she was also in charge of the Company store at that time which involves employees giving her cash or checks to pay for orders she places for Company products and her depositing these funds with the facility cashier.)

59. Ms. Munoz also went on to say that she believed Mr. Castillo had come back to her later to ask if he could just keep making cash payments to her rather than doing a payroll deduction for what he owed on the phone but she told him he could not.

60. This account conflicted with Ms. Munoz's own earlier description of how Mr. Castillo was planning to purchase his Nextel phone.

61. I then obtained a signed written statement from Mr. Castillo confirming that he had given Ms. Munoz $150.00 in cash toward the purchase of his phone. A copy of this statement is attached as **Exhibit 3** hereto.

62. On Monday, October 7, 2002, I had another meeting with Ms. Munoz and asked her if there was anything else she would like to tell me about Mr. Castillo's phone. She said only that she had never been trained about how to handle cash. I told her at this time that we were terminating her employment effective October 3, 2002 for being dishonest – specifically for giving me contradictory explanations concerning the circumstances under which Mr. Castillo's phone was purchased. A copy of Ms. Munoz's termination notice is attached as **Exhibit 4** hereto.

63. Ms. Munoz's only response was to say again that she had not been trained concerning how to handle cash. I explained that even if this was true, it did not explain her not being honest with me. I then asked her why she had not been honest with me. Ms. Munoz replied that "it was in the back of her mind."

64. The decision to terminate Ms. Munoz's employment was made by me with the approval of my supervisors and in agreement with Mr. Guerra and Mr. Ramos.

65. This decision was not based on or "in retaliation for" Ms. Munoz's earlier comments concerning Mr. Guerra but would have been made regardless of these comments.

**FURTHER THIS AFFIANT SAITH NOT.**

_Denise Martinez_
DENISE MARTINEZ

Sworn to and subscribed before me this _15_ day of _March_, 2005.



_Ma Margarita Garza_
Notary Public

My Commission Expires: _January 11, 2009_

Apx.-55

Munoz v CCE - Affidavit of Denise Martinez.DOC        12

**Memo**

From: Denise Martinez

Date: 9/25/02

Re: 9/23/02 meeting with Chris Munoz

Today, September 25, 2002, we had a meeting the purpose of which was to follow-up on the three issues we had discussed in another meeting on Monday of this week at which Chris Munoz, Janie Olmos and I were present. The three issues were the following:

1. A report Chris Munoz made to Carlos Ramos on September 13, 2002 stating that Lee Guerra had hugged her once three months ago during a golf tournament and had been looking down her blouse while they worked together.

2. Lee Guerra's meeting with the McAllen DSM's on September 18, 2002 in which he asked about any job problems they were having and reminded them that they needed to maintain communication with their supervisors or Human Resources or with him directly if they did have such problems. Lee also told the DSM's that they should not be venting or dumping their problems on Chris. This process was discussed in this meeting in part because of reports Chris Munoz had made to Carlos Ramos in the same conversation referenced in item 1 above that the DSM's were not happy with Lee's management style and had told her that Lee was "talking down to them."

3. Lee Guerra's conversations with Chris Munoz about her reports to Carlos Ramos.

These three issues have been discussed and resolved as follows:

1. In response to Chris' report to Carlos Ramos on September 13, 2002, Carlos asked her if she had felt Lee was harassing her by hugging her. Chris said "no." She explained to Carlos in response to his questions that she was "not making a harassment claim" and "did not want any investigation because there was nothing to investigate." She said she was only telling him because she wanted to vent. Carlos later asked Lee in a meeting where I was present on September 16, 2002 if he recalled any time he had hugged Chris and he did not. Carlos also asked Lee about looking down Chris' blouse and he said he did not do this. Carlos then asked Lee to talk with Chris and to let her know that he did not remember any hug and had not looked down her blouse but that he also did not want to create any rumors that made her uncomfortable. Lee had this conversation with Chris on September 18, 2002. During this meeting, Chris also told Lee that the hug had not offended her but that she was just concerned with what other people would think. Chris then told Lee that she never said he was looking down her blouse but had only told Carlos that she thought other people were (as per Lee)

During our meeting on September 23, I explained to Chris that if any employee makes her feel uncomfortable by looking down her blouse or hugging her or something else like this, she should let her supervisor or myself or someone else in Human Resources know. Chris understands this and is satisfied with this process.

