**Westlaw.**

Not Reported in F.Supp.2d                                                                 Page 1
2004 WL 1078908 (E.D.La.), 9 Wage & Hour Cas.2d (BNA) 1223, 28 NDLR P 86
**(Cite as: 2004 WL 1078908 (E.D.La.))**

**H**

**Motions, Pleadings and Filings**

United States District Court,
E.D. Louisiana.
Amanda DUTTON
v.
UNIVERSITY HEALTHCARE SYSTEM, L.L.C.,
et al
**No. Civ.A. 03-2084.**

May 12, 2004.

Tracie Janelle Jackson, Attorney at Law, Belle
Chasse, LA, for plaintiff.

Robert B. Landry, III, PLC, New Orleans, LA, for
defendant.

MCNAMARA, J.

*1 Before the court are the following motions:
 (1) "Motion for Summary Judgment" filed by
 Defendant, University Healthcare System, L.L.C.
 d/b/a Tulane University Hospital and Clinic
 (Tulane Hospital); and
 (2) "Cross-Motion for Summary Judgment" filed
 by Plaintiff, Amanda Dutton. [FN1]

> FN1. Plaintiff's Cross-Motion for
> Summary Judgment is also her opposition
> to Defendant's Motion for Summary
> Judgment.

The motions are before the court on briefs, without
oral argument. Now, having reviewed the
memoranda of counsel, the record and the
applicable law, the court finds that there are no
genuine issues of material fact, and Defendant is
entitled to judgment as a matter of law.

*I. Background*
Plaintiff, Amanda Dutton, was employed by Tulane
Hospital from March 1999, through December 4,
2001, when she was terminated. Plaintiff first held

the position of Supervisor of non-governmental
billing and non-governmental collections, [FN2]
and reported to the then Director of Business
Services, Mike Lane.

> FN2. In her opposition memorandum,
> Plaintiff states that "[t]he governmental
> collections department collected from
> governmental entities such as Medicare,
> Medicaid and Champus", while "[t]he
> non-governmental department collected
> from private insurance payers and
> workmen's compensation." (Plaintiff's
> Opp. at 2).

In June 2000, the Tulane Hospital billing and
collection department was re-organized, and Mary
Failla replaced Mike Lane as the business office
director. [FN3] Plaintiff lost supervision over the
non-governmental billing, but kept supervision over
the non-governmental collection. Plaintiff's duties
included, but were not limited to, following-up and
working with the collectors to insure they were
collecting money owed to Tulane Hospital in an
appropriate manner.

> FN3. Before her employment at Tulane,
> Mary Failla had worked as the business
> office manager at Lakeside Hospital,
> which (like Tulane) is an HCA facility.

To assist and educate personnel in the business
office, Ms. Failla hired an outside consulting firm,
Coast to Coast Consulting, Inc. (C2C). Two trainers
from C2C worked with Plaintiff and her collection
staff from approximately October 2000, until
mid-December 2000.

Despite the attempt to improve Plaintiff's
performance, Ms. Failla observed and documented
problems. On November 6, 2000, Ms. Failla sent
Plaintiff an e-mail telling her "not to pass the buck."
(Defendant's Exhibit F). As of December 6, 2000,
Plaintiff had not instituted a written procedure in
place for gathering stent invoices so that Tulane
could collect them the insurance companies.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                              Page 2
2004 WL 1078908 (E.D.La.), 9 Wage & Hour Cas.2d (BNA) 1223, 28 NDLR P 86
(Cite as: 2004 WL 1078908 (E.D.La.))

(Plaintiff's Dep. at 92). And she never finalized a stent invoice collection procedure during her tenure at Tulane. (*Id.* at 94).

While Plaintiff does not recall the actual date, she admits that Ms. Failla discussed with her productivity reports and Ms. Failla's concern that Plaintiff's collectors could have been more productive than they actually were. (*Id.* at 101-02).

In April 2001, Plaintiff received a performance evaluation, with an overall performance score of two. (Defendant's Exhibit I). This was the lowest overall performance score that Dutton received while employed at Tulane Hospital, and it was also the lowest performance score of any of the supervisors who reported to Ms. Failla. (Plaintiff's Dep. at 107, and Failla's Dep. at 178). Ms. Failla explained that such a performance was "barely satisfactory." (Failla's Dep. at 178). Plaintiff even rated herself as "does not meet" expectation in the area of "monitor[ing] activities and work assignments for accuracy, timeliness and compliance with department standards." (Defendant's Exhibit I, p. 5).

**\*2** On May 7, 2001, financial analysts from Tulane Hospital's corporate office issued an audit report and review of Tulane Hospital's Business Services Offices. (Defendant's Exhibit J). In their report, these analysts described as a "major issue": "[C]ollection follow-up should be monitored more closely to help ensure adequate follow-up is performed adequately, based on established collection philosophies." (Exhibit J, p. 2).

Plaintiff admitted that she was aware that the internal auditors found collection follow-up to be a major issue as part of the audit, and she agreed that communication, follow-up and monitoring of her collectors needed improvement. (Plaintiff's Dep. at 103). Plaintiff also admitted that she could monitor her collectors' activities by using a computer system called "File Tracks", [FN4] and she could also monitor their telephone calls by reviewing their telephone logs. (*Id.* at 106).

> FN4. In her opposition memorandum, Plaintiff explained that:
> The file track is the system used by each collector to receive and work accounts for

collections each day. At the end of each day, Defendant's system downloads new collection accounts into each collector's file tracks. [Plaintiff] receives accounts from each collector that has not collected an account over 30 days old. [Plaintiff's] file track is updated nightly as well.
(Plaintiff's Opp. at 3, citations omitted).

From June 20, 2001 through August 20, 2001, Plaintiff requested and was granted leave under the Federal Medical Leave Act, for the removal of a fibroid tumor in her uterus. (*See* Defendant's Exhibit K, Leave of Absence Report). While Plaintiff was on this leave, Tulane Hospital contracted with Advanced Receivables Strategy, Inc. (ARS), a company that specialized in billing and collection functions.

Two ARS representatives, Elizabeth Mirck and Carlo Ianni, performed many of Plaintiff's duties during her absence. On July 19, 2001, Ms. Mirck e-mailed Ms. Failla regarding the following issues she encountered during her three weeks as Interim Collections manager: (1) there was no evidence that the collectors' productivity logs were reviewed for accuracy, accountability or for use as a training and counseling tool and the manager's file track did not show any interaction with the collector after review and replacement back to the specific collector; (2) collector phone usage was not monitored; (3) implant invoices were not requested timely; (4) cardiac stent invoicing procedures were not developed or implemented to consistently facilitate the collectors ability to file for payment; (5) lines of communication and interaction between the supervisor (Plaintiff) and her staff appeared to be almost non-existent or limited; (6) Plaintiff's inbox contained correspondence that required immediate attention; (7) there was no organized filing system in place for confidential personnel information; (8) "generally everything was unorganized"; (9) the failure to implement and monitor certain procedures was creating redundant work for two departments. (Defendant's Exhibit L, Mirck E-mail).

On August 13, 2001, Mr. Ianni (the other ARS representative) e-mailed Ms Failla regarding problems that he discovered: (1) Plaintiff's staff members were not aware of proper policy procedures for non-covered facility charges; (2) the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                     Page 3
2004 WL 1078908 (E.D.La.), 9 Wage & Hour Cas.2d (BNA) 1223, 28 NDLR P 86
(Cite as: 2004 WL 1078908 (E.D.La.))

staff members were improperly or poorly documenting accounts; (3) follow-up was not monitored for appropriateness and timeliness; (4) ceratin collection staff members did not understand why they were performing certain tasks. (Defendant's Exhibit L, Ianni E-mail).

*3 In a written warning dated August 20, 2001, Ms. Failla listed Plaintiff's "Violations and Area[s] of Deficiency", with an accompanying list of "Corrective Action[s]". (Defendant's Exhibit N, Employee Corrective Counseling Performance Plan & Attachments).

Ms. Failla's listed violations/areas of deficiency mirrored the deficiencies that had been discovered by the ARS personnel, Ms. Mirck and Mr. Ianni, and they included: (1) lines of communication to the staff were almost non-existent regarding procedure implementations: (2) mail received was found unopened and had never been worked; (3) phone logs were not properly used; (4) staff was not trained appropriately; (5) staff follow-up efforts to collect were not monitored appropriately; (6) staff notes that were entered into the system were poor and incomplete; (7) staff had lack of training, guidance and counseling; (8) cardiac stent procedure was never completed and set up; (9) no organization fo the office or file cabinet; (10) work given to Plaintiff to complete was never done and never turned in as requested; (11) file track was not completed timely or documented properly. (Id.).

On August 21, 2001, the day Plaintiff returned from her medical leave, Ms. Failla counseled Plaintiff and presented her with a copy of the Areas of Deficiency and Corrective Action plan. (Plaintiff's Dep. at 119-20). [FN5] On August 29, 2001, Plaintiff responded with a memorandum in which Plaintiff denied most of the issues raised by Ms. Failla. (Defendant's Exhibit O, Plaintiff's Memo.; see also Plaintiff's Dep. at 121). Thereafter, Ms. Failla and Plaintiff exchanged more memoranda. (Defendant's Exhibit P, Failla's memo; and Defendant's Exhibits Q & R, Plaintiff's memo's).

> FN5. In her deposition, Plaintiff admits that she was counseled on August 21, 2001, and she received a list of "Violations/Areas of Deficiency" and "Corrective Action". (Plaintiff's Dep. at

119-20).
In her Affidavit attached to her Opposition to Defendant's Motion for Summary Judgment, Plaintiff denies receiving the Corrective Action portion of the warning and write-up. (Plaintiff's Exhibit 65, ¶ 6). However, Plaintiff cannot defeat Defendant's motion for summary judgment using an affidavit that impeaches her prior deposition. S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 495-96 (5th Cir.1996).

In October 2001, Plaintiff requested time off to undergo an additional medical procedure, but she did not submit a leave of absence form. Neither Plaintiff nor Tulane Hospital designated this absence as Family Medical Leave. However, Plaintiff was permitted to be absent from work. Plaintiff was absent from October 15, 2001 to October 22, 2001, during which time, she underwent a single day of out-patient diagnostic procedures (which included an endoscopy and colonoscopy). (Dutton Dep. at 214).

On November 1, 2001, Ms. Failla reviewed Plaintiff's "File Tracks", the computer system used by the Tulane Hospital Business office to track patient billing and payment cycles. [FN6] Ms. Failla noted that Plaintiff had over 1,000 accounts that were not being worked in her File Tracks system, and she asked Plaintiff to clean out her File Tracks by November 9, 2001. (Defendant's Exhibit S, Failla's E-mail dated November 1, 2001).

> FN6. See also fn. 4, supra, for Plaintiff's explanation of the file track system.

On November 9, 2001, Ms. Failla reviewed Plaintiff's File Tracks and found that there were still over 1,000 accounts in the system that needed work. (Defendant's Exhibit T, Failla's E-mail dated November 9, 2001; Defendant's Exhibit U, print-out of Plaintiff's file track accounts). The dollar value of these unworked accounts was $556,732.04. (Defendant's Exhibit U).

*4 On December 4, 2001, Ms. Failla and Human Resources specialist, Lisa Talbot, met with Plaintiff and terminated her for failing to meet expectations and poor performance. (Plaintiff's Dep. at 138; & Defendant's Exhibit W, Personnel Action Request).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1078908 (E.D.La.), 9 Wage & Hour Cas.2d (BNA) 1223, 28 NDLR P 86
(Cite as: 2004 WL 1078908 (E.D.La.))

This decision to terminate Plaintiff was made after review and investigation by the Tulane Hospital Interim Chief Financial Officer (CFO), Brian Lee, and outside counsel. (Plaintiff's Exhibit 8, Lee's Dep. at 23-29).

On December 12, 2001, Plaintiff requested reconsideration of her discharge by writing CFO Lee. (Defendant's Exhibit X). In her letter to Mr. Lee, Plaintiff states in part that "[m]y immediate supervisor's reason for termination was personal in that she thought we were not getting along together ... My main concern and evaluation is that this Director has been terminating existing employees and assigning positions to [employees at Lakeside Hospital where she previously worked]." (Id.). Plaintiff makes no specific mention of discrimination or retaliation.

On February 14, 2002, Mr. Lee wrote Plaintiff advising her that:
I have received your Formal Letter of Grievance and attached documentation. Based upon the review of these documents and internal investigations, it has been determined that your termination was justified and will not be overturned.
(Defendant's Exhibit Y).

On February 18, 2002, Plaintiff wrote to Mr. Lee requesting additional review. (Defendant's Exhibit Z). On or about March 11, 2002, Plaintiff made a written appeal to Tulane's President and Chief Executive Officer, Jim Montgomery. (Plaintiff's Exhibit 45). On April 4, 2002, Mr. Montgomery informed Plaintiff that he found no supportive evidence to overturn the decision to terminate her. (Defendant's Exhibit AA).

Following her termination, Plaintiff went to the Equal Employment Opportunity Commission (EEOC), spoke to someone there and filled out a questionnaire. But Plaintiff did not sign or file a charge with the EEOC, because after her interview with the EEOC representative, he told Plaintiff "he wasn't sure if there was anything they could do for [her]" and because Plaintiff "never heard anything from him," she understood that to mean that the EEOC could do "nothing" for her. (Dutton Dep. at 145-49).

Defendant concedes that Plaintiff subsequently filed a charge with the Department of Labor, and Defendant submits that "[a]fter a DOL associate investigator made a determination that an FMLA violation had occurred, the matter was submitted to the DOL management for review and nothing more was done by the DOL." (Defendant's Memo. at 12). [FN7]

FN7. In her exhibits attached to her Memorandum in Opposition to Defendant's Motion for Summary Judgment, Plaintiff has included a copy of the DOL investigative report. (Plaintiff's Exhibit 62). However, in another Minute Entry issued simultaneously with this Minute Entry, the court granted defendant's Motion to Strike this Exhibit as untimely listed as a Trial Exhibit. (See Minute Entry, Doc. No. 62; see also fn. 21, infra ).

On July 22, 2003, Plaintiff filed this lawsuit against Defendant, asserting claims under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601 et seq., and unspecified laws of Louisiana. In her Complaint, Plaintiff specifically claims that Defendant intentionally discriminated and retaliated against her by:
*5 (1) refusing to restore Plaintiff to the same or equivalent position when she returned from her first FMLA leave in August 2001;
(2) discharging Plaintiff from her employment without just cause less than two months after returning from her second FMLA leave in October 2001 and due to Defendant's "perception" that Plaintiff suffered from a "disability" that would cause future absences.
(Complaint, ¶ 14).

In its Motion for Summary Judgment, Defendant seeks dismissal of all of Plaintiff's claims. In her Cross-Motion for Summary Judgment, Plaintiff seeks partial judgment on two elements of her FMLA claim, "namely whether Dutton's leaves are protected under the FMLA and whether Dutton suffered adverse action in proximity to returning to work from those leaves." (Plaintiff's Reply to Defendant's Opp. at 3).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Apx.-79

Not Reported in F.Supp.2d
2004 WL 1078908 (E.D.La.), 9 Wage & Hour Cas.2d (BNA) 1223, 28 NDLR P 86
(Cite as: 2004 WL 1078908 (E.D.La.))

Page 5

*I. Legal Analysis*
*A. Plaintiff's ADA Claim*

(1) Plaintiff filed a charge with the EEOC and her ADA claim is now untimely.

"Under the ADA, a plaintiff must file a charge of discrimination [with the EEOC] within 300 days of the alleged discriminatory act." *Ramirez v. City of San Antonio,* 312 F.3d 178, 181 (5th Cir.2002) *citing* 42 U.S.C. § 12117 (incorporating 42 U.S.C. § 2000e-5(e)). The limitations period on an employment discrimination claim "begins to run from the time the complainant knows or reasonably should have known that the challenged act occurred." *Ramirez,* 312 F.3d at 181 (citation omitted).