2. Lee told Chris in their meeting on September 18 that he had spoken to the DSM's regarding the complaints she had reported from them to Carlos and that they had denied these complaints. He also explained to her that he had asked the DSM's not to be venting or dumping their complaints on her so that she would not have to deal with any problems they had in the future.

Apx.-56

EXHIBIT 1

Chris' response to this information was to feel that the DSM's would not ~~like her~~ talk or trust her anymore. She expressed this to me on Monday, September 23, 2002. I explained to her that this was not the purpose of Lee's instruction to the DSM's or to her regarding their venting to her. The bottom line is that it is not part of her job to have to listen to employees vent their job complaints. Employees are supposed to discuss problems they have on the job with their supervisors, HR or someone else who can help them. Lee was trying to facilitate this process by reminding the DSM's of this process, ~~and letting Chris know what he had told them so she could also help facilitate the process by also reminding DSM's or any employees who came in her office just to vent their job problems that they should take these problems to someone who can help resolve them.~~ burdened by ~~Lee was also trying to~~ avoid having Chris be put in the ~~awkward position of~~ having information that someone else really needs to know in order to help resolve a problem ~~that~~ that employees had confided in her.

Chris new understands this and has agreed to help facilitate this process by not encouraging employees to have "closed door" meetings with her, and instead telling them that they need to report their concerns or complaints to their supervisor, Lee or someone in HR who can help them.

3. Finally, we discussed the process that needs to be used in light of these circumstances when Lee and Chris need to communicate in the future. Lee had reported to me that Chris had walked out on a couple of meetings that he had tried to have with her about issues 1 and 2 last Wednesday and Thursday. During our meeting on September 23, I explained to Chris that she cannot simply walk out during a meeting with a supervisor and that doing so constitutes insubordination. Chris said she understood this, but explained that she did not perceive that she had walked out before these meetings with Lee were over. Chris explained that she had told Lee that she did not want to talk about these issues at that time and believed that the meetings was to continue at a later time. ~~had ended before she left.~~ I told Chris that if there were issues she did not feel comfortable talking directly with Lee about that she could tell him that she would like to speak with me or someone else in HR about them and that he would work with her to coordinate this. I explained that this approach, rather than just telling Lee she did not want to talk about something and leaving the room, was a more clear way of dealing with any such issue.

Chris agreed that walking out would be insubordination and that she would use this approach for any issues she was uncomfortable about and said that she does not have problems communicating with Lee generally.

This meeting took place in the Human Resources office and lasted approximately ___ minutes. We were in attendance in this meeting and agree that this memo accurately reflects the issues discussed and the resolutions of these issues.

_____

_____

_____

I was not in attendance at this meeting, but have reviewed this memo and agree that it accurately reflects the way these issues have been dealt with and resolved.

_____

nowhere does it say that she feels retaliated. / Because Non-weed

Apx.-57

Memo

From: Denise Martinez

Date: 9/25/02

Re: 9/23/02 meeting with Chris Munoz

Today, September 25, 2002, we had a meeting the purpose of which was to follow-up on the three issues we had discussed in another meeting on Monday of this week at which Chris Munoz, Janie Olmos and I were present. The three issues were the following:

1. A report Chris Munoz made to Carlos Ramos on September 13, 2002 stating that Lee Guerra had hugged her once three months ago during a golf tournament and had been looking down her blouse while they worked together.

2. Lee Guerra's meeting with the McAllen DSM's on September 18, 2002 in which he asked about any job problems they were having and reminded them that they needed to maintain communication with their supervisors or Human Resources or with him directly if they did have such problems. Lee also told the DSM's that they should not be venting or dumping their problems on Chris. This process was discussed in this meeting in part because of reports Chris Munoz had made to Carlos Ramos in the same conversation referenced in item 1 above that the DSM's were not happy with Lee's management style and had told her that Lee was "talking down to them."