The limitations period in this case began when Defendant terminated Plaintiff's employment on December 4, 2001. Plaintiff does not dispute that she did not file a charge with the EEOC. However, Plaintiff argues that the limitations for filing her EEOC charge should be tolled "because of the EEOC's inaction." (Plaintiff's Opp. at 30).

In her Opposition Memorandum, Plaintiff maintains that:
    she went to the EEOC and filled out a questionnaire form regarding her allegations within the 300 days of her termination. Once the form was completed, Dutton met with an EEOC investigator. The investigator informed Dutton there was nothing they could do because she did not have a disability and that [ ] the supervisor of the governmental collections division was also an African American female. *Dutton was not represented by legal counsel at the time and took the investigator's word.*
(Plaintiff's Opp. at 31, citing her Dep. at 145) (emphasis added).

However, in her deposition, Plaintiff admitted that *she did visit an attorney prior to going to the EEOC,* and he advised her to go to the EEOC as her first step. (Plaintiff's Dep. at 243). Further, in her deposition, Plaintiff testified that the EEOC representative did not "confirm" that the EEOC could not help her, but she since Plaintiff "never heard from him, [she] took that to mean nothing." (*Id.* at 149).

Although the burden is on Plaintiff to demonstrate a factual basis to toll the limitations period, based on the little information Plaintiff provided in her deposition, the court "cannot say that the EEOC affirmatively misled [her] about the nature of [her] rights." *Ramirez,* 312 F.3d at 185. And to date, Plaintiff has not filed an EEOC charge. Thus, the court concludes that Plaintiff has failed to meet her burden of showing that equitable tolling applies in her case, and Defendant's motion for summary judgment should be granted on the ground that Plaintiff's ADA claim was untimely filed.

(2) Even if Plaintiff's ADA claim is properly before this court, it has no merit.

*6 Under the ADA, the term "disability" means:
    (1) a physical or mental impairment that substantially limits one or more of the major life activities of an individual;
    (2) a record of such an impairment; or
    (3) being regarded as having such an impairment.
42 U.S.C. § 12102(2)(A-C).

Here, Plaintiff's ADA claims falls under the "regarded as" category. An individual, like Plaintiff, who is not in fact disabled may have a viable claim that she was "regarded as" disabled if: (1) she has no impairment at all but is regarded by the employer as having a "substantially limiting" impairment; or (2) she has an impairment which is not substantially limiting but which the employer perceives as constituting a "substantially limiting" impairment. *Pegram v. Honeywell, Inc.,* 361 F.3d 272, 287 (5th Cir.2004).

To survive summary judgment, Plaintiff must show that Defendant regarded her impairment (whether imagined or real) as being "substantially limiting," i.e., foreclosing her ability to perform "a class of jobs or a broad range of jobs." *Id.* The inability to perform a single, particular job does not constitute a substantial limitation. *Id., see also Dupre v. Charter Behavioral Health Systems, Inc.,* 242 F.3d 610, 616 (5th Cir.2001) (even if employer thought that employee's condition would cause her to be absent, there was no evidence that employer thought employee was unable to perform other jobs).

Here, the record shows no evidence upon which a reasonable trier of fact could conclude that Tulane

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Apx.-80

Not Reported in F.Supp.2d
2004 WL 1078908 (E.D.La.), 9 Wage & Hour Cas.2d (BNA) 1223, 28 NDLR P 86
(Cite as: 2004 WL 1078908 (E.D.La.))

Page 6

Hospital regarded Plaintiff as disabled, because Plaintiff has presented no evidence that Tulane regarded her as having an actual or imagined impairment that substantially limited her ability to perform the particular job she had, much less work in a whole class or broad range of jobs. *Id.*

It is undisputed that Tulane Hospital knew that Plaintiff had taken leave for a gynecological procedure in June 2001, and that Plaintiff had a short work absence for another medical procedure in October 2001. In a letter written to Tulane in support of Plaintiff's June 2001 request for medical leave, Plaintiff's doctor stated that after some five weeks of recovery, Plaintiff would be able to return to work with no restrictions. (Defendant's Ex. K, Human Resources File, containing Dr. Bellina's letter dated June 13, 2001).

Further, in her deposition, Plaintiff admitted that: she had not been diagnosed with a disability while working for Tulane; she did not take a leave of absence in connection with any disability; she never requested an accommodation from Tulane in connection with a disability; and she never told anyone at Tulane that she had a disability. (Plaintiff's Dep. at 79-80).

Plaintiff has simply failed to create a genuine issue of fact as to whether Tulane terminated her because Tulane regarded her as having an impairment, much less, a substantially limiting one. Thus, Tulane is entitled to summary judgment dismissing Plaintiff's "regarded as" ADA claim.

*B. Plaintiff's FMLA Claims*

**\*7** In her Complaint, Plaintiff asserts two retaliation claims under the FMLA:
(1) Defendant refused to restore Plaintiff to the same or equivalent position upon her return from her first FMLA leave in August 2001; and
(2) Defendant discharged Plaintiff from her employment without just cause less than two months after returning from her second FMLA leave in October 2001.
(Complaint at ¶ 14).

In *Chafin v. John H. Carter., Inc.*, 179 F.3d 316 (5th Cir.1999), the Fifth Circuit summarized the rights of an employee under the FMLA and the

corresponding obligations of an employer:
The FMLA requires covered employers to provide up to 12 weeks of unpaid leave to any eligible employee who suffers from "a serious health condition that makes the employee unable to perform the functions of the position of such employee." After a qualifying absence, the employer must restore the employee to the same position or a position comparable to that held by the employee before the leave. An employer may not "interfere with, restrain, or deny the exercise of ... any right provided under the FMLA. Thus, employers have a prescriptive obligation under the FMLA - they must grant employees substantive rights guaranteed by the FMLA - and they have a proscriptive obligation--they may not penalize employees for exercising these rights.
*Id.* at 319.

When direct evidence of discrimination is lacking, as is the case here, "the *McDonnell Douglas* [FN8] organizational framework applies to claims that an employee was penalized for exercising rights guaranteed by the FMLA." *Id.* The three-part burden-shifting scheme places the onus on the plaintiff alleging an adverse employment action to first establish a *prima facie* case of discrimination that:

> FN8. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

(1) she engaged in a protected activity;
(2) the employer committed an adverse employment action (or retaliation) against her; and
(3) there is a casual connection between the protected activity and the adverse employment action.
*Id.*

Once the plaintiff makes this preliminary showing, the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action. If the employer carries this burden of production, the presumption raised by the *prima facie* case is rebutted. *Id.* at 319-20.

Once the employer produces sufficient evidence to support a nondiscriminatory explanation for its

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Apx.-81

Not Reported in F.Supp.2d                                                                                Page 7
2004 WL 1078908 (E.D.La.), 9 Wage & Hour Cas.2d (BNA) 1223, 28 NDLR P 86
(Cite as: 2004 WL 1078908 (E.D.La.))

decision, the plaintiff must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000); *Hunt v. Rapides Healthcare System, LLC,* 277 F.3d 757, 768 (5th Cir.2001).

(1) Can Plaintiff satisfy the three prongs of a prima facie case under the FMLA? "No."

First Prong: Did Plaintiff engage in protected activity? "Yes."

**\*8** For purposes of its motion for summary judgement, Tulane does not dispute that Plaintiff engaged in "protected activity" when: (1) Plaintiff took a designated FMLA leave from June 20, 2001 through August 20, 2001; and (2) took undesignated leave from work for a one-day outpatient procedure from Monday, October 15, 2001 through Monday, October 22, 2001. (Defendant's Supporting Memo. at 19). [FN9]

> FN9. The court notes that in opposition to Plaintiff's cross-motion for summary judgment, Tulane argues that:
> Dutton's absence from work from October 15, 2001 through October 22, 2001 was not covered by the FMLA. Although Tulane Hospital allowed Dutton to be absent from work, Dutton did not give notice that her leave for a one-day outpatient procedure was FMLA related....Dutton has never produced documentation showing that she provided FMLA notice for her October 2001 absence, while she did provide notice for the earlier unrelated leave.
> (Defendant's Opposition at 3-4).
> However, because Defendant does not dispute (for purposes of its motion for summary judgment) that Plaintiff engaged in "protected activity" when she took the undesignated leave in October 2001, the court need not decide whether or not this "undesignated leave" was in fact "FMLA leave".

Second Prong: Did Plaintiff an adverse

employment action? "Yes."

Under Fifth Circuit jurisprudence, only "ultimate employment decisions" such as hiring, granting leave, discharging, promoting and compensating, satisfy the "adverse employment action" element of a *prima facie* case of retaliation. *Hunt v. Rapides Healthcare System, LLC,* 277 F.3d 757, 769 (5th Cir.2001). Here, it is undisputed that Plaintiff received an adverse employment action when she was terminated from her employment at Tulane on December 4, 2001.

In her Complaint, Plaintiff claims that she also suffered an adverse employment action, when she returned from her first FMLA leave on or about August 21, 2001, because Defendant refused to restore her to the same or equivalent position. However, the court rejects this claim because, in her deposition, Plaintiff admits that after her leave, she returned to her position of non-governmental supervisor (or "business service supervisor") with the same pay, same benefits and in the same department. (Plaintiff's Dep. at 113-14).

Plaintiff also argues in her opposition memorandum that she "suffered adverse employment action August 21, 2001, the day she returned from the first FMLA leave, when she received the violations/performance deficiencies and corrective action." (Plaintiff's Opp. Memo. at 16). However, as a matter of law, simply being written up is not an adverse employment action. In essence, laws against retaliation were "designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." *Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 707 (5th Cir.1997) (citation omitted).

Thus, the court finds that Plaintiff's termination (on December 4, 2001) is the only adverse employment action she suffered.

*Third Prong:* Is there a causal connection between Plaintiff's protected leave and her termination? "No."

The causal link required by the third prong of the *prima facie* case does not rise to the level of a "but

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Apx.-82

Not Reported in F.Supp.2d
2004 WL 1078908 (E.D.La.), 9 Wage & Hour Cas.2d (BNA) 1223, 28 NDLR P 86
(Cite as: 2004 WL 1078908 (E.D.La.))

for" standard. *Gee v. Principi,* 289 F.3d 342, 345 (5th Cir.2002). The plaintiff "need not prove that her protected activity was the sole factor motivating the employer's challenged decision in order to establish the 'causal link' element of a *prima facie* case." *Id.* (citation omitted).

Further, "[c]lose timing between an employee's protected activity and an adverse action against [her] may provide the 'causal connection' required to make out a *prima facie* case of retaliation." *Evans v. City of Houston,* 246 F.3d 344, 354 (5th Cir.2001) (citation omitted). But time lapse, while a part of the court's analysis, is not in itself conclusive of the court's determination of causal connection between a protected activity and an adverse employment action. *Shirley v. Chrysler First, Inc.,* 970 F.2d 39, 44 (5th Cir.1992).

*9 Here, Plaintiff was terminated on December 4, 2001, some 3 1/2 months after she returned to work from FMLA leave on or about August 21, 2001, and approximately 6 weeks after returning to work from the five days Plaintiff took off (from undesignated FMLA leave) in October 2001. Thus, at first blush, the temporal proximity between Plaintiff's protected leave and her termination infers a causal connection.

However, upon closer scrutiny, the court finds that the sole fact that Plaintiff was fired months after her first leave and then weeks after her second leave, does not support a retaliatory motive for two reasons. First, before Plaintiff took her FMLA leave in June 2001, she had received the lowest performance score of any of the supervisors evaluated by Ms. Failla (Failla's Dep. at 178). Evidence that an employer had been concerned about a problem before the employee engaged in protected activity underscores the significance of the temporal connection. *Smith v. Allen Health Systems, Inc.,* 302 F.3d 827, 834 (8th Cir.2002). [FN10]

> FN10. In *Smith,* the employer, a memorial foundation for a hospital, discharged a long-term employee two weeks after she took FMLA leave. *Smith,* 302 F.3d at 830. The employee's job duties included promptly acknowledging contributions to the Foundation with a receipt and thank

you letter. *Id.* Before going on leave, the employer counseled the employee that donors had complained about not receiving acknowledgments. *Id.* at 830-31. While the employee was on leave, undone work dating back as much as two months was discovered in her office. *Id.* at 831. About two weeks after the employee was on leave, she was called in for a meeting and her employment was terminated for failure to send out receipts. *Id.* The Eighth Circuit affirmed summary judgment dismissal, finding that the employee failed to present sufficient evidence of pretext even though the employee was fired at about the same time she took family leave.

Second, the relation between the timing of Plaintiff's designated FMLA leave (from June 20, 2001-August 20, 2001) and her termination is not mere coincidence, but actually has a causal explanation that hurts, rather than helps Plaintiff's case. It was during her leave (from June 2001 through August 2001) that contract employees from Advanced Receivables Strategy, Inc. (Ms. Mirck and Mr. Ianni) notified Ms. Failla about numerous deficiencies and issues she discovered regarding Plaintiff's job performance. "This gives an explanation for the temporal proximity other than a retaliatory motive of the employer." *Id.* [FN11]

> FN11. *See* fn. 10, *supra.*

In deciding whether a plaintiff has established an inference of a causal connection, a court should also consider the identity of the final decisionmaker. *See, e.g., Mato v. Baldauf,* 267 F.3d 444, 450 (5th Cir.2001); *Long v. Eastfield College,* 88 F.3d 30, 306-07 (5th Cir.1996).

Circumstantial evidence of retaliation may include proof that the person whose practices were challenged by an employee was the same person who decided to take an adverse employment action against that employee. *Fieros v. Texas Dept. of Health,* 274 F.3d 187, 193-96 (5th Cir.2001). That is not the case here, because the person whose practices are challenged by Plaintiff--Mary Failla--recommended Plaintiff's termination, but she was not the final decisionmaker.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1078908 (E.D.La.), 9 Wage & Hour Cas.2d (BNA) 1223, 28 NDLR P 86
(Cite as: 2004 WL 1078908 (E.D.La.))

In *Mato* and *Long,* the Fifth Circuit expressly held that if a plaintiff's supervisor appeared to have retaliatory animus towards the Plaintiff and recommended to the final decisionmaker that the Plaintiff be fired, the supervisor's retaliatory animus would not be imputed to the final decisionmaker if the employer conducted an independent investigation before reaching a decision. *See Mato,* 267 F.3d at 450; *Long,* 88 F.3d at 306-07.

Here, Failla recommended that Plaintiff be terminated and pursuant to instruction from Lisa Talbot of Tulane Hospital's Human Resources department, she documented this recommendation in Plaintiff's personnel file. Further, Ms. Talbot, Tulane Hospital's Chief Financial Officer (Lee), and Tulane's counsel, conducted an independent review and investigation of whether or not Plaintiff should be terminated.

*10 But even if Ms. Failla had a retaliatory animus towards Plaintiff (which Plaintiff has not shown except through her own self-serving generalized testimony stating her subjective belief that Ms. Failla retaliated against her), [FN12] Ms. Failla's animus may not be imputed to Defendant, because Plaintiff has made no showing that Ms. Failla had influence or leverage over HR Specialist Ms. Talbot, CFO Lee or Defendant's counsel (who were all involved in the decision to terminate Plaintiff). Indeed, at her deposition, Plaintiff denied that either Ms. Talbot or Mr. Lee retaliated against her when she was terminated. (Plaintiff's Dep. at 139-40). Plaintiff also testified at her deposition that she did *not* feel that the ARS representatives (Ms. Mirck and Mr. Ianni), who e-mailed Ms. Failla about Plaintiff's job deficiencies that they discovered while filling in for Plaintiff while she was out on leave from June 20, 2001 to August 20, 2001, were retaliating against her for taking medical leave. [FN13] (Plaintiff's Dep. at 125-26).