3. Lee Guerra's conversations with Chris Munoz about her reports to Carlos Ramos.

These three issues have been discussed and resolved as follows:

1. In response to Chris' report to Carlos Ramos on September 13, 2002, Carlos asked her if she had felt Lee was harassing her by hugging her. Chris said "no." She explained to Carlos in response to his questions that she was "not making a harassment claim" and "did not want any investigation because there was nothing to investigate." She said she was only telling him because she wanted to vent. Carlos later asked Lee in a meeting where I was present on September 16, 2002 if he recalled any time he had hugged Chris and he did not. Carlos also asked Lee about looking down Chris' blouse and he said he did not do this. Carlos then asked Lee to talk with Chris and to let her know that he did not remember any hug and had not looked down her blouse but that he also did not want to create any rumors that made her uncomfortable. Lee had this conversation with Chris on September 18, 2002. During this meeting, Chris also told Lee that the hug had not offended her but that she was just concerned with what other people would think. Chris then told Lee that she never said he was looking down her blouse but had only told Carlos that she thought other people were (as per Lee). Chris' recollection of this conversation is that she told Lee that she had told Carlos that other people had told her that he was looking down her blouse, but she has never seen Lee do this. C<u>M</u>

During our meeting on September 23, I explained to Chris that if any employee makes her feel uncomfortable by looking down her blouse or hugging her or something else like this, she should let her supervisor or myself or someone else in Human Resources know. Chris understands this and is satisfied with this process.

2. Lee told Chris on September 18 that he had spoken to the DSM's regarding the complaints she had reported from them to Carlos and that they had denied these complaints. He also explained to her that he had asked the DSM's not to be venting or dumping their complaints on her so that she would not have to deal with any problems they had in the future.
    Chris' response to this information was to feel that she had been retaliated against because she believed that the DSM's would not talk to her or trust her anymore. She expressed this to me

Apx.-58

EXHIBIT 2

on Monday, September 23, 2002. I explained to her that this was not the purpose of Lee's instruction to the DSM's or to her regarding their venting to her. The bottom line is that it is not part of her job to have to listen to employees vent their job complaints. Employees are supposed to discuss problems they have on the job with their supervisors, HR or someone else who can help them. Lee was trying to facilitate this process by reminding the DSM's of this process. Lee was also trying to avoid having Chris be "burdened" by having information that someone else really needs to know in order to help resolve a problem that employees had confided in her. In light of Chris' comment that she felt "retaliated against" as a result of Lee's comments to the DSM's, I spoke with Jimmy Silva, the Sales Manager, who was present when Lee met with the DSM's, and also met with three of our four DSM's. From these conversations, I learned that Lee had not instructed the DSM's not to talk to Chris or to otherwise treat her badly or retaliate in any way against her. All he had said was that it was not her job to have to listen to their complaints.

Chris now understands this process and has agreed that she will not discuss job complaints with other employees. Instead, she will explain to them that they need to report their concerns or complaints to their supervisors, Lee or someone in HR who can help them. Chris also understands that engaging in such discussions in the future will result in discipline, up through and including termination, as engaging in such conversations is not part of her job duties and is a hindrance to employee concerns and complaints being constructively and efficiently resolved.

3. Finally, we discussed the process that needs to be used in light of these circumstances when Lee and Chris need to communicate in the future. Lee had reported to me that Chris had walked out on a couple of meetings that he had tried to have with her about issues 1 and 2 last Wednesday and Thursday. During our meeting on September 23, I explained to Chris that she cannot simply walk out during a meeting with a supervisor and that doing so constitutes insubordination. Chris said she understood this, but explained that she did not perceive that she had walked out before these meetings with Lee were over. Chris explained that she had told Lee that she did not want to talk about these issues at that time and believed that the meeting was to continue at a later time. I told Chris that if there were issues she did not feel comfortable talking directly with Lee about that she could tell him that she would like to speak with me or someone else in HR about them and that he would work with her to coordinate this. I explained that this approach, rather than just telling Lee she did not want to talk about something and leaving the room, was a more clear way of dealing with any such issue.