FN12. *See* Plaintiff's Dep. at 140.

FN13. As previously discussed, Ms. Failla's August 20, 2001 written warning to Plaintiff mirrored the deficiencies discovered by the ARS personnel. (*See* pp. 5-6, *supra* ).

Thus, the court concludes that Plaintiff has failed to

present a genuine issue of material fact regarding the necessary causal link. As such, Plaintiff has failed to establish her *prima facie* case and summary judgment is appropriate.

(2) Defendant's proffered reasons for terminating Plaintiff are legitimate and non-retaliatory.

*Assuming* Plaintiff could establish a *prima facie* case of retaliation, the burden in the adversarial three-step framework of *McDonnell Douglas* shifts to Tulane to state legitimate, non-retaliatory reasons for terminating Plaintiff. According to the summary judgment record, Plaintiff was terminated because she failed to meet expectations and for poor performance.

In April 2001, before Plaintiff even requested FMLA leave, she received a "barely satisfactory" job evaluation. (Failla Dep. at 178). In May 2001, major issues (involving problems with collection follow-up) which stemmed (at least in part) from Plaintiff's inadequate job performance as a monitoring supervisor were identified in an internal audit. While on FMLA leave (June - August 2001), numerous job deficiencies were discovered by third-party contractual representatives who were filling in for Plaintiff. After Plaintiff returned from this first leave, she was counseled for numerous deficiencies and was given a corrective action plan. Despite such counseling, Defendant documented continuing problems with Plaintiff's job performance, and Defendant ultimately made the decision to terminate Plaintiff's employment.

The court finds that Defendant's reasons for firing Plaintiff, if believed, would permit the trier of fact to conclude that the decision to fire Plaintiff was legitimate and not retaliatory. [FN14] Thus, Defendant has carried the burden of production, and the presumption raised by the *prima facie* case is rebutted. Plaintiff was then obliged to present sufficient evidence that (1) creates a question of fact as to whether Defendant's reasons are pretextual *and* (2) creates a reasonable inference that Defendant acted in retaliation. *Hunt v. Rapides Healthcare System, LLC,* 277 F.3d 757, 768 (5th Cir.2001).

FN14. Defendant need not persuade the court that it was actually motivated by its proffered reasons. *Williams v. Time*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                   Page 10
2004 WL 1078908 (E.D.La.), 9 Wage & Hour Cas.2d (BNA) 1223, 28 NDLR P 86
(Cite as: 2004 WL 1078908 (E.D.La.))

*Warner Operation, Inc.,* 98 F.3d 179 (5th Cir.1996). Rather, Defendant's burden at this stage is one of production only, not persuasion, involving no credibility assessments. *Reeves,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), *citing St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

(3) Plaintiff has failed to raise a genuine issue of material fact that Defendant's reasons for terminating her were a pretext for retaliation.

*11 Plaintiff makes several arguments that Defendant's reasons for firing her are untrue. Plaintiff claims that "prior to my leave, my evaluation was not one of dissatisfaction." (Plaintiff's Dep. at 140; Plaintiff's Performance Evaluations of March 2000 and April 2001, Exhibits 12 & 15). Plaintiff also points out that in September and October 2000, her division won a collection contest. (Plaintiff's Opp. at 3, *citing* Plaintiff's Exhibit 13). Plaintiff also wrote several memo's to Mary Failla rebutting the list of deficiencies and corrective action presented to Plaintiff when she returned from leave. (Plaintiff's Exhibit 27 & 31).

Further, Plaintiff maintains that any counseling she received regarding her file tracks was improper because her file tracks "ballooned" (from less than 100 accounts to more than 1,000 accounts) while she was on leave in the summer of 2001. (Plaintiff's Memo of 8/27/01, Plaintiff's Exhibit 29 & Plaintiff's Memo of 10/3/01, Doc. No. 30). Plaintiff also points out that on 9/10/01, she had 1484 accounts, but by 9/28/01, she had worked the number of accounts down to 735. (Plaintiff's Opp. at 9, & Plaintiff's Exhibit 59, p. 6).

Plaintiff also maintains that when she took her second medical leave from October 15-22, 2001, again no one worked her file tracks and they ballooned to 986 accounts by the time she returned. [FN15] (Plaintiff's Opp. at 9, and Plaintiff's Exhibit 59 at pp. 6-7). Finally, Plaintiff argues, without evidentiary support, that by the time she was fired, she had reduced her file tracks to under 300. [FN16] (Plaintiff's Opp. at 10).

FN15. Plaintiff concedes that Mary Failla e-mailed her on November 1, 2002 and November 9, 2001, asking when her file track (which then had over 1,000 accounts) would be cleaned up. (Plaintiff's Opp. at 10, & Plaintiff's Exhibits 32 & 33). Defendant maintains that many of the unworked accounts reached Plaintiff's file tracks during periods when she was not on leave, and that many of the accounts had never been worked by a collector. (Defendant's Reply at 8, & Defendant's Exhibit V).

FN16. While Plaintiff cites Mary Failla's deposition, Ex. 6 at 291-92, in support of this argument, the cited testimony does not support Plaintiff's statement that she had reduced the accounts to 300, by the time she was fired. The court has no duty to search the record for triable issues. *Ragas v. Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir.1998). Rather, "[t]he party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which the evidence supports his or her claim." *Id.*

Viewing the summary judgment evidence in the light most favorable to Plaintiff, the court finds that Plaintiff has created an issue of fact, albeit weak, as to whether Defendant's reasons were untrue. But as the court next discusses, Plaintiff has woefully failed to present competent summary judgment evidence that creates a reasonable inference that Defendant fired her in retaliation for her taking FMLA leave. [FN17] Thus, Plaintiff cannot survive summary judgment. [FN18]

FN17. Merely disputing Ms. Failla's assessment of Plaintiff's performance does not create an issue of fact as to the pretextual nature of Defendant's explanation for terminating Plaintiff. *Sandstad v. CB Richard Ellis, Inc.,* 309 F.3d 893, 899 (5th Cir.2002).

FN18. "Summary judgment is appropriate in any case 'where critical evidence is so weak or tenuous on an essential fact that it

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Apx.-85

could not support a judgment in favor of the nonmovant." ' *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075-76 (5th Cir.1994) (citation omitted).

The Fifth Circuit has "repeatedly and emphatically stated that anti-discrimination laws 'are not vehicles for judicial second-guessing of business decisions." ' *Mato v. Baldauf,* 267 F.3d 444, 452 (5th Cir.2001) (citation omitted). And "[t]he existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification." *Little v. Republic Refining Co.,* 924 F.2d 93, 97 (5th Cor.1991). "[E]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason." *Id.*

So, the issue at stake in an employment discrimination or retaliation case is not whether the employer's decision is the correct decision, or a fair decision, or the best decision; rather the issue is whether the employer had a discriminatory or retaliatory motive. *Deines v. Texas Dep't of Protection and regulatory Services,* 164 F.3d 279, 282 (5th Cir.1999).

**\*12** Here, even if Defendant's reasons (failure to meet expectations and poor performance) were not the true reasons for terminating Plaintiff, she must still produce *substantial probative evidence* that the real reason for her termination was retaliation for taking FMLA leave. *Chafin,* 179 F.3d at 320. She has not done so at this summary judgment juncture.

As previously discussed, the temporal proximity between Plaintiff's medical leave and termination does not support an inference of retaliatory motive. ( *See* discussion *supra,* pp. 20-21).

Further, the only evidence that Defendant retaliated against Plaintiff for taking FMLA leave is Plaintiff's own self-serving generalized testimony stating her subjective belief that her supervisor, Mary Failla, retaliated against her. (Plaintiff's Dep. at 140). But, again as previously discussed, even if Ms. Failla had a retaliatory animus towards Plaintiff, such animus cannot be imputed to Defendant because the decision to terminate Plaintiff was independently

reviewed by Defendant's Human Resources Specialist, its Chief Financial Officer and its legal counsel. (*See* discussion *supra,* pp. 21-23).

Further, in her deposition, Plaintiff could point to no employee at Tulane who had been fired, demoted or given a pay cut for taking FMLA leave. (Plaintiff's Dep. at 141-43). And while Plaintiff attaches to her opposition, the Affidavits of individuals who claim that Ms. Failla did not like employees taking FMLA leave, there are no allegations in these affidavits that those individuals were fired or otherwise punished for taking FMLA leave. (*See* Affidavits of Karen Erin and Rose Kline, Plaintiff's Exhibits 63 & 64). Further, these Affidavits set forth irrelevant and immaterial allegations, conclusions, state opinions and contain hearsay, and thus they constitute incompetent summary judgment. [FN19] *Ragas,* 136 F.3d at 458 .

> FN19. In a Minute Entry issued simultaneously with this Minute Entry, the court granted Defendant's Motion to Strike the Affidavit of Rose Kline, because Plaintiff did not timely list her as a Trial witness. (*See* Minute Entry, Doc. No. 62).

Similarly, Plaintiff attaches to her opposition her own Affidavit, which contains hearsay, conclusory allegations and speculation regarding her employment at Tulane and another employee who took FMLA leave. (Plaintiff's Exhibit 65). As such, it is incompetent summary judgment evidence. [FN20] *Leonard v. Dixie Well Service & Supply, Inc.,* 828 F.2d 291, 295 (5th Cir.1987).

> FN20. The court also strikes Plaintiff's Affidavit to the extent that it impeaches her prior deposition testimony. *See also* fn. 5, *supra.*

A reasonable factfinder after carefully reviewing the competent summary judgment evidence could not properly conclude that Defendant's proffered reasons for terminating Plaintiff were false *and* that the real reason was retaliation for taking FMLA leave. [FN21] In *Reeves,* the Supreme Court observed: "Certainly there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1078908 (E.D.La.), 9 Wage & Hour Cas.2d (BNA) 1223, 28 NDLR P 86
**(Cite as: 2004 WL 1078908 (E.D.La.))**

defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Reeves,* 530 U.S. at 148. Such is the case here.

> FN21. Plaintiff included in her Exhibits attached to her opposition, a Department of Labor internal narrative report regarding the FMLA charge Plaintiff filed against Tulane. (Plaintiff's Exhibit 62). As previously noted, in a Minute Entry issued simultaneously with this Minute Entry, the court granted Defendant's Motion to Strike this DOL report as untimely. (*See* fn. 7, *supra* ). However, even if the court would consider this exhibit (over Defendant's objections that it is also inadmissible, untrustworthy and lacking in probative value), the consideration of this report, with all of the other summary judgment evidence contained in th record, would not alter the court's ultimate conclusion that Defendant is entitled to summary judgment dismissal of Plaintiff's FMLA claims.

Accordingly;

IT IS ORDERED that Defendant's "Motion for Summary Judgment" be and is hereby GRANTED, dismissing all of Plaintiff's claims.

**\*13** IT IS FURTHER ORDERED that Plaintiff's "Cross-Motion for Partial Summary Judgment" be and is hereby DISMISSED.

2004 WL 1078908 (E.D.La.), 9 Wage & Hour Cas.2d (BNA) 1223, 28 NDLR P 86

**Motions, Pleadings and Filings (Back to top)**

. 2:03CV02084 (Docket)
                                 (Jul. 22, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Apx.-87



Not Reported in F.Supp.2d
2004 WL 389093 (N.D.Tex.)
(Cite as: 2004 WL 389093 (N.D.Tex.))

Page 1

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas, Dallas Division.
Raymond HALL, Plaintiff,
v.
PITNEY BOWES, INC., Defendant.
No. Civ.A.3:02-CV-2756-B.

Feb. 27, 2004.

Gregg M. Rosenberg, Gregg M. Rosenberg & Associates, Houston, TX, for Plaintiff.

Bobby G. Pryor, Pryor & Bruce, Rockwall, TX, for Defendant.

*MEMORANDUM OPINION AND ORDER*

RAMIREZ, Magistrate J.

**\*1** Pursuant to the District Court's *Order of Transfer to United States Magistrate Judge,* filed March 7, 2003, this matter has been transferred to the undersigned United States Magistrate Judge for the conduct of all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c). The following pleadings are presently before the Court:
    1. *Defendant's Motion for Summary Judgment,* filed September 26, 2003;
    2. *Plaintiff's Response to Defendant's Motion for Summary Judgment,* filed October 21, 2003; and
    3. *Defendant Pitney Bowes Inc.'s Reply Brief in Support of Motion for Summary Judgment,* filed November 5, 2003.

Having reviewed the pertinent pleadings and the evidence submitted therewith, the Court is of the opinion that *Defendant's Motion for Summary Judgment* should be GRANTED.

### I. BACKGROUND

*A. Factual Background*

This is an employment discrimination and retaliation case. Raymond Hall ("Plaintiff") is an African-American male who has been employed by Pitney Bowes, Inc. ("Defendant") since 1974. (Resp. at 3.) From 1990 to approximately April 2000, Plaintiff was a District Manager for Defendant in the Houston, Texas area. *See id.* Plaintiff alleges that he was denied pay raises that were granted to his peers for five years while working in that area, even though his "Houston/San Antonio district was tied for number one in performance in the nation for 1998." (Resp. Ex.A at 1.) Thereafter, in April 2000, Defendant promoted Plaintiff to Regional Manager in St. Louis, Missouri, where Plaintiff worked until February 2001. *See id.* In February 2001, Defendant demoted Plaintiff to District Manager and transferred him to Dallas, Texas. *See id.* In March 2001, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging that Defendant demoted him because of his race. *See id.* at 4. In April 2001, Plaintiff made the same allegation to Defendant's human resources manager. *See id.* Sometime thereafter, the EEOC dismissed Plaintiff's complaint, but provided him with a "right to sue" letter. *See id.* Plaintiff did not pursue the matter any further. *See id.*

In May 2001, Plaintiff applied for the Regional Manager position in Phoenix, Arizona. *See id.* Richard Jozwiakowski, Vice President of Customer Service and Worldwide Technical Support, selected four candidates from dozens of applicants and created an advisory committee to interview them and make a hiring recommendation. *See id.* Mr. Jozwiakowski selected Plaintiff as one of the four candidates, and Plaintiff traveled to Danbury, Connecticut, for the interview. *See id.* at 9. Shortly before his interviews began, Plaintiff encountered advisory committee member Leonard Jones in the restroom. (Resp. at 5.) Mr. Jones, who is also African-American, remarked to Plaintiff: "Oh, a black man, I should have known you were just a visitor." *Id.* Afterwards, Mr. Jones and advisory

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Apx.-88

Not Reported in F.Supp.2d
2004 WL 389093 (N.D.Tex.)
**(Cite as: 2004 WL 389093 (N.D.Tex.))**

Page 2

committee member Sandra Long separately interviewed Plaintiff. Each ranked Plaintiff as the weakest of the four candidates. (Def. Br. at 4-5.) At some point before Plaintiff left Danbury, he also met with another employee of Defendant, Brian Baxendale. (Resp. at 5.) Mr. Baxendale was not a member of the advisory committee and did not interview Plaintiff or the other candidates, but he met with each of them individually. (Resp. at 5, 10.) During Mr. Baxendale's meeting with Plaintiff, he asked Plaintiff if he thought that he had ever been discriminated against; Plaintiff stated that he had thought that Defendant's discrimination had played a part in his February 2001 demotion. *See id.* The advisory committee unanimously recommended that Plaintiff not be selected for the Regional Manager position. (Def. Br. at 5.)