Chris agreed that walking out would be insubordination and that she would use this approach for any issues she was uncomfortable about and said that she does not have problems communicating with Lee generally.

This meeting took place in the Human Resources office and lasted approximately _90_ minutes. We were in attendance in this meeting and agree that this memo accurately reflects the issues discussed and the resolutions of these issues.

_[signature]_
_[signature]_
_[signature]_

I was not in attendance at this meeting, but have reviewed this memo and agree that it accurately reflects the way these issues have been dealt with and resolved.

_[signature]_

—My signature is only to acknowledge receipt of this document. CSM.

Apx.-59

- On or about the middle of July Tony bought a Nextel I95 phone from Chris. Tony paid for this Phone $150.00 Cash & he was to be deducted $150.00 from his paycheck.
  Tony was deducted $150.00 in the Aug Payroll.

- Kyle Yeary was aware that the money he paid for Tony's old phone would be to pay for his new I95.

- As soon as Tony got the money from Kyle he went straight to pay Chris the $150.00 Cash.

*Tony Castillo*  October 4, 2002.

*Denise Martinez*  10/4/02.

Tony's Statement

Tony Castillo

Apx.-60

EXHIBIT 3

# Coca-Cola Enterprises

## EMPLOYEE TERMINATION NOTICE/PROPERTY CLEARANCE CHECKLIST

IN CASE OF INVOLUNTARY TERMINATION CONSULT HUMAN RESOURCES BEFORE COMPLETING THIS FORM.

| SOCIAL SECURITY NUMBER | NAME | POSITION | FACILITY NAME |
|---|---|---|---|
| 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 | Christina Munoz | Branch Secretary | McAllen |
| TERMINATION DATE / LAST DATE WORKED | STREET ADDRESS | STATE | ZIP CODE |
| 10/3/02 | | | |
| HIRE DATE | BIRTH DATE | | |

### TERMINATION REASON

- 1 = VOLUNTARY
- 2 = INVOLUNTARY
- 3 = LAYOFF
- 4 = RETIRED
- 5 = DEATH
- 6 = TRANSFERRED

COMMENTS: Briefly Describe Above Reason

B. Dishonesty MDS
Dishonesty.

### PROPERTY CLEARANCE CHECKLIST

SUPERVISOR: Use list below as a guide to recover all Company property. Sign off items received by placing your initials next to the item under column headed "Cleared By." Fill in N/A (Not Applicable) next to all items not pertaining to employee. Return items to appropriate departments.

| ITEM | CLEARED BY | ITEM | CLEARED BY |
|---|---|---|---|
| I.D. CARD | | TOOLS | |
| UNIFORMS | ✓ | EXPENSE ADVANCES | |
| SAFETY EQUIPMENT/BACKBELT | ✓ | KEYS: OFFICE | ✓ |
| CREDIT CARDS | ✓ | DESK | ✓ |
| SALES RECEIPT & PRODUCT SHORTAGES | ✓ | FILES | ✓ |
| PAGING SYSTEM/BEEPER | ✓ | ENTRANCE DOOR | ✓ |
| COMPANY CAR | ✓ | COMPUTER (LAP-TOP) | |
| MILEAGE LOG | ✓ | COMPANY MATERIALS | |
| HAND CALCULATOR | ✓ | PURCHASING CARD | |

EMPLOYEE SIGNATURE: _Refused to sign_  DATE:

APPROVALS:

SUPERVISOR'S SIGNATURE _____ DATE _____

FACILITY/DEPARTMENT MANAGER SIGNATURE _Wendy Mendoza_ DATE 10-7-02

H.R. MANAGER SIGNATURE _____ DATE 10-7-02

Witness _Ann Allen_

___ DAYS VACATION

FOR HUMAN RESOURCES USE:

Data Notice Sent: _____ (initials)
Date: _____
ESIP Form Sent: _____ (initials)
Date: _____
Input By: RD (initials)
Date: 10/10/02

REHIRE ELIGIBILITY
- YES
- NO
- PROVISIONAL

**EXHIBIT 4**

Apx.-61