*2 After receiving the advisory committee's recommendation, Mr. Jozwiakowski interviewed the four candidates individually and agreed with the advisory committee that Plaintiff was the weakest candidate. *See id.* at 6. Ultimately, Mr. Jozwiakowski selected another candidate, an American-Indian male, for the Regional Manager position. *See id.*

The following year, in January 2002, Plaintiff expressed an interest through his attorney in a position in the mailing division in Boston, Massachusetts. (Resp. at 6.) Defendant informed Plaintiff that the position was being moved to Danbury, Connecticut, and that Plaintiff had fourteen hours to accept or decline the position. *See id.* Plaintiff declined the position "because of the time restraint and the manner in which the job was presented" to him. (Resp. Ex.A at 3.) In May 2002, Plaintiff accepted a different position in Detroit, Michigan. *See id.*

*B. Procedural Background*

On March 6, 2002, Plaintiff filed a charge of discrimination with the EEOC, complaining that Defendant demoted him in February 2001, and denied him the Regional Manager position in May 2001, because of his race. (Def.Ex.B.) Plaintiff also alleged retaliation in his EEOC complaint. *See id.* The EEOC dismissed his charge, but provided him with a "right to sue" letter. (Def. Ex.A at 3.) On December 24, 2002, Plaintiff filed this action,

complaining that Defendant denied him the Regional Manager position in 2001 because of his race and retaliated against him for his previous EEOC activity in violation of Title VII. *See id.* Plaintiff seeks declaratory, injunctive, and equitable relief in addition to monetary damages. *See id.* at 3-4. Defendant responds that it did not unlawfully discriminate against Plaintiff in awarding the Regional Manager position to another candidate, that Plaintiff's claims are limited to those in his EEOC charge, that Plaintiff fails to state a claim for intentional infliction of emotional distress, and that Plaintiff has suffered no damages.

By the instant motion, Defendant moves for summary judgment as to all of Plaintiff's claims and argues that the decision not to promote Plaintiff to the Regional Manager position was based on legitimate, nondiscriminatory reasons. (Def. Br. at 3-7.) Defendant contends that the company selected a more qualified and better-suited candidate for the position and that Plaintiff cannot establish that Defendant's reasons for such selection are pretextual. *See id.* Defendant further argues that Plaintiff's own deposition testimony disavows his retaliation claim. *See id.* Plaintiff responds that he can prove a prima facie case of discrimination, that Defendant lacked a legitimate, nondiscriminatory reason to deny Plaintiff the Regional Manager position, and that Plaintiff did not knowingly disavow his retaliation claim because "retaliation" is a legal term of art and Plaintiff is not a lawyer. (Resp. at 6-16.)

II. ANALYSIS
*A. Summary Judgment Standard*

*3 Summary judgment is appropriate when the pleadings and record evidence show that no genuine issue of material facts exists and that the movant is entitled to judgment as a matter of law. *See Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) . "[T]he substantive law will identify which facts are material[,]" and only genuine disputes about material facts will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the non-movant bears the burden of proof at trial, the movant may satisfy its burden by showing that there is an absence of evidence to support the non-movant's case. *Latimer v. Smithkline & French*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 389093 (N.D.Tex.)
**(Cite as: 2004 WL 389093 (N.D.Tex.))**

Page 3

*Lab.,* 919 F.2d 301, 303 (5th Cir.1990). Once the movant makes this showing, the burden shifts to the non-movant to show that summary judgment is inappropriate. *Little,* 37 F.3d at 1075. Further, the court must view all of the evidence in the light most favorable to the non-movant. *See Richter v. Merchants Fast Motor Lines, Inc.,* 83 F.3d 96, 98 (5th Cir.1996). "On a motion for summary judgment in a case such as this one, where the Court would act as the ultimate trier of fact, the Court is permitted to draw inferences from the evidence so long as the inferences do not involve issues of witness credibility or disputed material facts." *United States v. Real Property Known as 1700 Duncanville Road,* 90 F.Supp.2d 737, 740 (N.D.Tex.2000).

*B. Title VII Framework*

Title VII's burden-shifting paradigm is well established. "First, the plaintiff must establish by a preponderance of the evidence a prima facie case of discrimination." *Nichols v. Lewis Grocer,* 138 F.3d 563, 566 (5th Cir.1998). A plaintiff may establish a prima facie case of race discrimination through either direct evidence, statistical proof, or the test established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Urbano v. Continental Airlines, Inc.,* 138 F.3d 204, 206 (5th Cir.1998). If the plaintiff makes a prima facie case, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment action." *Id.* "Once the defendant meets this burden of production, the plaintiff must demonstrate that the defendant's proffered explanation is not the actual reason for its decision, but is instead a pretext for discrimination." *Id.* "An employer's reason cannot be shown to be a 'pretext for discrimination' unless the plaintiff introduces *some* evidence, whether circumstantial or direct, that permits the jury to believe that the reason was false and that illegal discrimination was the actual reason." *Id.* This burden-shifting framework applies to claims for retaliation under Title VII, although the plaintiff must establish "but for" causation instead of pretext. *See Vadie v. Mississippi State University,* 218 F.3d 365, 374 (5th Cir.2000); *see also Valentine v. Bowsher,* 1998 WL 329364, at *1 (N.D.Tex. June 12, 1998) (applying the *McDonnell Douglas* framework in a Title VII

retaliation case).

*C. Race Discrimination*

**\*4** As stated above, Plaintiff may establish a prima facie case of race discrimination through direct evidence, statistical proof, or the *McDonnell Douglas* framework. Neither Plaintiff's complaint nor his summary judgment evidence contains direct or statistical proof of race discrimination. The *McDonnell Douglas* framework, therefore, is the measure of whether there is a genuine issue of material fact regarding his discrimination claim.

1. Prima facie Case

Applying the *McDonnell Douglas* framework in a failure to promote case, Plaintiff must make a prima facie showing: (1) that he is a member of a protected class, (2) that he sought and was qualified for the position, (3) that he was rejected for the position, and (4) that the employer continued to seek applicants with his qualifications. *See Haynes v. Pennzoil Co.,* 207 F.3d 296, 300 (5th Cir.2000). Plaintiff's affidavit states that (1) he is African-American, thus a member of a protected racial class, (2) he sought and was qualified for the position of Regional Manager, (3) he was rejected for that position, and (4) Defendant sought and interviewed other applicants with his qualifications. (Resp. Ex.A at 1-3.) Plaintiff has established his prima facie case. Thus, a presumption of discrimination arises, and the burden shifts to Defendant to articulate some legitimate, nondiscriminatory reason for its actions. *See Urbano,* 138 F.3d at 206.

2. Legitimate Nondiscriminatory Reason

Defendant argues that Plaintiff was denied the Regional Manager position for legitimate nondiscriminatory reasons. (Def. Br. at 8.) Defendant has presented evidence that the advisory committee members individually and collectively ranked Plaintiff as the weakest of the four candidates. They did not recommend that Plaintiff be selected for the Regional Manager position. Defendant presents affidavit testimony of two members of the advisory committee that interviewed Plaintiff, Leonard Jones and Sandra Long, and the affidavit of Richard Jozwiakowski,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Apx.-90

Not Reported in F.Supp.2d
2004 WL 389093 (N.D.Tex.)
(Cite as: 2004 WL 389093 (N.D.Tex.))

the individual responsible for the ultimate hiring decision. Mr. Jones states in his affidavit that during Plaintiff's interview, Plaintiff failed

to provide examples of ongoing direct customer involvement or innovations in meeting customer needs that I believed were necessary for the position. The other candidates I interviewed effectively communicated their experience in meeting customer needs and the innovations they employed in dealing with customers.... Based on their resumes and the interviews that I conducted, I concluded that [Plaintiff] was the weakest of the three candidates I interviewed.

(Def. Ex.F at 1-2.) Based on his evaluation of Plaintiff, Mr. Jones did not recommend Plaintiff for the Regional Manager position. *See id.* The other advisory committee member to interview Plaintiff, Sandra Long, states that Plaintiff

failed to provide examples of innovations in meeting customer needs. On the other hand, [the two top interviewees] provided numerous examples of their customer involvement and innovations with customers. In addition, [they] displayed an enthusiasm for the position and for dealing with customers, in general, which [Plaintiff] did not demonstrate during the interview.

**\*5** (Def. Ex.G at 1-2.) Ms. Long also states that she did not recommend Plaintiff for the Regional Manager position, and that Plaintiff's race was not a factor in her decision. *See id.* Finally, the individual ultimately responsible for the hiring decision, Mr. Jozwiakowski, states in his affidavit that the advisory committee members that interviewed Plaintiff

rated him as the weakest of the four candidates and did not recommend that he be hired for this position. I also interviewed [Plaintiff] for this position, and agreed with the advisory committee members that he was the weakest candidate of the four. He failed to provide me[,] in response to questions [,] examples of where he had established relationships with key customer accounts.

(Def. Ex.E at 1-2.) Mr. Jozwiakowski asserts that the other three candidates provided examples of established relationships, and their high levels of "customer involvement and achievement" made them "more viable candidates" than Plaintiff. *See id.* at 2. Mr. Jozwiakowski states that he based his hiring decision on the strongest examples of

superior customer involvement and sales achievement. *See id.* Although Mr. Jozwiakowski believed that he selected a minority for the position, he concludes that race was not a consideration in his decision. *See id.* at 3.

The Court finds that Defendant has articulated legitimate, nondiscriminatory reasons why it did not select Plaintiff for the Regional Manager position. These reasons meet Defendant's burden. *See Solorzano v. Shell Chemical Co.,* 2000 WL 1252555, at \*7 (E.D.La. Aug.31, 2000) (finding that the defendant articulated legitimate, nondiscriminatory reasons for its decision not to promote the plaintiff, who was rated the third weakest candidate). Defendant's legitimate nondiscriminatory reasons erase any inference of discrimination established by Plaintiff's prima facie case, and the burden shifts back to Plaintiff to demonstrate that Defendant's reasons are in fact pretextual. *See Frantisek Benes, P.E. v. City of Dallas,* 2002 WL 318334, at \*15 (N.D.Tex. Feb.26, 2002). Plaintiff must therefore show that Defendant's reasons are pretextual and that discrimination was the actual reason that he was not selected for the Regional Manager position. *See Nichols,* 138 F.3d at 566.

3. Pretext or Intentional Discrimination

"An employer's reason cannot be shown to be a 'pretext for discrimination' unless the plaintiff introduces some evidence, whether circumstantial or direct, that permits the jury to believe that the reason was false and that illegal discrimination was the actual reason." *Id.; see also Blow v. City of San Antonio, Tex.,* 236 F.3d 293, 297 (5th Cir.2001) (citing *Sanderson v. Reeves,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (holding that such evidence may be circumstantial)). Whether direct or circumstantial, "the evidence offered to counter the employer's proffered reasons must be substantial." *Nichols,* 138 F.3d at 566.

**\*6** Plaintiff alleges a pattern of racial discrimination by Defendant. (Resp. at 8.) Plaintiff alleges that Defendant denied him pay raises for five years while he was the Regional Manager in Houston and thereafter demoted him to District Manager. [FN1] (Resp. at 8; Ex .A at 1.) Plaintiff asserts that the filed claims with Defendant's human

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 389093 (N.D.Tex.)
(Cite as: 2004 WL 389093 (N.D.Tex.))

Page 5

resources manager in April 2001 and the EEOC in March 2001 contending that the demotion was racially discriminatory. *See id.* Plaintiff states that he then received a racially derogatory voice-mail at work from an unidentified source. Before the interview for the Regional Manager position, Plaintiff encountered a member of the advisory committee in the restroom, who stated: "Oh, a black man, I should have known you were just a visitor." (Resp. at 8.) Plaintiff argues that this statement was derogatory and is evidence of racial discrimination. In addition, Plaintiff claims that he told another member of the advisory committee, Mr. Baxendale, that he believed that Defendant's racial discrimination played a part in his February 2001 demotion. *See id.* Further, Plaintiff states that he was more qualified for the Regional Manager position than any of the other applicants because he "held the position of Regional Manager before and knew what the job entailed." *Id.* at 2. Plaintiff argues that this evidence establishes that Defendant's legitimate nondiscriminatory reasons are pretextual.

> FN1. Plaintiff does not seek a remedy for these past events, but offers these instances as background to prove discrimination and retaliation in the Defendant's decision to deny him the Regional Manager position. Therefore, the Court need not address Defendant's arguments that these events are time-barred or otherwise fail. *See Winter v. Bank of America,* 2003 WL 23200278, at *5 n. 8 (N.D.Tex. Dec.12, 2003) (accepting evidence tendered "as background evidence to prove discrimination and retaliation" and not addressing whether the evidence was time-barred or did not constitute adverse employment actions cognizable under Title VII).

Defendant responds that Plaintiff's own sworn testimony contradicts his claims of discrimination. Defendant cites Plaintiff's deposition testimony, wherein Plaintiff stated: "No, I do not have evidence that anyone did not select me based on race. [T]he other applicants that applied were equal to or had the same experience as me ..." (Def. Ex.C at 7, 10.) In the context of summary judgment, the Court can consider the variances in Plaintiff's sworn

testimony and his summary judgment evidence. *See Winter,* 2003 WL 23200278, at *7 (considering variances between affidavit testimony and deposition testimony in Title VII case). Plaintiff has failed to present any competent summary judgment evidence to contradict his sworn deposition testimony. Rather, Plaintiff presents speculation that he was more qualified for the Regional Manager position than any of the other applicants because he "held the position of Regional Manager before and knew what the job entailed." (Resp. at 2.) However, while Defendant may have based part of its decision on Plaintiff's prior experience as a Regional Manager, the argument that this experience alone made Plaintiff "more qualified" is speculative and insufficient to create a genuine issue of material fact. *See Nichols v. Loral Vought Sys. Corp.,* 81 F.3d 38, 42 (5th Cir.1996) (explaining that summary judgment evidence must be more than mere subjective beliefs or speculation). Indeed, in order to show that he was more qualified, Plaintiff's qualifications must "leap from the record and cry out to all who listen that he was vastly--or even clearly--more qualified for the subject job." *Price v. Federal Express Corp.,* 283 F.3d 715, 723 (5th Cir.2002). Defendant argues that the record possesses no such evidence that Plaintiff was "vastly--or even clearly--more qualified for the subject job." *Id.* Consequently, Plaintiff has failed to present evidence that he was more qualified for the position. Even if Plaintiff presented evidence of higher qualifications, the Court is not to "try ... the validity of an employer's good faith belief as to one employee's competence in comparison to another." *Deines v. Texas Dep't. of Protective and Regulatory Services,* 164 F.3d 277, 281 (5th Cir.1999).

*7 [D]iscrimination laws [are not] vehicles for judicial second-guessing of business decisions. It is not the function of the [factfinder] to scrutinize the employer's judgment as to who is best qualified to fill the position; nor is it the [factfinder's] task to weigh the respective qualifications of the applicants. Whether the employer's decision was the correct one, or the fair one, or the best one is not a question within the [factfinder's] province to decide. The single issue for the trier of fact is whether the employer's selection of a particular applicant over the plaintiff was motivated by discrimination.
*Id.* (citations omitted). Accordingly, "even if the jury concluded that [Plaintiff] was the best

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Apx.-92

Not Reported in F.Supp.2d
2004 WL 389093 (N.D.Tex.)
**(Cite as: 2004 WL 389093 (N.D.Tex.))**

qualified candidate, he still would not have proved his case [of racial discrimination]." *Id.* at 282. Plaintiff's qualifications do not create a fact issue precluding summary judgment.

With respect to Plaintiff's arguments regarding his lack of pay raises and his demotion, Plaintiff presents no evidence to show a connection between these events and Defendant's decision to not promote him. Defendant argues that Plaintiff's deposition testimony refutes any connections between the previous demotion and this suit:

Q. And so you didn't understand the St. Louis issue to be a part of this lawsuit, correct?
A. I ...
Q. I think that's what you told me.
A. Right.
(Reply at 2.)

Plaintiff's only other evidence of possible discriminatory animus are the ethnically-based comments that he allegedly received on his work voice-mail and from Mr. Jones in the restroom. However, it is well-settled that "derogatory stray remarks unconnected to an employment decision cannot create a fact issue regarding discriminatory intent." *Solorzano,* 2000 WL 1252555, at *7; *see also Scales v. Slater,* 181 F.3d 703, 712 (5th Cir.1999) (citing *Price v. Marathon Cheese Corp.,* 119 F.3d 330, 337 (5th Cir.1997); *Equal Employment Opportunity Comm'n v. Texas Instruments, Inc.,* 100 F.3d 1173, 1181 (5th Cir.1996); and *Ray v. Tandem Computers, Inc.,* 63 F.3d 429, 434 (5th Cir.1995)). Moreover, Plaintiff's own affidavit shows that he received the alleged derogatory voice-mail from an unidentified source *before* he applied for the Regional Manager position. (Resp. Ex.A at 2.) Plaintiff's deposition testimony also indicates that he did not believe that Mr. Jones' comment "Oh, a black man, I should have known you were just a visitor" was discriminatory, but that it indicated "that it was a rarity to have blacks in Danbury, Connecticut." (Reply at 3-4.) Defendant states that Danbury, Connecticut, has a five-percent African-American population. (Reply at 4.) Even assuming that Plaintiff now finds these comments racially discriminatory, Plaintiff has failed to show a connection between the comments and Defendant's decision not to promote him. Without such connection, these comments do not create a genuine

issue of material fact. *See Solorzano,* 2000 WL 1252555, at *7; *see also Christiason v. Hitelite Industries, Inc.,* 2000 WL 963449, at *3 & n. 6 (N.D.Tex. July 10, 2000) (noting that "cases that have found spatially unrelated, amorphous age-based comments to be insufficient proof of pretext."); *Laughlin v. Liberty Mut. Ins. Co.,* 1997 WL 694113, at *6 (N.D.Tex. Oct.30, 1997) ("Generally speaking, to be probative of discrimination, the remark 'must be direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that age was an impermissible factor in the decision to terminate the employee." ') (quoting *EEOC v. Texas Instruments Inc.,* 100 F.3d 1173, 1081 (5th Cir.1996)).

*8 Where the plaintiff has offered no evidence to rebut the employer's facially benign explanations, no inference of discrimination can be drawn. *See EEOC v. Louisiana Office of Community Servs.,* 47 F.3d 1438, 1447-48 (5th Cir.1995) (explaining that a plaintiff must tender factual evidence from which a fact-finder could reasonably conclude that the defendant's reasons were pretext for discrimination). Consequently, Plaintiff has failed to show a genuine issue of material fact regarding pretext, and the Court grants Defendant summary judgment on Plaintiff's Title VII discrimination claim. *See Moore v. Eli Lilly & Co.,* 990 F.2d 812, 817 n. 24 (5th Cir.1993) (holding that plaintiff failed to prove pretext and listing other cases in which plaintiffs similarly failed to meet their burden; "the most prevalent flaw in the losing plaintiffs' evidence is the absence of proof of nexus between the firing (or failure to promote) and the allegedly discriminatory acts of the employer").

D. Retaliation

Plaintiff also complains that Defendant retaliated against him in violation of Title VII. (Def. Ex.A at 3.) Defendant argues that Plaintiff's retaliation claim is not before this Court because it was not pleaded in Plaintiff's EEOC charge. In the alternative, Defendant argues that there are no genuine issue of fact regarding Plaintiff's claim for retaliation. (Mot. at 9.)

1. Failure to Exhaust

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Defendant's argument that Plaintiff's retaliation claim is not before this Court challenges Plaintiff's administrative exhaustion of this claim. Defendant contends that Plaintiff failed to present his retaliation claim to the EEOC because he did not check the box for "Retaliation" in his charge. (Mot. at 9.) Defendant posits that "the 'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir.1970). However, because Plaintiff specifically stated in his EEOC complaint that he was "discriminated and retaliated against due to [his] race," Plaintiff's retaliation claim was directly before the EEOC. *See id* . (emphasis added). Thus, the Court need not consider whether the scope of the investigation would include the charge of retaliation. [FN2]

> FN2. It is worth noting that even if Plaintiff's retaliation claim had not been so specifically stated, it could still be considered in appropriate circumstances. The "Fifth Circuit has long held that it is unnecessary for a plaintiff to his exhaust his administrative remedies prior to asserting a retaliation claim that grows out of an earlier charge of discrimination." *Rangel v. Ashcroft,* 2001 WL 1597858, at *3 (N.D.Tex. Dec.11, 2001) (citing *Gupta v. East Texas State University,* 654 F.2d 411, 414 (5th Cir.1981)). Courts "have 'ancillary' jurisdiction to hear post-charge retaliation claims when the retaliation claim grows out of an earlier charge that has been properly exhausted." *Id.*

Because Plaintiff's retaliation claim was clearly presented to the EEOC, the Court finds that Plaintiff's retaliation claim was administratively exhausted and is properly before the Court.

2. Prima facie Case

Plaintiff may establish a prima facie case of retaliation through either direct evidence, statistical proof, or the *McDonnell Douglas* burden-shifting paradigm. *See Valentine,* 1998 WL 329364, at *1. Plaintiff does not present direct or statistical evidence of retaliation. Thus, the *McDonnell*

*Douglas* framework is the measure of whether there is a genuine issue of material fact regarding Plaintiff's claim of retaliation.

*9 Applying the *McDonnell Douglas* framework to Plaintiff's claim of retaliation, Plaintiff must show: (1) that he participated in statutorily protected activity as described in Title VII; (2) an adverse employment action occurred; and (3) a causal connection exists between the protected activity and the adverse action. *See Holtzclaw v. DSC Communications Corp.,* 255 F.3d 254, 259 (5th Cir.2001). "The burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action." *Winter,* 2003 WL 23200278, at *10. "Once the defendant does so, the inference of discrimination created by the prima facie case disappears, and the ultimate question becomes whether the protected conduct was the 'but for' cause of the adverse employment action." *Id.*

Plaintiff alleges that he was engaged in a statutorily protected activity as described in Title VII, i.e., the filing the charge of discrimination regarding the demotion in St. Louis and filing the same charge of discrimination with Defendant's human resources manager. (Resp. at 14.) "An employee has engaged in activity protected by Title VII if she has either (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." *Long v. Eastfield College,* 88 F.3d 300, 304 (5th Cir.1996). Plaintiff has satisfied the first element. With regard to the second element, the denial of the Regional Manager promotion clearly constitutes an adverse employment action. *See Patrick v. Ridge,* 2004 WL 42609, at *7 n. 6 (N.D.Tex. Jan.6, 2004) ("Plaintiff suffered an adverse employment action in being denied a promotion which would have resulted in an increase in pay.").

Finally, Plaintiff must show a minimal causal connection between his previous discrimination complaints and Defendant's decision not to promote him to the Regional Manager position. "Although the initial requirement that a plaintiff show a 'causal link' is less stringent than the 'but for' causation that a jury must find, and this court has characterized the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 389093 (N.D.Tex.)
(Cite as: 2004 WL 389093 (N.D.Tex.))

burden as 'minimal," ' Plaintiff "must still demonstrate *some* causal connection between his complaints" to the EEOC and Defendant, and Defendant's decision not to promote him. *See Keeley v. Cisco Systems,* 2003 WL 21919771, at *7 (N.D.Tex. Aug.8, 2003) (citations omitted). Plaintiff attempts to show this minimal causal connection through the close temporal proximity of his prior complaints, his statement to one of the advisory committee members that he believed he had been discriminated against by Defendant, and the denial of his promotion. (Resp. at 15.) Plaintiff filed his charge with the EEOC in March 2001, and complained to Defendant's human resources manager about the demotion in April 2001. Defendant denied Plaintiff the Regional Manager position in May 2001. Courts have found that "mere close proximity in time" between an employee's allegations of discrimination and an adverse action may satisfy the minimal causal connection. *See, e.g., Keeley,* 2003 WL 21919771, at *9 (finding a genuine issue of material fact regarding the causation element of a retaliation claim based partly on temporal proximity). The Court finds that the close temporal proximity presented in this case is sufficient to create a genuine issue of material fact regarding the third element of Plaintiff's prima facie case. *See id.* For the purposes of summary judgment, the burden now shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its actions. *See id.* at *9 n. 15; *see also Patrick,* 2004 WL 42609, at *7.

3. Legitimate Nondiscriminatory Reason

*10 Defendant reasserts the same reasons that it argued in response to Plaintiff's discrimination claims, i.e., that Plaintiff was the weakest of the four candidates. (Def. Br. at 8.) The Court determined that these reasons are legitimate, nondiscriminatory reasons that carry Defendant's burden. *See Solorzano,* 2000 WL 1252555, at *7. Thus, Defendant has carried its burden to proffer legitimate, nondiscriminatory reasons for its decision not to promote Plaintiff to the Regional Manager position. The burden now shifts to Plaintiff to identify specific record facts showing that his engagement in the protected conduct was the "but for" cause of Defendant's refusal to promote him. *See id.* at *10.

4. But For Causation

Plaintiff has the ultimate burden of "showing that 'but for' the protected activity, the [adverse employment action] would not have occurred, notwithstanding the other reasons advanced by the defendant." *Vadie,* 218 F.3d at 374 (quoting *McMillan v. Rust College, Inc.,* 710 F.2d 1112, 1116 (5th Cir.1983)); *see also Long,* 88 F.3d at 305 n. 4 ("even if a plaintiff's protected conduct is a substantial element in a defendant's [adverse employment] decision ..., no liability for unlawful retaliation arises if the [same decision would have been made] even in the absence of the protected conduct"). The requirement of showing "but for" causation is more stringent than the minimal causation required to make Plaintiff's prima facie case. [FN3] *See Long,* 88 F.3d at 305 n. 4. To show a genuine issue regarding "but for" causation, Plaintiff has to show that a fact issue exists whether "but for" his protected activities, Defendant would have selected him for the Regional Manager position. *See Vadie,* 218 F.3d at 374.

> FN3. "At first glance, the ultimate issue in an unlawful retaliation case--whether the defendant discriminated against the plaintiff because the plaintiff engaged in conduct protected by Title VII--seems identical to the third element of the plaintiff's prima facie case--whether a causal link exists between the adverse employment action and the protected activity. However, the standards of proof applicable to these questions differ significantly.... The standard for establishing the 'causal link' element of the plaintiff's prima facie case is much less stringent." *Long,* 88 F.3d at 305 n. 4.

Plaintiff argues that "Clearly all that could have motivated Defendant was a discriminatory or retaliatory reason[,]" and Defendant's proffered reasons are "bogus and unworthy of credence." (Resp. at 15.) Plaintiff's conclusory allegations and subjective beliefs of what motivated Defendant are not competent summary judgment evidence. *See Winter,* 2003 WL 23200278, at *7-8; *see also Thornton v. Neiman Marcus,* 850 F.Supp. 538, 544 (N.D.Tex.1994) (holding that evidence that consists of subjective beliefs is not competent summary

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 389093 (N.D.Tex.)
(Cite as: 2004 WL 389093 (N.D.Tex.))

Page 9

judgment evidence). Indeed, Plaintiff's own testimony undermines his claim. During Plaintiff's deposition, Defendant asked:

Q: Has there been any retaliation against you?

A: [Plaintiff answered] None that I know of.

(Def. Ex.C at 10.) Defendant claims that this is evidence that there was no retaliation, and that Plaintiff fails to present any controverting evidence. Plaintiff responds that because he is not an attorney, he cannot conclusively deny a claim of retaliation because "retaliation" is a legal term of art and retaliatory animus is a question for the jury to decide. (Resp. at 14.) In the context of summary judgment, the Court can consider the variances in Plaintiff's sworn testimony and his summary judgment evidence. *See Winter*, 2003 WL 23200278, at *7. Plaintiff has failed to present any competent summary judgment evidence to contradict his sworn deposition testimony.

*11 The only evidence that Plaintiff presents is the evidence of the temporal proximity of his filing of the EEOC charge and complaint to Defendant's human resources manager and the denial of his promotion. A close temporal proximity may satisfy Plaintiff's initial prima facie case, where the causal burden is "minimal," but it does not satisfy the stringent requirement of showing "but for" causation. "[T]emporal proximity alone is generally insufficient to establish a causal connection for a retaliation claim." *Little v. BP Exploration*, 265 F.3d 357, 363-64 (6th Cir.2001). Because Plaintiff presents only evidence of a temporal proximity, he fails to identify a genuine issue of material fact regarding "but for" causation. Indeed, Plaintiff has failed to show that the exercise of his protected activities are *even related* to Defendant's reasons for not promoting him. *See Frantisek Benes, P.E.*, 2002 WL 318334, at *15 (holding that even if the court considered the plaintiff's "filing of grievances as well as his EEOC charges as the protected activity he was engaged in, Plaintiff still fails to establish the causal link that 'but for' this protected conduct the Defendant's decisions not to promote him to the above noted positions would have been different.").

### III. CONCLUSION

In conclusion, Plaintiff's subjective belief that he has been the victim of racial discrimination and retaliation, unsupported by any specific factual evidence, is insufficient to rebut Defendant's

evidence of legitimate, nondiscriminatory reasons for its actions. Accordingly, Defendant is entitled to summary judgment on Plaintiff's claims of unlawful discrimination and retaliation in violation of Title VII. Because these are the only claims presented in Plaintiff's complaint, Defendant is entitled to judgment as a matter of law. For the foregoing reasons, *Defendant's Motion for Summary Judgment* is hereby GRANTED and this action is DISMISSED with prejudice. The Court will enter judgment by separate document in accordance with Fed. R. Civ. P. 58(a).

SO ORDERED.

2004 WL 389093 (N.D.Tex.)

**Motions, Pleadings and Filings (Back to top)**

. 3:02CV02756 (Docket)

(Dec. 24, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                Page 1
2004 WL 2980351 (5th Cir.(Tex.))
**(Cite as: 2004 WL 2980351 (5th Cir.(Tex.)))**

**H**

**Briefs and Other Related Documents**

Only the Westlaw citation is currently available.

This case was not selected for publication in the Federal Reporter.

Please use FIND to look at the applicable circuit court rule before citing this opinion. Fifth Circuit Rule 47.5.4. (FIND CTA5 Rule 47.)

United States Court of Appeals, Fifth Circuit.
Ladonna HOCKMAN, Plaintiff-Appellant,
v.
WESTWARD COMMUNICATIONS, LLC; et al,
Defendants,
Westward Communications, LLC; Westward
Communications, LP, Defendants-
Appellees.
No. 03-41620.

Decided Dec. 22, 2004.

**Background:** Female former employee brought action against former employer alleging hostile work environment sexual harassment, retaliation, and constructive discharge in violation of Title VII, and alleging state law claims against male coworker. Employer moved for summary judgment. The United States District Court for the Eastern District of Texas, Hannah, J., 282 F.Supp.2d 512, granted motion. Employee appealed.

**Holdings:** The Court of Appeals, Prado, Circuit Judge, held that:
(1) male coworker's alleged harassment was not so severe and pervasive as to affect term, condition, or privilege of employment, as required for prima facie case of hostile work environment sexual harassment under Title VII;
(2) employer took prompt remedial action as matter of law because employee unreasonably failed to take advantage of corrective opportunities

provided;
(3) employee failed to make out prima facie case of retaliation, absent showing of adverse employment action; and
(4) employer's prompt remedial measures were fatal to employee's constructive discharge claim.
Affirmed.

**[1] Federal Courts ⟳0**

170Bk0 k.
Court of Appeals reviews district court's grant of summary judgment de novo, applying same standard as district court. Fed.Rules Civ.Proc. Rule 56, 28 U.S.C.A.

**[2] Civil Rights ⟳0**
78k0 k.
Hostile-work-environment claim consists of five elements: (1) employee belongs to protected group, (2) employee was subjected to unwelcome sexual harassment, (3) harassment complained of was based on sex,(4) harassment affected term, condition, or privilege of employment, and (5) employer knew or should have known of harassment and failed to take prompt remedial action. Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).

**[3] Civil Rights ⟳0**
78k0 k.
For harassment to affect term, condition, or privilege of employment, it must be both objectively and subjectively abusive. Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).

**[4] Civil Rights ⟳0**
78k0 k.
Whether environment is objectively hostile or abusive is determined by considering totality of circumstances; although no single factor is required, courts look to (1) frequency of discriminatory conduct, (2) its severity, (3) whether it is physically threatening or humiliating as opposed to mere offensive utterance, (4) whether it unreasonably interferes with employee's work performance, and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                Page 2
2004 WL 2980351 (5th Cir.(Tex.))
(Cite as: 2004 WL 2980351 (5th Cir.(Tex.)))

(5) whether complained-of conduct undermines employee's workplace competence. Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).

**[5] Federal Civil Procedure** ☜══0
170Ak0 k.

To survive summary judgment on hostile work environment sexual harassment claim, harassment must be so severe and pervasive that it destroys protected class member's opportunity to succeed in the workplace; alleged conduct must be more than rude or offensive comments, teasing, or isolated incidents, and implicit or explicit in sexual content of harassment must be message that employee is incompetent because of her sex. Fed.Rules Civ.Proc. Rule 56, 28 U.S.C.A.; Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).

**[6] Civil Rights** ☜══0
78k0 k.

Male coworker's alleged harassment of female employee was not so severe and pervasive as to affect term, condition, or privilege of her employment, as required for prima facie case of hostile work environment sexual harassment under Title VII; coworker allegedly once made remark to her about another employee's body, once slapped her on behind with newspaper, once "grabbed or brushed" against her breasts and behind, once held her cheeks and tried to kiss her, asked her to come to office early so they could be alone, and once stood in door of bathroom while she was washing her hands. Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).

**[7] Civil Rights** ☜══0
78k0 k.

When company, once informed of allegations of sexual harassment, takes prompt remedial action to protect claimant, company may avoid Title VII liability; "prompt remedial action" must be reasonably calculated to end the harassment. Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).

**[8] Civil Rights** ☜══0
78k0 k.

What constitutes "prompt remedial action" by employer informed of allegations of sexual harassment depends on facts of case; not every response by employer will be sufficient to discharge

its legal duty, and rather employer may be liable despite having taken remedial steps if employee can establish that employer's response was not reasonably calculated to halt the harassment. Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).

**[9] Civil Rights** ☜══0
78k0 k.

Employer named as defendant on hostile work environment sexual harassment claim took prompt remedial action as matter of law, insofar as female employee unreasonably failed to take advantage of corrective opportunities provided; if employee was dissatisfied with her supervisor's handling of complaint about male coworker she should have gone directly to Director of Human Resources, despite supervisor's alleged warning "never to go above her head," in keeping with company's antiharassment policy which was provided in handbook that employee had acknowledged receiving. Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).

**[10] Civil Rights** ☜══0
78k0 k.

Title VII retaliation claims are analyzed under *McDonnell Douglas* burden-shifting framework. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**[11] Civil Rights** ☜══0
78k0 k.

To make out prima facie case of retaliation under Title VII, employee must provide evidence that (1) she engaged in protected conduct, (2) she was thereafter subjected to adverse employment action, and (3) adverse employment action was taken in response to her protected conduct; if employee succeeds, burden then shifts to employer to articulate legitimate, nondiscriminatory reason for the adverse employment action and if employer carries this burden then employee must present evidence showing that employer's proffered rationale was pretextual, and that engaging in protected activity was but-for cause of adverse employment action. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**[12] Civil Rights** ☜══0
78k0 k.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Apx.-98

Slip Copy
2004 WL 2980351 (5th Cir.(Tex.))
(Cite as: 2004 WL 2980351 (5th Cir.(Tex.)))

Page 3

Filing of Equal Employment Opportunity Commission (EEOC) complaint is clearly "protected activity" for purposes of Title VII's antiretaliation provision. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**[13] Civil Rights** €══0
78k0 k.
In determining whether employer's action constitutes "adverse employment action" for purposes of Title VII retaliation claim, court is concerned solely with "ultimate employment decisions" such as hiring, granting leave, discharging, promoting, and compensating. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**[14] Civil Rights** €══0
78k0 k.
Newspaper editor failed to make out prima facie case of retaliation for her
filing of claim with Equal Employment Opportunity Commission (EEOC), absent showing of adverse employment action from her transfer to another newspaper, placement under supervision of individual whose wife had offer of employment rescinded so that company could afford to keep the complaining editor, alleged hostile treatment and institution of "baseless" racial harassment investigation against her, issuance of directive "not to be sick" on day of week when "paste-ups" were done, and requirement she provide detailed documentation of future doctors' appointments; transfer was purely lateral, and other actions were not "ultimate employment decisions." Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**[15] Civil Rights** €══0
78k0 k.
A "purely lateral transfer" cannot constitute "adverse employment action" needed to support Title VII retaliation claim; transfer is "purely lateral" where new position has same job title, benefits, duties, and responsibilities as old position. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e- 3(a).

**[16] Civil Rights** €══0
78k0 k.
To survive summary judgment on constructive discharge claim, employee must provide evidence

that working conditions were so intolerable that reasonable employee in her position would have felt compelled to resign; mere harassment alone is insufficient and rather employee must show aggravating factors to justify departure which include (demotion, reduction in salary or job responsibilities, reassignment to menial or degrading work or to work under younger supervisor, badgering, harassment, or humiliation by employer calculated to encourage employee's resignation, or offers of early retirement or continued employment on terms less favorable than employee's former status.

**[17] Civil Rights** €══0
78k0 k.
Ultimately, to succeed on Title VII constructive discharge claim, employee must show greater degree of harassment than is required for hostile work environment claim. Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).

**[18] Federal Civil Procedure** €══0
170Ak0 k.
Summary judgment is appropriate where nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation. Fed.Rules Civ.Proc. Rule 56, 28 U.S.C.A.

**[19] Civil Rights** €══0
78k0 k.
Employer's prompt remedial measures in response to female newspaper editor's claim of sexual harassment by male coworker were fatal to editor's claim of constructive discharge; upon learning of her complaint, editor was immediately transferred to another newspaper, separating her from the alleged harasser. Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. § 2000e-2(a).
Alex Arthur Castetter, Stuckey, Garrigan & Castetter, Nacogdoches, TX, for Plaintiff-Appellant.

Felicity A. Fowler, Matthew Thomas Deffebach, Haynes & Boone, Houston, TX, for Defendant-Appellee.

Appeals from the United States District Court for the Eastern District of Texas.

Before WIENER and PRADO, Circuit Judges, and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Apx.-99

Slip Copy
2004 WL 2980351 (5th Cir.(Tex.))
(Cite as: 2004 WL 2980351 (5th Cir.(Tex.)))

Page 4

LITTLE, District Judge. [FN*]

EDWARD C. PRADO, Circuit Judge: [FN**]

*1 Ladonna Hockman sued Westward Communications, LLC and Westward Communications, LP (collectively "Westward") asserting various claims under 42 U.S.C. §§ 2000 et seq. ("Title VII"). The district court granted Westward's motion for summary judgment on all claims, and Hockman appealed. We now affirm.

I. *Background*

Westward owns certain newspapers in East Texas that are involved in this lawsuit: the *Grand Saline Sun* in Grand Saline, the *Wood County Democrat* in Quitman, and the *Edgewood Enterprise* in Edgewood. At all times relevant to this lawsuit, Nell French was the publisher of all three papers and Hockman's immediate supervisor. Oscar Rogers ran a commercial printing press from the back of the *Grand Saline Sun* office. Aggie McDonald was the composition and graphics manager. Molly Harvill was the office manager.

Hockman actually worked for Westward twice. First, she worked as the assistant editor of the *Edgewood Enterprise* from July 30, 1998 to June 30, 1999. The reason for Hockman's 1999 departure is disputed: Hockman claims that she left because of a "personality clash" with the paper's publisher at that time, Jan Adamson; Westward claims that Hockman was involved in a theft. Regardless of the reason, Hockman was rehired in April 2001 as an editor for the *Grand Saline Sun*.

When Hockman rejoined the Westward team, she was provided with a copy of the employee handbook which contains the company's antiharassment policy. The policy provides for the following in the event of a complaint:

If an employee believes that he or she is being subjected to harassment of any kind, the incident(s) must be reported promptly to his/her supervisor. If the employee feels that it would be inappropriate to report the matter to the immediate supervisor, or the matter is not satisfactorily resolved at this level, the employee should report the incident(s) directly to the Director, Human Resources at 440-746-1701.

On July 24, 2001, Hockman signed an acknowledgement form, attesting that she had received a copy of the handbook and understood its provisions.

Hockman claims that soon after she returned to Westward, Rogers began to harass her in the following ways: First, Rogers commented on the body of a former Westward employee, Sheila Ledesma. Specifically, Hockman claims that "[Rogers] would tell her that Sheila Ledesma had a nice behind and body." Next, Hockman claims that beginning in July of 2001, Rogers would brush up against her breasts and behind. Third, Hockman claims that on one occasion, Rogers "slapped [her] behind with a newspaper." Fourth, Rogers once attempted to kiss Hockman. Fifth, on more than once occasion, Rogers asked Hockman to come in early so that they could be alone together. Finally, Rogers once stood in the doorway of the ladies' restroom as Hockman was washing her hands. Rogers stepped aside, however, when Hockman exited the restroom. On October 11, 2001, Hockman and her coworker, Harvill, told their supervisor, French, that they had been harassed by Rogers. The parties dispute what happened next. Hockman claims that she did not go to French before October of 2001 because she was embarrassed. However, Hockman discussed Rogers's behavior with Harvill and McDonald before approaching French. Both women allegedly told Hockman that they had also been harassed by Rogers. According to Hockman, she and Harvill told French that Rogers had touched them inappropriately, and Hockman told French that Rogers had once tried to kiss her. In response, French asked Hockman how she wanted the situation handled. Hockman claims that she responded that she was not sure what French was supposed to do in this situation, that she was sure there was a formal procedure for handling such complaints, and that French should take action in compliance with that procedure. Hockman claims that French then directed her to a sexual harassment policy which was purportedly for a previous company named Howard and Bluebonnet and was not in effect for Westward during the relevant time period. Hockman claims that to her knowledge, French never acted on her complaint; Hockman reapproached French once or twice, but French again asked Hockman what she was supposed to do

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Apx.-100

Slip Copy
2004 WL 2980351 (5th Cir.(Tex.))
(Cite as: 2004 WL 2980351 (5th Cir.(Tex.)))

Page 5

about the situation.

**\*2** Westward's account of the October 11 and post-October 11 events is completely different. According to Westward, when approached by Hockman on October 11, 2001, French asked her if she wanted to lodge a formal complaint and Hockman said that she did not; she did not want to jeopardize her working relationship with Rogers. French claims that she informed Hockman that Rogers's actions may constitute sexual harassment and that they could get fired if they did not file a formal complaint. Hockman then told French that McDonald would corroborate her allegations, but she nonetheless remained unwilling to file a formal complaint against Rogers. Rather, Hockman told French that she wanted French to talk to McDonald before taking any formal action.

French claims that she immediately investigated Hockman's allegations. First, she contacted six other Westward employees who had worked with Rogers. Each stated that they had neither witnessed nor suffered any harassment at the hands of Rogers.

Next, on approximately October 23, 2001, French met with McDonald, who refused to support Hockman's allegations. McDonald claimed that she had not experienced inappropriate behavior by Rogers, nor was she aware of any other Westward employee towards whom Rogers engaged in sexually inappropriate behavior.

For the next three weeks, French followed up with Hockman weekly, asking Hockman whether she was ready to file a formal complaint against Rogers. According to French, Hockman consistently refused to file a complaint. French thereafter concluded that Hockman's allegations were meritless.

Hockman, however, asserts that she was not hesitant about filing a formal complaint against Rogers after she spoke to French on October 11. Rather, according to Hockman, French had previously told her "never to go above [French's] head." Hockman contends that because of French's directive, Hockman believed that she would be fired if she reported the harassment to anyone else.

Westward claims that in the fall of 2001, the Chief Operating Officer of the *Sun* and the *Enterprise*, J.

Tom Graham, began analyzing ways to manage the papers more efficiently because both papers were doing poorly financially. Because French divided her time among three different Westward papers, Graham decided to create an assistant publisher position to manage the business and editing duties of the *Sun* and the *Enterprise*. With the creation of such a position, Hockman's editor position would become unnecessary.

Graham wanted someone with business experience to be the new assistant editor; Hockman had none. Accordingly, Graham concluded that she was not qualified for the new job. Hockman was consequently set to be discharged upon the creation of the new position. On February 7, 2002, Wilbur Callaway was offered the assistant editor position. Because Callaway had requested that his wife work with him, Westward offered her a position answering telephones and assisting Callaway at the *Edgewood Enterprise*.

**\*3** On February 19, 2002, Graham; Robert McMaster, the Chief Executive Officer of Westward; and Gina Fisher, Westward's Director of Human Resources, received a letter from Hockman's attorney stating that Hockman intended to file a complaint with the Equal Employment Opportunity Commission ("EEOC") asserting claims of sexual harassment and sex discrimination against Westward.

According to Westward, Fisher immediately launched an investigation. On February 20, 2002, Fisher contacted Hockman--who refused to speak with Fisher out of her attorney's presence--and French, who told Fisher that Hockman had not wanted to pursue a formal complaint on October 11, 2001. That same day, Fisher contacted McDonald, who stated that she had not witnessed any harassment by Rogers. Fisher also called Bill Holder, the Regional Vice President of Westward. Fisher asked Holder to be present during a phone conversation between Fisher and Rogers. During that conversation, Fisher informed Rogers of the allegations against him, which he emphatically denied.

The next day, Fisher spoke to Hockman by telephone while Hockman was at her attorney's office. Fisher asked Hockman why she had never

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Apx.-101

Slip Copy
2004 WL 2980351 (5th Cir.(Tex.))
**(Cite as: 2004 WL 2980351 (5th Cir.(Tex.)))**

contacted her after the October 11 meeting with French. Hockman stated that French had told her "never to go above her head."

At that time, Graham, McMaster, and Fisher decided to separate Rogers and Hockman, who were both working at the *Grand Saline Sun.* Westward made Hockman the editor of the *Edgewood Enterprise* . Although, according to Westward, the company had previously decided to discharge Hockman when Callaway's employment began, given the pending harassment claim, Westward now believed that it was better to separate Hockman from Rogers than to terminate her employment. To afford keeping Hockman on as a Westward employee, Westward rescinded its offer of employment to Callaway's wife.

Hockman claims that the *Enterprise* facility was filled with "numerous spiders and webs, hundreds of cricket corpses, dead rats, maggots, old newspapers, thick dust, bodily fluids on the desk and wall and feces and urination," and that she had to clean up this mess in retaliation for her allegations against Rogers. Westward, of course, paints a different picture of the *Enterprise* and Edgewood. Westward claims that as editor of the *Enterprise,* Hockman's pay and benefits did not change; thus, this was a purely lateral transfer. Moreover, Hockman was reimbursed for mileage between Grand Saline (where she lived) and Edgewood (where she worked), even though Hockman's children attended school in Edgewood and she had often made that commute when she worked at the *Sun.* Finally, Hockman had worked at the *Enterprise* during her first stint of employment with Westward.

According to Westward, Fisher was continuing her investigation during this time. On February 28, 2002, she again interviewed both French and Rogers. From March 1st through 4th, she interviewed current and former Westward employees, almost all of whom denied observing or being aware of any sexually inappropriate behavior by Rogers. The only interviewee who told Fisher of any potentially inappropriate behavior by Rogers was Jan Adamson, a former publisher of the *Sun.* Adamson told Fisher that approximately seven or eight years before, Rogers had made "innuendos" at work. However, Adamson also explained that all of

the employees were "raunchy in the office." Adamson had been terminated by Westward, and told Fisher that she hoped "Westward would get theirs" and that she "hated Westward." Because of Adamson's bias and the lack of evidence to support Hockman's allegations, Fisher determined that there was no corroborating evidence of harassment or sexually inappropriate behavior by Rogers.

*4 On March 6, Fisher again contacted McDonald. McDonald again denied experiencing any harassment by Rogers. However, she did tell Fisher about discriminatory remarks Hockman had made about Rogers before she had been transferred to Edgewood. According to McDonald, Hockman had learned that a grand jury had refused to indict Hockman's husband's ex-wife on a trespassing charge. Rogers had served as the foreman of the grand jury which had considered the charge. Outraged by the grand jury's decision to "no-bill" her husband's ex-wife, Hockman allegedly stated that "Rogers's job would be gone by next Friday" and referred to him by the "N word."

On March 13, 2002, Fisher called Rogers and French to tell them that the results of her investigation were inconclusive. Fisher warned Rogers, however, that any sexually inappropriate behavior was prohibited. The following day, Fisher made a conference call to Hockman and French. During this call, Fisher told Hockman that there was no evidence to support her allegations and warned her not to engage in racially inappropriate behavior at work.

Hockman was still working at the *Edgewood Enterprise* when Fisher concluded her investigation. As part of her duties at the *Enterpise,* Hockman was responsible for helping to "paste up" the paper--stories are laid out on sheets to later be printed as part of the newspaper. Paste ups were done on Tuesday of each week at the *Wood County Democrat* facility in Quitman (the Edgewood facility lacked the appropriate equipment). At the beginning of April 2002, Hockman missed three consecutive work days, one of which was a paste up day. Hockman had also missed the paste up day of the previous week. According to Westward, on April 2, 2002, Holder issued Hockman a written warning that her absences were inexcusable. Two days later, on April 4, 2002, Hockman tendered her

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2980351 (5th Cir.(Tex.))
(Cite as: 2004 WL 2980351 (5th Cir.(Tex.)))

resignation to Westward.

Hockman characterizes the "paste up" incident much differently than does Westward. Hockman claims that Rogers's harassment caused her to develop a sleeping disorder which required medication and several absences from work. Because of these absences, Holder issued her a directive "not to be sick on Tuesdays" and ordered her to provide written confirmation from her doctors' offices reflecting the times and dates of any future appointments. Hockman quit on April 4, 2002, claiming that her doctor instructed her to resign from Westward because the harassment was having a negative effect on her health. She claims that she was constructively discharged from Westward.

## II. *Procedural History*

On February 27, 2002, Hockman filed a claim with the EEOC alleging sexual harassment, retaliation, and constructive discharge in violation of Title VII. On July 25, 2002, the EEOC issued Hockman a determination letter finding insufficient evidence of her allegations. On October 23, 2002, Hockman filed suit against Rogers and Westward alleging sexual harassment, retaliation, constructive discharge, and sex discrimination against Westward and various state law claims against Rogers. On September 18, 2003, the district court granted Westward's motion for summary judgment on all federal claims against Westward, and declined to exercise supplemental jurisdiction over Hockman's state law claims against Rogers. [FN1]

*5 Hockman appealed, claiming that the district court erred in granting Westward's motion for summary judgment as to her hostile work environment, retaliation, and constructive discharge claims. We will consider each claim in turn.

## III. *Summary Judgment Standard*

[1] We review a district court's grant of summary judgment de novo, applying the same standard as the district court. *Shepherd v. Comptroller of Pub. Accounts,* 168 F.3d 871, 873 (5th Cir.1999). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the nonmoving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). We review the record in the light most favorable to the nonmovant and draw all reasonable inferences in her favor. *Fabela v. Socorro Indep. Sch. Dist.,* 329 F.3d 409, 414 (5th Cir.2003).

## IV. *Discussion*

### A. *Hostile Work Environment*

[2] Hockman first claims that she was subjected to a hostile work environment in violation of Title VII. A hostile-work-environment claim consists of five elements: (1) the plaintiff belongs to a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the harassment affected a term, condition, or privilege of her employment; and (5) her employer knew or should have known of the harassment and failed to take prompt remedial action. *Jones v. Flagship Int'l,* 793 F.2d 714, 719-20 (5th Cir.1986). Only elements four and five are in dispute.

### 1. *Whether the Harassment Affected a Term, Condition, or Privilege of Employment*

[3][4] For harassment to affect a term, condition, or privilege of employment, it must be both objectively and subjectively abusive. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Butler v. Ysleta Indep. Sch. Dist.,* 161 F.3d 263, 269 (5th Cir.1998). Whether an environment is objectively hostile or abusive is determined by considering the totality of the circumstances. *Harris,* 510 U.S. at 23. Although no single factor is required, courts look to (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating as opposed to a mere offensive utterance; (4) whether it unreasonably interferes with an employee's work performance, *id.* at 23; and (5) whether the complained-of conduct undermines the plaintiff's workplace competence, *Butler,* 161 F.3d at 270. Because Rogers's harassment was nonsevere and nonpervasive, the district court properly granted Westward's motion for summary judgment on Hockman's hostile work environment

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2980351 (5th Cir.(Tex.))
**(Cite as: 2004 WL 2980351 (5th Cir.(Tex.)))**

claim.

[5] To survive summary judgment, the harassment must be "so severe and pervasive that it destroys a protected classmember's opportunity to succeed in the work place." *Shepherd,* 168 F.3d at 874. The alleged conduct must be more than rude or offensive comments, teasing, or isolated incidents. *Id.* Moreover, "implicit or explicit in the sexual content [of the harassment] [must be] the message that the plaintiff is incompetent because of her sex." *Butler,* 161 F.3d at 270. Hockman has not put forth enough evidence to raise a fact issue with regard to this element.

*6 First, the record is unclear as to how, exactly, Rogers touched Hockman inappropriately. Hockman testified that the first incident of harassment that she remembers occurred when Rogers "would sort of brush up against [her]." Hockman admits, though, that these brushings were neither severe nor pervasive. In fact, at first she thought they were accidental, stating that "just as quickly as it started, with a couple of exceptions--just as quickly as it started, it ended .... And once it was over, it was over."

Second, we have found judgment as a matter of law appropriate in cases with facts more egregious than those that Hockman alleges here. In *Shepherd v. Comptroller of Public Accounts,* for example, Shepherd testified that her coworker, Moore, told her, "your elbows are the same color as your nipples," and "you have big thighs" while he simulated looking under her dress. 168 F.3d at 872. Moore stood over Shepherd's desk on several occasions and tried to look down her clothing. *Id.* He also "touched her arm on several occasions, rubbing one of his hands from her shoulder down to her wrist while standing beside her." *Id.* Finally, on two occasions, after coming in late to an office meeting, "Moore patted his lap and remarked, 'here's your seat.' " *Id.*

In *Shepherd,* we held that Moore's comments were not as frequent or severe as those we had previously found to alter the workplace environment. *Id.* at 874-75. To illustrate how frequent harassment must be to sustain a hostile work environment claim under Title VII, we contrasted the facts of *Shepherd* with two other Fifth Circuit cases in which the

harassment was severe enough for the plaintiffs to withstand the defendants' motions for judgment as a matter of law. *Id.* at 875.

In *Farpella-Crosby v. Horizon Health Care,* the defendant's comments were considered frequent and severe enough to sustain a jury verdict for the plaintiff. 97 F.3d 803, 805 (5th Cir.1996). In that case, Defendant Blanco frequently made comments "attributing Farpella-Crosby's large number of children to a proclivity to engage in sexual activity." *Id.* Specifically, Farpella-Crosby complained of the following behavior by Blanco:

Blanco repeatedly commented that he "knew what she liked to do" because she had seven children and that she "must not have a television." At a baby shower held at the facility for another employee, Blanco joked to the group that Farpella-Crosby "[didn't] know how to use condoms." Blanco also frequently inquired about Farpella-Crosby's sexual activity. He would often question her ... about where [she] had been the night before (while off duty), whether [she] had taken men home, and whether [she] "[had gotten] any." Farpella-Crosby ... testified that Blanco made similar comments two or three times a week. [She] testified that the comments were so frequent that she could not possibly remember each instance. Blanco threatened Farpella-Crosby with her job on numerous occassions when she asked him to stop making these comments.

*7 On one occasion, after Farpella-Crosby had eaten lunch in her office with a boyfriend, Blanco said that "when you open the door [to the office], the smell of fish just hits you in the face. You shouldn't be doing that kind of think at work." ... Blanco essentially admitted that he did question Farpella-Crosby about her personal life, but claimed that he did so because he believed the lack of sleep resulting from sexual activity could affect her work performance.

*Id.* (last set of brackets in original). On these facts, we held that "there is substantial evidence from which the jury could have concluded that Blanco's comments and questions were sufficiently severe and pervasive as to alter the conditions of [Farpella-Crosby's] employment and create an abusive working environment." *Id.* at 806.

The harassment alleged by the plaintiff in *Waltman v. International Paper Company,* 875 F.2d 468 (5th

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2980351 (5th Cir.(Tex.))
**(Cite as: 2004 WL 2980351 (5th Cir.(Tex.)))**

Page 9

Cir.1989), was worse. There, we reversed summary judgment for the defendant on the following facts: One of the defendant's employees several times broadcast obscenities directed at Waltman over the public address system. *Id.* at 470. After that incident, "other employees began making suggestive comments to Waltman." *Id.* at 470-71. Waltman's supervisor urged her to have sex with a coworker. *Id.* at 71. On several occasions, he also "pinched her buttocks with pliers and tried to put his hands in her back pockets." *Id.* Her supervisor and coworkers constantly made such remarks as "I would like a piece of that" (referring to Waltman). *Id.*

Over the course of about three years, Waltman received over thirty pornographic notes in her locker. *Id.* "Sexually explicit pictures and graffiti were drawn on the walls of the powerhouse, on the restroom walls and on the elevator." *Id.* Some of these drawings were directed at Waltman. [FN2] Waltman also testified that many of the men would leave their lockers open and that the lockers contained pornographic pictures and used tampons. *Id.* at 471 & n. 1. Waltman's supervisor testifed that the walls of the work space contained drawings of naked men and women. *Id.* at 471.

On one occasion, one employee told another that "Waltman was a whore and that she would get hurt if she did not keep her mouth shut ." *Id.* On another occasion, Waltman's coworker told her that he "would cut off her breast and shove it down her throat." *Id.* That same coworker later "dangled Waltman over a stairwell, more than thirty feet from the floor." *Id.* On other occasions, Waltman's coworkers grabbed her breasts and thighs. *Id.*

Waltman testified that eighty percent of the men in her work place had made sexual comments to her at some point, and a week did not go by without such comments being made. *Id.* On these facts, we held that Waltman had raised a fact issue regarding the existence of a hostile work environment at her work place. *Id.* at 478.

*8 The Supreme Court has repeatedly stated that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' " *Faragher v. City of*

*Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citation omitted)(citing *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) ). Therefore, contrasting the facts in *Shepherd* to those in *Farpella-Crosby* and *Waltman,* we held that Moore's comments were "boorish and offensive," but not severe. 168 F.3d at 874. Rather, "each comment made by Moore [was] the equivalent of a mere utterance of an epithet that engenders offensive feelings," but did not suffice to survive summary judgment. *Id.* (citing *Harris,* 510 U.S. at 21-22). In short, Moore's comments were not in the same league as that behavior for which courts afford relief under Title VII. *Id.* at 874-75.

[6] Here, Hockman claims that in the approximate year and a half that she worked for Westward, Rogers harassed her in the following ways: (1) he once made a remark to Hockman about another employee's body, (2) he once slapped her on the behind with a newspaper, (3) he "grabbed or brushed" against Hockman's breasts and behind, (4) he once held her cheeks and tried to kiss her, (5) he asked Hockman to come to the office early so that they could be alone, and (6) he once stood in the door of the bathroom while she was washing her hands. This conduct is perhaps even less egregious than that alleged in *Shepherd.* Cf. *Shepherd,* 168 F.3d at 872 (describing the harassment which included Moore remarking that "[Shepherd's] elbows [were] the same color as [her] nipples," commenting on the size of Shepherd's thighs while pretending to look under her desk, and attempting to look down Shepherd's clothing). At best, Hockman's allegations are on the same plane as those in *Shepherd.* Shepherd's allegations were insufficient in that case, and Hockman's are insufficient here.

Rogers's remarks to Hockman about Ledesma's body and requests to be alone with Hockman are offhand comments which are boorish and offensive, but not severe. Similarly, the newspaper slap amounts to "simple teasing," which "will not amount to discriminatory changes in the 'terms and conditions of employment.' " *Faragher,* 524 U.S. at 788. The attempted kiss and bathroom incident were isolated incidents which were not serious. *See id.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2980351 (5th Cir.(Tex.))
(Cite as: 2004 WL 2980351 (5th Cir.(Tex.)))

Page 10

The "grabbings" or "brushings" against Hockman's breasts or behind, by her own account, were also not severe. Hockman did not even estimate how many times this conduct occurred. [FN3] Cf. Waltman, 875 F.2d at 471 ("Waltman estimated that eighty percent of the men [at work] made sexually suggestive comments to her," and "testified that a week did not go by without a co-worker directing a sexual comment at her."); Farpella-Crosby, 97 F.3d at 805 (describing conduct directed at the plaintiff "two or three times a week," "repeatedly," "often," and on "numerous occasions").

**\*9** The conduct described by Hockman is simply not in the same league as that at issue in the Farpella-Crosby and Waltman cases. It is similar to that alleged in Shepherd, and we affirmed summary judgment for the defendant in that case. 168 F.3d at 872. As a matter of law, the conduct described by Hockman was not so severe and pervasive as to affect the terms, conditions, or privileges of her employment. The district court properly granted summary judgment for Westward on Hockman's hostile work environment claim.

2. *Whether Westward Failed to Take Prompt Remedial Action*

Even if Rogers's conduct did affect a term, condition, or privilege of Hockman's employment, she still cannot succeed on her hostile work environment claim. There must be evidence that Westward failed to take prompt remedial action upon learning of the alleged harassment. Jones, 793 F.2d at 719-20. To the contrary, Westward took prompt remedial action as a matter of law, because Hockman unreasonably failed to take advantage of corrective opportunities provided by Westward.

[7][8] "When a company, once informed of allegations of sexual harassment, takes prompt remedial action to protect the claimant, the company may avoid Title VII liability." Nash v. Electrospace Sys., Inc., 9 F.3d 401, 402 (5th Cir.1993). " 'Prompt remedial action' must be 'reasonably calculated' to end the harassment." Skidmore v. Precision Printing and Packaging, Inc., 188 F.3d 606, 615 (5th Cir.1999) (quoting Jones, 793 F.2d at 719-20). What constitutes prompt remedial action depends on the facts of the case; "not every response by an employer will be

sufficient to discharge its legal duty." Id. at 615 (quoting Waltman, 875 F.2d at 479). "Rather, the employer may be liable despite having taken remedial steps if the plaintiff can establish that the employer's response was not 'reasonably calculated' to halt the harassment." Id. at 615-16.

[9] We have often found that an employer took prompt remedial action as a matter of law. Id. at 616 (citing Hirras v. Nat'l R.R. Passenger Corp., 95 F.3d 396, 400 (5th Cir.1996) (listing Waymire v. Harris County, 86 F.3d 424, 428 (5th Cir.1996); Carmon v. Lubrizol Corp., 17 F.3d 791, 794-95 (5th Cir.1994); Dornhecker v. Malibu Grand Prix Corp., 828 F.2d 307, 309-10 (5th Cir.1987)). One factor we have found dispositive is whether the plaintiff reasonably took advantage of corrective opportunities provided by the employer. See Woods v. Delta Beverage Group, Inc., 274 F.3d 295, 300 n. 3 (5th Cir.2001). The district court granted summary judgment on the failure-to-take-prompt-remedial-measures factor for this very reason; Hockman unreasonably failed to bring her complaint to a higher-echelon employee (Fisher) though she was dissatisfied with the way French handled the situation. Hockman's claims that she was told "not to go above French's head," and that French directed her to an outdated harassment policy for another company, even if true, do not overcome the undisputed facts that: (1) Hockman received the Westward employee handbook containing the company's antiharassment policy; (2)the policy provides that if the employee does not feel that her allegation is being handled satisfactorily by his or her supervisor, then she should report the incident directly to the Director of Human Resources; (3) she acknowledged her receipt of the handbook and understanding of its provisions with her signature; and (4) despite her awareness, there is no evidence that Hockman availed herself of any of the company's provisions after speaking to French, several months after the alleged harassment began. The district court held that whether Hockman subjectively felt that she could not "go over French's head" is immaterial to the fact that the policy she acknowledged directed her to do just that. This analysis is in accord with Woods v. Delta Beverage Group, where we applied an objective standard. 274 F.3d at 301 ("A reasonable woman would have felt compelled to report Eddy's alleged post-July 7 harassment to her

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

supervisors. Therefore, [summary judgment was appropriate.]"). We therefore affirm summary judgment for Westward on Hockman's sexual harassment claim; Hockman cannot prove that Westward failed to take prompt remedial action where she unreasonably failed to take advantage of corrective opportunities provided by Westward.

B. *Retaliation*

**\*10** **[10]** Hockman next claims that Westward retaliated against her for filing her EEOC complaint. Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U .S.C. § 2000e-3(a). We analyze retaliation claims under the *McDonnell Douglas* burden-shifting framework. *See Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 167 (5th Cir.1999) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 80205, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

**[11]** To make out a prima facie case of retaliation, Hockman must provide evidence of three things: (1) she engaged in protected conduct, (2) she was thereafter subjected to an adverse employment action, and (3) the adverse employment action was taken in response to her protected conduct. *Chaney,* 179 F.3d at 167. If Hockman succeeds, the burden then shifts to Westward to articulate a legitimate, nonretaliatory reason for the adverse employment action. *Id.* If Westward carries this burden, then Hockman must present evidence showing that Westward's proffered rationale was pretextual, and that engaging in the protected activity was the but-for cause of the adverse employment action. [FN4] *Id.*

**[12]** The filing of an EEOC complaint is clearly a protected activity within the meaning of the statute. *Walker v. Thompson,* 214 F.3d 615, 629 (5th Cir.2000) (citing *Dollis v. Rubin,* 77 F.3d 777, 781 (5th Cir.1995)). Hockman has therefore satisfied the first element of her prima facie case.

**[13]** Next, Hockman must present evidence showing that Westward subjected her to an adverse

employment action. In determining whether a defendant's action constitutes an adverse employment action, "we are concerned solely with ultimate employment decisions ." *Id.* (citing *Webb,* 139 F.3d at 540). "[U]ltimate employment decisions include acts 'such as hiring, granting leave, discharging, promoting, and compensating.' " *Id.* (quoting *Dollis,* 77 F.3d at 782); *Green v. Adm'rs of the Tulane Educ. Fund,* 284 F.3d 642, 657 (5th Cir.2002). We have previously found that the following actions on the part of employers did not constitute ultimate employment decisions: refusing to consider the plaintiff for a promotion, refusing to allow her to attend a training conference, and criticizing her work to government vendors, *Dollis,* 77 F.3d at 779-80; the verbal threat of being fired, reprimanding the plaintiff for not being at her assigned work station, a missed pay increase, and being placed on "final warning," *Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 708 (5th Cir.1997); changing locks, restructuring office procedures, and clarifying job duties, *Green,* 284 F.3d at 657-58; and a visit to the plaintiff's home by two of her supervisors, one of whom was included in the EEOC charge, to instruct her to report to the company's medical center if her claimed illness was work related, *Mattern,* 104 F.3d at 705. By contrast, we have found the denial of paid or unpaid leave to constitute an ultimate employment decision, *Mota v. Univ. of Tex. Houston Health Sci. Ctr.,* 261 F.3d 512, 521-22 (5th Cir.2001), and have suggested that an unwanted reassignment may also constitute an ultimate employment decision, *Walker,* 214 F.3d at 629.

**\*11** **[14]** In this case, Hockman claims that Westward retaliated against her in the following ways: (1) transferring her to the *Edgewood Enterprise,* (2) placing her under the supervision of Wilbur Callaway, (3) treating her with hostility, (4) instituting a "baseless" racial harassment investigation against her, (5) issuing her a directive "not to be sick on Tuesdays," and (6) requiring detailed documentation of any future doctors' appointments. In light of the precedent discussed above, the only allegation made by Hockman which might conceivably be classified as an adverse employment action is her transfer to the *Edgewood Enterprise.* The other actions are not ultimate employment decisions and therefore do not qualify as adverse employment actions.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2980351 (5th Cir.(Tex.))
(Cite as: 2004 WL 2980351 (5th Cir.(Tex.)))

Page 12

[15] Hockman's transfer to the *Edgewood Enterprise* likewise fails to constitute an adverse employment action, however, because it was a purely lateral move. A purely lateral transfer cannot constitute an adverse employment action. *Burger v. Central Apt. Mgmt., Inc.*, 168 F.3d 875, 879 (5th Cir.1999). We have previously held a transfer to be purely lateral where the new position had "the same job title, benefits, duties, and responsibilities" as the old position. *Id.* As the editor of the *Edgewood Enterprise*, Hockman retained the same pay, duties, and benefits; was reimbursed for her mileage from Grand Saline to Edgewood; and although the Edgewood facility was temporarily filthy, any filth was cleaned up within a week or two of Hockman's arrival. Therefore, this was a purely lateral transfer, and Hockman has failed to make out a prima facie case of retaliation. Accordingly, the district court properly granted Westward's motion for summary judgment.

C. *Constructive Discharge*

[16][17] Finally, Hockman claims that she was constructively discharged from Westward. To survive summary judgment on a constructive discharge claim, the plaintiff must provide evidence that working conditions were "so intolerable that a reasonable employee in her position would [have felt] compelled to resign." *Webb v. Cardiothoracic Surgery Assoc. of N. Tex.*, 139 F.3d 532, 539 (5th Cir.1998). Mere harassment, alone, is insufficient; rather, the plaintiff must show "aggravating factors" to justify departure. *See Barrow v. New Orleans Steamship Ass'n*, 10 F.3d 292, 297 (5th Cir.1994). Such factors include: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir.2000). Ultimately, to succeed on a constructive discharge claim, the plaintiff must show a greater degree of harassment than is required for a hostile work environment claim. *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir.1998).

*12 [18] Hockman's constructive discharge claim fails for three reasons. First, Hockman reiterates the same facts that she alleges constituted harassment by Rogers and retaliation by Westward; she does not allege facts which provide the aggravation required to support a claim of constructive discharge. Second, Hockman alleges that Harvill overheard Callaway say that he would get a bonus from Westward if "he ran Harvill off." Hockman claims that it is reasonable to assume this deal applied to her as well. Yet Hockman cannot rely on such speculation to survive summary judgment. In *Forsyth v. Barr*, we made clear that summary judgment is appropriate where the nonmoving party "rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." 19 F.3d 1527, 1533 (5th Cir.1994). That is what Hockman has done here.

[19] Finally, Westward's prompt remedial measures are fatal to Hockman's constructive discharge claim. In *Dornhecker v. Malibu Grand Prix Corporation*, the plaintiff resigned one day after reporting the harassment to her company's president. 828 F.2d 307, 308-09 (5th Cir.1987). Her employer, however, had assured the plaintiff that she would never have to work with her harasser again. *Id.* at 308. We reversed a judgment for the plaintiff because her resignation had been unreasonable. *Id.* at 310. In doing so, we stated that the plaintiff had not given her employer a fair opportunity to remedy the situation. *Id.*

Here, upon learning of Hockman's complaint, Westward immediately transferred her to Edgewood, separating her from Rogers. Hockman does not allege that she was sexually harassed after being transferred. Westward's prompt remedial action therefore precludes Hockman's constructive discharge claim. The district court properly granted Westward's motion for summary judgment.

V. *Conclusion*

For the foregoing reasons, we AFFIRM the judgment of the district court as to all claims.

AFFIRMED.

> FN* District Judge for the Western District of Louisiana, sitting by designation.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 13

FN** Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

FN1. The district court dismissed Hockman's state law claims against Rogers without prejudice.

FN2. For an explicit description of the graffiti, see *Waltman,* 875 F.2d at 471 n. 2.

FN3. During Hockman's deposition, defense counsel asked her how many times the "grabbings" or "brushings" had occurred, and Hockman responded: "[A]ll I can say is, I know that I would remember specific incidents if it was just two or three or six maybe. But I don't." Defense counsel followed up on the question, asking Hockman if she could at least estimate how many times Rogers touched her, to which Hockman responded, "I--I just--I don't know. I can't give you anything."

FN4. Hockman has not alleged that Westward acted with mixed motives. *Cf. Fabela v. Socorro Indep. Sch. Dist.,* 329 F.3d 409, 414-15 (2003) (explaining the difference between pretext and mixed-motive retaliation claims).

**Briefs and Other Related Documents (Back to top)**

. 03-41620  (Docket)

(Nov. 25, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Apx.-109



2005 WL 237351                                                                     Page 1
--- F.3d ----, 2005 WL 237351 (5th Cir.(Tex.)), 95 Fair Empl.Prac.Cas. (BNA) 129
**(Cite as: 2005 WL 237351 (5th Cir.(Tex.)))**

**H**

**Briefs and Other Related Documents**

United States Court of Appeals,
Fifth Circuit.
Susan SEPTIMUS,
Plaintiff-Appellee-Cross-Appellant,
v.
The UNIVERSITY OF HOUSTON; The University
of Houston System, Defendants-
Appellants-Cross-Appellees.
**No. 03-20992.**

Feb. 2, 2005.

**Background:** Female employee brought action
against state university alleging gender
discrimination, hostile work environment, and
retaliation. The university moved for summary
judgment. The United States District Court for the
Southern District of Texas, Vanessa D. Gilmore, J.,
granted partial summary judgment for university.
Following jury award for employee on remaining
claims, the employee and university cross-appealed.

**Holdings:** The Court of Appeals, Kinkeade,
District Judge, sitting by designation, held that:
(1) District Court's plain error in instructing jury
on causation standard for retaliation claims required
reversal;
(2) university's proffered reason for hiring male
candidate for business counsel position was not
pretext for gender discrimination;
(3) employee's speculation that supervisor denied
her an interim promotion because she had filed
discrimination complaints did not establish
retaliation claim; and
(4) supervisor's conduct was not sufficiently severe
or pervasive enough to make employee's working
environment objectively hostile or abusive.
Affirmed in part, and reversed and remanded in
part.

**[1] Federal Courts** ☞611

170Bk611 Most Cited Cases
Court of Appeal's consideration of issue raised for
first time on appeal is limited to plain error review.

**[2] Federal Courts** ☞611
170Bk611 Most Cited Cases
For an appellant to prevail under the plain error
standard of review, it must show that: (1) an error
occurred; (2) the error was plain, which means clear
or obvious; (3) the plain error must affect
substantial rights; and (4) not correcting the error
would seriously impact the fairness, integrity, or
public reputation of judicial proceedings.

**[3] Federal Courts** ☞611
170Bk611 Most Cited Cases
The plain error exception for review of alleged
error to which appellant did not object at trial is
designed to prevent a miscarriage of justice where
the error is clear under current law.

**[4] Federal Civil Procedure** ☞2182.1
170Ak2182.1 Most Cited Cases
In determining whether a particular jury instruction
was erroneous, Court of Appeals considers the jury
charge as a whole; an inadequate instruction merits
reversal when the charge as a whole leaves court
with the substantial and ineradicable doubt whether
the jury has been properly guided in its
deliberations.

**[4] Federal Courts** ☞908.1
170Bk908.1 Most Cited Cases
In determining whether a particular jury instruction
was erroneous, Court of Appeals considers the jury
charge as a whole; an inadequate instruction merits
reversal when the charge as a whole leaves court
with the substantial and ineradicable doubt whether
the jury has been properly guided in its
deliberations.

**[5] Civil Rights** ☞1541
78k1541 Most Cited Cases
Under the pretext framework for a Title VII
retaliation claim, after the employee demonstrates a
*prima facie* case of retaliation and the employer

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Apx.-110

carries its burden by stating a legitimate, non-retaliatory reason for the employment action, employee's permissible reason is actually a pretext for retaliation. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[6] Civil Rights 1541**
78k1541 Most Cited Cases
The *McDonnell Douglas* evidentiary framework applies to Title VII retaliation claims brought under a pretext theory; employee's ultimate burden is to prove that the employer's stated reason for the adverse action was merely a pretext for the real, retaliatory purpose. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[7] Civil Rights 1252**
78k1252 Most Cited Cases
Proper standard of proof on the causation element of a Title VII retaliation claim is that the adverse employment action taken against the employee would not have occurred "but for" her protected conduct. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[8] Civil Rights 1556**
78k1556 Most Cited Cases
District court's plain error in instructing jury in Title VII retaliation case brought under the pretext theory, that female state university employee's claims of retaliation relating to her transfer and alleged constructive discharge were subject to a "motivating factor" causation standard, rather than a "but for" causation standard, required reversal; employee was held to a lower standard in proving causation element of her retaliation claim, and the employer's substantial rights were prejudiced as a result, since the outcome of the case might have been affected. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[8] Colleges and Universities 8.1(3)**
81k8.1(3) Most Cited Cases
District court's plain error in instructing jury in Title VII retaliation case brought under the pretext theory, that female state university employee's claims of retaliation relating to her transfer and alleged constructive discharge were subject to a "motivating factor" causation standard, rather than a "but for" causation standard, required reversal; non-retaliatory reason for the employment action, employee was held to a lower standard in proving the burden falls to the employee to establish that the causation element of her retaliation claim, and the employer's substantial rights were prejudiced as a for retaliation. Civil Rights Act of 1964, § 701 et result, since the outcome of the case might have been affected. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[8] Federal Courts 909**
170Bk909 Most Cited Cases
District court's plain error in instructing jury in Title VII retaliation case brought under the pretext theory, that female state university employee's alleged constructive discharge were subject to a "motivating factor" causation standard, rather than a "but for" causation standard, required reversal; employee was held to a lower standard in proving causation element of her retaliation claim, and employer's substantial rights were prejudiced as a result, since the outcome of the case might have been affected. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[9] Federal Courts 766**
170Bk766 Most Cited Cases

**[9] Federal Courts 776**
170Bk776 Most Cited Cases
District court's grant of summary judgment is reviewed *de novo*, applying the same standard as the district court. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[10] Civil Rights 1536**
78k1536 Most Cited Cases
Employee bringing discrimination claim under Title VII must first establish a *prima facie* case of discrimination, and if she successfully does so, the employer shall respond by setting forth its legitimate, non-discriminatory reason for its adverse employment decision. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[11] Federal Civil Procedure <IMG BORDER=0 WIDTH=22 HEI**